MICHAEL B. KUSHNER (State Bar No. 196224)
SUREN N. WEERASURIYA (278521)
PAUL H. DEESE (State Bar No. 301328)
Kushner Carlson
A Professional Law Corporation
85 Enterprise, Suite 310
Aliso Viejo, CA 92656
Telephone: (949) 421-3030
Telecopier: (949) 421-3031
Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| JUSTIN REZVANI, individually, and derivatively on behalf of REACH LABS, INC. dba THEAMPLIFY, a Delaware Corporation,<br><br>Plaintiff,<br><br>vs.<br><br>DAVID JONES, an individual; YOU & MR. JONES, INC., a Delaware corporation; REACH LABS, INC. dba THEAMPLIFY, a Delaware Corporation, and DOES 1 to 50, Inclusive,<br><br>Defendants. | Case No.<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## THE PARTIES

**1.** Plaintiff the Reach Labs dba theAmplify ("theAmplify") is a California Corporation. It is an influencer marketing platform which creates large-scale native advertising campaigns for brands. After its founding in 2013, theAmplify exploded to a daily reach of more than 500 million people by the end of 2015.

**2.** Plaintiff Justin Rezvani is a natural person residing in Los Angeles County, California. He owns 45.85% of theAmplify.

**3.** David Jones is a natural person and the owner of Defendant You & Mr. Jones, Inc. ("YoJo").

**4.** YoJo is a Delaware Corporation. It owns 51% of theAmplify and is a brand technology company that Jones founded in 2015. YoJo's headquarters are in New York.

**5.** Defendant Jean-Marco Antoni is YoJo's Chief Financial Officer.

**6.** Rezvani owns 45.85% of theAmplify, and YoJo owns 51% of the theAmplify.

**7.** Jones, Antoni, and Rezvani comprise theAmplify's Board of Directors ("the Boards").

## JURISDICTION AND VENUE

**8.** The Court has subject matter jurisdiction over Plaintiffs' Fourteenth Cause of Action for Jones and YoJo's violations of 18 U.S.C. §1964(the "RICO Claim"), under 18 U.S.C. §1331 and 18 U.S.C. §1965(a) because it arises under federal law. And the Court has supplemental jurisdiction over Plaintiffs' other claims because they arise from the same controversy and transactions as the RICO Claim.

**9.** The Court has personal jurisdiction over Defendants because they have each purposefully available themselves of the laws of California.

/ / /

/ / /

**10.** Venue is proper in the United State District Court for the Central District of California because it is the judicial district in which a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred.

**FUTILITY OF DEMAND**

**11.** Plaintiffs were not (and are not) obligated to make a demand upon Defendants because doing so would have been (and is) futile. Defendants have engaged in substantial wrongful conduct, self-dealing, and breaches of fiduciary duty such that Defendants have exposed themselves (and, unfortunately, theAmplify) to absolute liability to Plaintiffs, and other shareholders of theAmplify.

**12.** Because Defendants will not admit to taking such wrongful actions, and because Defendants have repeatedly tried to justify their wrongful conduct, Defendants have effectively deprived theAmplify of the internal controls and systems for LLC management compliance necessary to help detect, deter, and prevent the improper wrongful conduct at issue in this Action. Consequently, Defendants face a substantial risk of liability for breach of the duties of care, good faith, and loyalty, and are unable to evaluate a pre-suit demand fairly and objectively. Thus, a demand on Defendants is futile, and that obligation is excused.

**BACKGROUND ALLEGATIONS**

**theAmplify's Founding and Immediate Success**

**13.** In 2013, Rezvani founded theAmplify, a leading technology and data-driven influencer marketing service for social media companies such as Instagram, Snapchat, Facebook, and Twitter. Rezvani developed a proprietary algorithm owned by theAmplify called SharedRank™, which measures and discovers audiences on social media. Because of theAmplify's success, Rezvani obtained the Forbes 30 under 30 distinction in 2017.

**14.** In late 2015, Rezvani met Jones, who promised him even wilder success if Rezvani would grant YoJo 51% of the shares and majority control of theAmplify. Jones

promised Rezvani revenues of $100,000,000.00 annually for theAmplify and profits of more than $30,000,000.00 for Rezvani.

**Jones Represents to Rezvani That He Can Grow theAmplify And Increase Its Value and Profits**

**15.** On or about August 6, 2015, Rezvani had an initial telephone call with Jones. In that conversation, Jones told Rezvani that he was building YoJo into a large company that blended marketing and technology. In turn, Rezvani shared his vision for theAmplify. At the time, Rezvani owned over 98% of theAmplify and had projected to earn approximately $5 million in revenue and $1.2 million in profit for 2015.

**16.** On or about September 22, 2015, Rezvani and Jones had their first in-person meet at theAmplify's office in Culver City. During that meeting, Rezvani presented Jones with the details of the platform. Jones told Rezvani that he could help grow theAmplify's revenues to $100 million annually. Also, Jones told Rezvani that he would bring expertise to theAmplify centering around sales introductions and improvements in marketing, public relations, operations, and finance. Rezvani was impressed by — and thus relied on — Jones' representation about the projected the $100 million in annual revenue and his promise of bringing significant improvements in marketing, public relations, operations, and finance to theAmplify.

**17.** At the September 22, 2015, meeting, Jones also told Rezvani about a new unit at YoJo called "Blood," which would be run by George Prest and Drew Burdon, highly experienced advertising professionals. He claimed that Blood was a hub at YoJo bringing brands into the YoJo family to introduce to, and work with, YoJo-affiliated businesses. Jones' representation was particularly attractive to Rezvani because he was eager to partner with an individual or entity that could help generate significant additional client leads and make client introductions.

**18.** On or about October 6, 2015, Rezvani attended a meeting of advertising executives at Jones' invitation. After the meeting, Jones met with Rezvani and told him

that Jones would be able to get Rezvani into similar conferences and help introduce Rezvani to dozens of brands overnight.

**19.** In late October of 2015, negotiations began for YoJo's purchase of a controlling interest in theAmplify from Rezvani. Rezvani sent Jones a business valuation document which valued theAmplify at $42 million. In response, Jones told Rezvani repeatedly that he believed theAmplify was worth $30 million.

**20.** On or about October 28, 2015, Jones and Rezvani had a telephone conversation in which they discussed a deal structure for YoJo's purchase of 51% of theAmplify. Under the proposed deal structure, YoJo would pay Rezvani some money upfront, and pay the rest as "earnout payments" from 2016 to 2018 — based on theAmplify's financial results in 2016, 2017, and 2018. Jones assured Rezvani that it would be no problem for Rezvani to meet his maximum potential earnouts in 2016, 2017, and 2018 with support from Jones and YoJo. Jones continued to reiterate that he had deep relationships with the world's largest brands and could provide Rezvani with significant help in growing theAmplify. In fact, Jones told Rezvani that he would give theAmplify considerable support to ensure that Rezvani would earn significantly more than the $5,610,000 down payment. Jones specifically told Rezvani:

> Finally, as I said, I have no doubt you can get potentially more money for your company in the short-term, [but] our model is one of long-term partnership where if we deliver what I think we are capable of together (and with points 2.4 and 3) you can earn dramatically more than $30,000,000.

**21.** Rezvani also proposed seeking a partner to raise more capital for theAmplify at the $30 million valuation. In response, Jones informed Rezvani that he would not receive the type of support that Jones was willing to offer Rezvani if Rezvani decided to seek another partner to raise capital. Jones told Rezvani that he would only provide substantial support to companies that YoJo majority-owned. Jones also told

Rezvani that YoJo's minority-owned companies did not include the type of high-level support that majority-owned businesses received.

**22.** On or about November 11, 2015, Rezvani, Antoni, and Andre Pinto, a Mergers and Acquisitions Specialist for YoJo, met and agreed on a $30 million valuation for theAmplify along with some general terms. The sale of Rezvani's 51% equity interest in theAmplify valued at $15,300,000 based on the $30 million valuation.

**23.** The purchase was structured so that Rezvani would receive a down payment of $7,650,000 and earn-out payments of up to $7,650,000 based on theAmplify's profits for 2016, 2017 and 2018. That day, Antoni sent an email to Rezvani including these deal terms and stating, "[w]e are very excited and proud to become a partner of TheAmplify and yourself and to be able to contribute to the success of our common venture."

**24.** Later that evening, Rezvani met with Jones. Jones told Rezvani that he would help Rezvani grow theAmplify to a tremendous level and help him with all aspects of theAmplify's business.

**<u>The Parties Negotiate for Rezvani To Sell Some Shares In theAmplify To YoJo</u>**

**25.** On or about December 16, 2015, Rezvani signed a letter of intent to sell a 51% equity interest in theAmplify to YoJo.

**26.** On January 22, 2016, Rezvani met with Jones in New York City to discuss the sale. Jones reiterated his promises that he would be helping Rezvani in critical areas of the business and introducing him to brand representatives; and providing internal operational support for theAmplify. He also reiterated that YoJo's Blood systems would be a cornerstone for generating significant additional client leads and making client introductions. Jones' representation about the Blood system was essential to Rezvani.

**27.** By early April of 2016, the due diligence process was almost completed. Rezvani had developed sales projections for theAmplify based on Jones' promises to

Rezvani about the support systems that he and YoJo would be able to provide theAmplify.

**28.** On April 8, 2016, Jones called Rezvani and told him that once he was part of theAmplify, Jones would open up every single one of his relationships with the world's largest brands, including Reckitt Benckiser Group and PepsiCo, and as a result, generate a tremendous amount of business theAmplify.

**29.** Before selling a 51% interest in theAmplify — and as a condition precedent to it — Rezvani told Jones that he wanted to keep control of theAmplify's material business decisions and day-to-day operations. To induce Rezvani to sell a 51% interest in theAmplify, Jones repeatedly promised Rezvani that Rezvani would continue to have control over the theAmplify's material business decisions.

**30.** Jones drafted an Employment Agreement for Rezvani's continued employment as theAmplify's CEO, a Shareholder Agreement, and a Stock Purchase Agreement reflecting the sale of 51% of theAmplify from Rezvani to Jones.

**<u>Rezvani Sells His Majority Shares to YoJo Relying on Jones' Representations About theAmplify's Anticipated Future Success</u>**

**31.** On or about April 25, 2016 — relying on Jones' promises and representations about theAmplify's future success — Rezvani entered several new agreements regarding his ownership of, and employment with, theAmplify:

a. the Employment Agreement for his position as CEO of theAmplify (the "Employment Agreement"), a true and correct copy of which is attached to this Complaint as "Exhibit A;"

b. the Stock Purchase Agreement (the "SPA") for the sale of 51% of theAmplify from Rezvani to Jones, a true and correct copy of which is attached to this Complaint as "Exhibit B;" and

c. a Shareholder Agreement (the "Shareholder Agreement") memorializing the parties' rights and obligations as Directors, Officers, and

Shareholders of theAmplify, a true and correct copy of which is attached to this Complaint as "Exhibit C."[1]

**32.** In the Shareholder Agreement and Employment Agreement, the Rezvani and Jones agreed — in plain language — that theAmplify's Board of Directors needed Rezvani's consent for: (1) "hiring of any employee with an annual salary of $80,000 or more;" (2) "a change in the dividend policy from the policy of a 100% annual distribution;" (3) "the approval of material changes to the annual budget and business plan of the Company that imply a variation of the business lines and or of the business model of the Company;" and (4) "any transaction … potentially requiring or requiring the expenditure of more than $5,000 by and between Company, a Stockholder or any Seller …" The Shareholder Agreement purported to keep the power in Rezvani's hand — but gave true power over critical decisions to YoJo and Jones.

**<u>The Unconscionable Shareholder Agreement</u>**

**33.** The Shareholder Agreement Jones prepared states:

a. Under Section 1.1, that the Board of Directors would include three seats: two for individuals designated by YoJo, and one for an individual picked by Rezvani. The initial Board Members were Jones, Antoni, and Rezvani.

b. Under Section 1.3, a majority of the Board directors shall constitute a quorum, provided that such majority is comprised of Rezvani or his designee;

**34.** Under Section 1.6, that "[t]he business and affairs of the Company shall be managed by or under the direction of the Board," which included Rezvani;

**35.** By entering the Agreements — solely because he reasonably believed the promises Jones made him — Rezvani inadvertently gave up control of theAmplify. The one-sided Agreements gave YoJo 2 of 3 the seats on the Board, and 51% of the equity interest in theAmplify. The Agreements also allowed for YoJo to marginalize Rezvani

[1] The Complaint refers to these agreements collectively as "the Agreements."

in a variety of ways, including diminishing his shareholder rights if he (and nobody else) was terminated "for cause" as CEO (e.g., Rezvani could not force a buy-out of his remaining interest).

**36.** Notably, the SPA gave Rezvani a smaller up-front payment his 51% interest, with $7,650,000.00 upfront, and the rest of the $7,650,000.00 to be paid out as "earn-outs" in 2016, 2017, and 2018 — *if* theAmplify hit certain profit benchmarks.[2]

**After Robbing Rezvani's Control Of theAmplify, Jones Destroy Its Value**

**37.** In the next two years, Jones and YoJo degraded theAmplify for their self-interests, withdrawing cash from theAmplify and increasing spending. Jones overspent to lower theAmplify's profit, to minimize Rezvani's subsequent "earn-out" payments.

**38.** Jones and YoJo also began investing in direct competitors of theAmplify, acquiring equity stakes in companies like Tribe Dynamics and Trackkr. Through these investments, Jones and YoJo hurt theAmplify's sales — putting their interests ahead of theAmplify's best interests.

**39.** Immediately after YoJo's purchase of a controlling interest in theAmplify, Jones also stopped showing up to theAmplify meetings and showed little interest in the company — but continued dismantling Rezvani' work, and influence in theAmplify.

**Jones Proceeds to Exert Control Over theAmplify**
**While Diminishing Rezvani's Role**

**40.** After buying a 51% interest in theAmplify, YoJo removed theAmplify's accountant, Mike Taylor.

**41.** Rezvani is informed and believes, that in or around July of 2017, YoJo bought a substantial equity interest in Tribe Dynamics ("Tribe Dynamics"), an influencer data platform that ties "earned media," press coverage or other content placements that were not paid for by the advertiser, to sales. Tribe Dynamics is a direct

[2] The "earn-outs" were to be paid in certain percentages to Rezvani (40%) and the other two members that sold their interest in the transaction which totaled 51%, including Rezvani's father. This percentage of earn-outs to be paid directly to Rezvani is about 78.4%.

competitor of theAmplify. Both are influencer platforms, and YoJo's investment in Tribe Dynamics had the effect of cannibalizing theAmplify's sales and profits.

**42.** Rezvani is informed and believes, that despite Jones's representations to Rezvani, to date, the Blood Hub has not helped theAmplify bring in new clients.

**43.** In 2016, theAmplify generated approximately $4,670,000 million in revenue and $177,000 in profit.

**44.** In June of 2017, after not receiving a dividend payment, Rezvani sent an email to Andre Pinto, Jean-Marc Antoni, and David Jones, inquiring about the timing for his 2016 dividend payment. Pinto responded with the excuse that theAmplify was dealing with new attorneys.

**45.** In August of 2017, Rezvani again wrote to Pinto and requested his 2016 dividend payment. Pinto continued to provide Rezvani with a range of excuses for not processing the dividend payment.

**46.** In 2017, theAmplify generated approximately $5.7 million in revenue and $700,000 in profit. To date, Rezvani has only recently received roughly $80,000 for 2016 — and nothing for 2017.

**47.** While marginalizing Rezvani, Jones kept stringing him along. On June 18, 2017, Jones emailed Rezvani and highlighted his satisfaction with Rezvani's marketing abilities, stating: "I think we should also discuss making sure you are at the key brand sales meetings as no-one sells theAmplify like you."

**48.** In July of 2017, Jones had an in-person meeting with Rezvani in Santa Monica, California, where Jones informed Rezvani that their business relationship would work one of three ways: (1) Rezvani could be a good soldier, (2) Rezvani could work a few days a week at theAmplify and also do other things, or (3) Rezvani could leave his employment theAmplify. Though the client introductions offered by Jones and YoJo to Rezvani had been limited up to this point, Jones also told Rezvani that he would no longer provide Rezvani with any more client introductions.

**49.** Throughout 2016 and 2017, Rezvani's work responsibilities at theAmplify had continuously increased, and he was not receiving the expected help that Jones had promised him before YoJo purchased 51% of theAmplify. In fact, Rezvani's workload increased significantly because of YoJo's acquisition of a majority stake in theAmplify. As a result, in March 2017, Rezvani began suffering from anxiety.

**Jones Terminates Rezvani As CEO After Rezvani Returns from Disability Leave**

**50.** On November 1, 2017, Rezvani had a telephone conversation with Jones in which Rezvani disclosed that he was very anxious about losing a key client, Axe, and was seeing a therapist for work-related anxiety. Jones told Rezvani that he was worried about Rezvani and that Rezvani needed to take two to three weeks off. Rezvani agreed with the suggestion and took time off to cope with his stress and anxiety.

**51.** Rezvani treated for emotional distress and anxiety during his time off ("Disability Leave")

**52.** On November 21, 2017, Rezvani returned Disability Leave. That day, he flew to Slovenia on company business. On November 25, 2017, he flew back to Los Angeles. On November 28, 2017, he had a weekly business call scheduled with Jones. When Rezvani called Jones, Jones did not answer his telephone. In an email sent later that day, Jones requested an in-person meeting with Rezvani for December 8, 2017. Throughout the last week of November and the first week of December 2017, Rezvani worked in theAmplify's office, interacting with the team and clients, working on day-to-day business for theAmplify, and strategizing for the 2018 fiscal year.

**53.** On December 8, 2017, Jones and Emma Cookson, a Partner at YoJo, met with Rezvani and terminated him allegedly "for cause." Although Cookson and Jones terminated Rezvani for "cause" they offered Rezvani a different position with theAmplify on the condition that he sign an agreement releasing any legal claims against them, YoJo, and theAmplify. This offer shows that theAmplify did not terminate

Rezvani "for cause." The "for cause" termination was a pretext for discriminating against Rezvani because of his anxiety, and another attempt to marginalize Rezvani.

**54.** After the termination, theAmplify never paid Rezvani for his accrued vacation time or all earned wages.

**55.** Rezvani still owns 45.85% of theAmplify and holds a seat on the Board.

**56.** At all times Jones acted with the intent to injure Rezvani and the shareholders of theAmplify, or, at the very least, he acted with a willful and knowing disregard for their rights. Jones knew his conduct in increasing theAmplify's expenses and investing in competitor companies would devalue theAmplify and reduce shareholders' profits — including Rezvani's earn-out payments. He also knew of the probable consequences of his conduct and deliberately did not avoid those consequences, i.e., the financial downfall of theAmplify.

**57.** In recommending that Rezvani take leave for his anxiety, with the intention terminating Rezvani upon his return, and in terminating Rezvani for taking leave for his disability, Jones, on theAmplify's behalf — and thus, theAmplify — acted with the intent to injure Rezvani. At the very least, they acted with a willful and knowing disregard for Rezvani's right to a workplace free of discrimination based on his protected status as an employee with a disability.

## <u>FIRST CAUSE OF ACTION</u>

**(Rezvani Individually for Intentional Misrepresentation against Jones, YoJo, and Does 1 to 50)**

**58.** Rezvani repeats and incorporates by reference into this cause of action the allegations set forth above as though fully set forth in this cause of action.

**59.** Jones — on behalf of himself and YoJo — made several false representations to Rezvani, to induce him to enter the Shareholder Agreement, the Employment Agreement, and the SPA:

a. On September 22, 2015, at theAmplify's offices in Culver City, California, Jones represented to Rezvani that he would grow theAmplify's revenues to $100,000,000.00 annually;

b. On October 6, 2015, Jones represented to Rezvani that he would introduce Rezvani to dozens of major advertising brands and that he would put Rezvani in meetings with major advertising executives;

c. On October 28, 2015, Jones represented to Rezvani that Rezvani would earn dramatically more than $30,000,000.00, personally, and that Rezvani would earn his maximum potential earnouts in 2016, 2017, and 2018;

d. On November 11, 2015, Jones represented to Rezvani that Jones would help Rezvani with running all aspects of theAmplify, including assisting with operational support and finding the best talent in the industry to join theAmplify;

e. On January 22, 2016, in New York City, New York, Jones repeated the prior representations to Rezvani, and further represented that Rezvani would have access to YoJo's "Blood" system and that this system would generate significant additional client leads for theAmplify; and

f. On April 7, 2016, in response to Rezvani's concerns about theAmplify's projected sales, Jones represented to Rezvani that YoJo's support and the "Blood" system would ensure that the projected sales levels were met.

**60.** Jones knew his representations to Rezvani were false when he made them. At the very least, the Jones made the representations recklessly, without regard for their truth.

**61.** Jones intended for Rezvani to rely on his representations in deciding whether to sell 51% of theAmplify to YoJo.

**62.** Not knowing the representations to be false, and because Jones held himself out as an experienced and successful businessperson, Rezvani reasonably relied on his representations. Rezvani signed the one-sided Employment Agreement, the SPA,

and Shareholder Agreement (the "Agreements"), and sold his majority equity interest in theAmplify to Jones' company, YoJo.

**63.** Rezvani was harmed by Jones' false representations on YoJo's behalf.

**64.** Rezvani's reasonable reliance was a substantial factor in causing his harm.

**SECOND CAUSE OF ACTION**

**(Rezvani Individually for False Promise against Jones, YoJo, and Does 1 to 50)**

**65.** Rezvani repeats and incorporates by reference into this cause of action the allegations set forth above as though fully set forth in this cause of action.

**66.** Jones — on behalf of himself and YoJo — made several false promises to Rezvani, to induce him to enter the Shareholder Agreement, the Employment Agreement, and the SPA:

a. On September 22, 2015, at theAmplify's offices in Culver City, California, Jones promised Rezvani that he would grow theAmplify's revenues to $100,000,000.00 annually;

b. On October 6, 2015, Jones promised Rezvani that he would introduce Rezvani to dozens of major advertising brands and that he would put Rezvani in meetings with major advertising executives;

c. On October 28, 2015, Jones promised to Rezvani that Rezvani would earn dramatically more than $30,000,000.00, personally, and that Rezvani would earn his maximum potential earnouts in 2016, 2017, and 2018;

d. On November 11, 2015, Jones promised to Rezvani that Jones would assist Rezvani with running all aspects of theAmplify, including helping with operational support and finding the best talent in the industry to join theAmplify;

e. On January 22, 2016, in New York City, New York, Jones promised Rezvani that Rezvani would have access to YoJo's "Blood" system and that this system would generate significant additional client leads for theAmplify; and

/ / /

f. On April 7, 2016, in response to Rezvani's concerns about theAmplify's projected sales, Jones promised Rezvani that YoJo's support and the "Blood" system would ensure that the projected sales levels were met.

**67.** Jones did not intend to engage in any conduct that would help him, and for YoJo to meet the promises Jones made Rezvani.

**68.** Jones intended for Rezvani to rely on his promises in deciding whether to sell 51% of theAmplify to YoJo.

**69.** Not knowing the promises to be false, and because Jones held himself out as an experienced and successful businessperson, Rezvani reasonably relied on his promises. Rezvani signed the one-sided Employment Agreement, the SPA, and Shareholder Agreement (the "Agreements"), and sold his majority equity interest in theAmplify to Jones' company, YoJo. But Jones did not meet his promises to Rezvani.

**70.** Rezvani was harmed by Jones' false promises on YoJo's behalf.

**71.** Rezvani's reasonable reliance on Jones' false promises was a substantial factor in causing his harm.

**THIRD CAUSE OF ACTION**

**(Rezvani Individually for Breach of Contract (the SPA) Against Defendants YoJo and Does 1 to 50)**

**72.** Rezvani repeats and incorporates by reference into this cause of action the allegations set forth above as though fully set forth in this cause of action.

**73.** Rezvani and YoJo are parties to an agreement: the SPA.

**74.** Rezvani has substantially performed all obligations he owed YoJo under the SPA — except those he could not perform or was excused from performing because of YoJo's failure to perform its obligations.

**75.** YoJo failed to perform its obligations under Section 2.2(e) of the SPA by failing to:

a. timely provide Rezvani with 2016 and 2017 income statements; and

b. pay Rezvani sufficient earn-out payments.

**76.** Rezvani was harmed by YoJo's failure to perform its obligations under the SPA. Indeed, this failure was a substantial factor in causing Rezvani's harm.

**77.** Rezvani has suffered at least $7,500,000.00 in damages, in an amount to be proven at trial.

**78.** Under the SPA, Rezvani is entitled to attorney's fees and costs.

## FOURTH CAUSE OF ACTION

**(Rezvani Individually for Breach of The Implied Covenant of Good Faith and Fair Dealing (Under The SPA) Against Defendants YoJo and Does 1 to 50)**

**79.** Rezvani repeats and incorporates by reference into this cause of action the allegations set forth above as though fully set forth in this cause of action.

**80.** Rezvani and YoJo are parties to an agreement: the SPA.

**81.** Rezvani has substantially performed all obligations he owed YoJo under the SPA — except those he could not perform or was excused from performing because of YoJo's failure to perform its obligations.

**82.** YoJo unfairly interfered with Rezvani's right to receive earn-out payments under the SPA by increasing theAmplify's sending, and thus, reducing its profit margin.

**83.** Rezvani was harmed by YoJo's acts and omissions that diminished the amount of earn-out payments to Rezvani.

**84.** Rezvani has suffered at least $7,500,000.00 in damages, in an amount to be proven at trial.

**85.** Under the SPA, Rezvani is entitled to attorney's fees and costs.

## FIFTH CAUSE OF ACTION

**(Rezvani Individually for Breach of Contract (the Shareholder Agreement) Against Defendants YoJo and Does 1 to 50)**

**86.** Rezvani repeats and incorporates by reference into this cause of action the allegations set forth above as though fully set forth in this cause of action.

**87.** Rezvani and YoJo are parties to an agreement: the Shareholder Agreement.

**88.** Rezvani has substantially performed all obligations he owed YoJo under the Shareholder Agreement — except those he could not perform or was excused from performing because of YoJo's failure to perform its obligations. But, YoJo failed to perform its obligations under the Shareholder Agreement.

**89.** YoJo breached Section 1.4 of the Shareholder Agreement by

c. hiring several employees with annual salaries of more than $80,000.00 without Rezvani's affirmative vote;

d. failing to issue a dividend for a significant period for 2016;

e. failing to declare a dividend or other distribution in the amount of a 100% annual distribution in 2017.

**90.** Rezvani was harmed by YoJo's failure to perform its obligations under the Shareholder Agreement. Indeed, this failure was a substantial factor in causing Rezvani's harm.

**91.** Rezvani has suffered at least $5,843,137.25 in damages, for earn-outs from 2016 through 2018 and dividends, in an amount to be proven at trial.

**92.** Under the Shareholder Agreement, Rezvani is entitled to attorney's fees and costs.

## SIXTH CAUSE OF ACTION

**(Breach of The Implied Covenant of Good Faith and Fair Dealing (Under the Shareholder Agreement) Against Defendants YoJo and Does 1 to 50)**

**93.** Rezvani repeats and incorporates by reference into this cause of action the allegations set forth above as though fully set forth in this cause of action.

**94.** Rezvani and YoJo are parties to an agreement: the Shareholder Agreement.

**95.** Rezvani has substantially performed all obligations he owed YoJo under the Shareholder Agreement — except those he could not perform or was excused from performing because of YoJo's failure to perform its obligations.

**96.** But, YoJo unfairly interfered with Rezvani's right to receive the benefits of the Shareholder Agreement.

**97.** Rezvani was harmed by YoJo's conduct. Indeed, this conduct was a substantial factor in causing Rezvani's harm.

**98.** Rezvani has suffered at least $5,843,137.25 in damages, for earn-outs from 2016 through 2018 and dividends, in an amount to be proven at trial.

**99.** Under the Shareholder Agreement, Rezvani is entitled to attorney's fees and costs.

**SEVENTH CAUSE OF ACTION**

**(Breach of Contract (the Employment Agreement) Against Defendants theAmplify and Does 1 to 50)**

**100.** Rezvani repeats and incorporates by reference into this cause of action the allegations set forth above as though fully set forth in this cause of action.

**101.** Rezvani and theAmplify are parties to an agreement: the Employment Agreement.

**102.** Rezvani has substantially performed all obligations he owed theAmplify under the Employment Agreement — except those he could not perform or was excused from performing because of theAmplify's failure to perform its obligations.

**103.** However, theAmplify did not perform its obligations under the Employment Agreement.

**104.** TheAmplify the Employment Agreement by:

f. terminating Rezvani purportedly "for cause"— without proper "cause" for the termination, in violation of Section 4.4.3; and

g. failing to timely pay Rezvani all wages theAmplify owed him upon his termination, in violation of Section 4.3.2.

/ / /

/ / /

**105.** Rezvani was harmed by theAmplify's acts and omissions that breached the Employment Agreement. The failure was a substantial factor in causing Rezvani's harm.

**106.** Rezvani has suffered at least $7,500,000.00 in damages, including lost income, in an amount to be proven at trial.

**107.** Under the Employment Agreement, Rezvani is entitled to attorney's fees and costs.

**EIGHTH CAUSE OF ACTION**

**(Breach of The Implied Covenant of Good Faith and Fair Dealing (Under the Employment Agreement) Against Defendants theAmplify and Does 1 to 50)**

**108.** Rezvani repeats and incorporates by reference into this cause of action the allegations set forth above as though fully set forth in this cause of action.

**109.** Rezvani and theAmplify are parties to an agreement: the Employment Agreement.

**110.** Rezvani has substantially performed all obligations he owed theAmplify under the Employment Agreement — except those he could not perform or was excused from performing because of theAmplify's failure to perform its obligations.

**111.** However, theAmplify interfered with Rezvani's rights to receive benefits under the Employment Agreement. Specifically, theAmplify interfered with Rezvani's rights under the Employment Agreement by:

h. terminating Rezvani purportedly "for cause"— without proper "cause" for the termination, in violation of Section 4.4.3; and

i. failing to timely pay Rezvani all wages theAmplify owed him upon his termination, in violation of Section 4.3.2.

**112.** Rezvani was harmed by theAmplify's acts and omissions. The failure was a substantial factor in causing Rezvani's harm.

/ / /

**113.** Rezvani has suffered at least $7,500,000.00 in damages, including lost income, in an amount to be proven at trial.

**114.** Under the Employment Agreement, Rezvani is entitled to attorney's fees and costs.

## NINTH CAUSE OF ACTION

**(Rezvani Derivatively on behalf of theAmplify for Breach of Fiduciary Duty Against Defendants Jones and Does 1 to 50)**

**115.** Rezvani repeats and incorporates by reference into this cause of action the allegations set forth above as though fully set forth in this cause of action.

**116.** As a Director of theAmplify, Jones owed theAmplify and its shareholders the fiduciary duties of care, good faith, and loyalty.

**117.** The duty of care required Jones to exercise such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances.

**118.** Through his various acts and omissions described in this Complaint, Jones failed to exercise care as an ordinarily prudent person in a like position would use under similar circumstances, when he unreasonably and unnecessarily increased theAmplify's expenses, thus diminishing theAmplify's value as a company, and the equity interests of theAmplify's shareholders — including Rezvani.

**119.** The duty of good faith required Jones to discharge his duties to theAmplify and its shareholders in good faith.

**120.** Jones did not exercise his duties in good faith. Instead, Jones abused his position as a Director and took actions — including increasing expenses and investing in competitors — to theAmplify's detriment.

**121.** The duty of loyalty required Jones to act in the best interests of theAmplify and its shareholders.

/ / /

**122.** Jones did not act in the best interests of theAmplify and its shareholders — and instead, acted to serve his interests — by investing in competing companies. Indeed, Jones invested in competing companies to profit from the companies' success. But, these investments created competition for, and thus, harmed the interests of, theAmplify and its shareholders.

**TENTH CAUSE OF ACTION**

**(Rezvani Individually for Discrimination in Violation of the Fair Employment and Housing Act against Defendants theAmplify and Does 1 through 50, Inclusive)**

**123.** Rezvani repeats and incorporates by reference into this cause of action the allegations set forth above as though fully set forth in this cause of action.

**124.** On July 17, 2018, Rezvani timely filed a charge with the Department of Fair Employment and Housing (the "DFEH") against theAmplify for discrimination in employment. On July 17, 2018, the DFEH issued Rezvani a Right to Sue Notice against the theAmplify for violations of Fair Employment and Housing Act.

**125.** At all times relevant, theAmplify was and is an employer governed by the Fair Employment and Housing Act. At all times theAmplify has had more than five (5) employees.

**126.** While employed by theAmplify, Rezvani had a disability or was perceived by theAmplify as having a disability: anxiety.

**127.** Rezvani's anxiety substantially limited one or more of his life activities.

**128.** Rezvani worked as theAmplify's CEO. He was qualified for the position and able to perform the essential functions of his job with or without reasonable accommodation.

**129.** Despite Rezvani's exemplary performance as CEO, theAmplify terminated Rezvani after he returned from Disability Leave.

/ / /

/ / /

**130.** Rezvani is informed and believes that his anxiety, and related Disability Leave, were substantial motivating reasons for theAmplify's decision to terminate him from his position as CEO.

**131.** TheAmplify's termination of Rezvani's employment harmed Rezvani. And, theAmplify's conduct was a substantial factor in causing Rezvani's harm.

**ELEVENTH CAUSE OF ACTION**

**(Rezvani Individually for Wrongful Termination in Violation of Public Policy Against Defendants theAmplify and Does 1 through 50, Inclusive)**

**132.** Rezvani repeats and incorporates by reference into this cause of action the allegations set forth above as though fully set forth in this cause of action.

**133.** At all times relevant, it was the public policy of the state of California, under the Fair Employment and Housing Act that employers not discriminate against employees with disabilities.

**134.** A substantial motivating factor in Rezvani's termination was his disability, anxiety. Thus, by terminating Rezvani, theAmplify violated California public policy.

**135.** TheAmplify's termination of Rezvani's employment harmed Rezvani. And, theAmplify's conduct was a substantial factor in causing Rezvani's harm.

**TWELFTH CAUSE OF ACTION**

**(Rezvani Individually for Failure to Pay Earned Wages Upon Separation of Employment Against Defendants theAmplify and Does 1 through 50, Inclusive)**

**136.** Rezvani repeats and incorporates by reference into this cause of action the allegations set forth above as though fully set forth in this cause of action.

**137.** Rezvani worked for theAmplify.

**138.** TheAmplify owes Rezvani wages under the Employment Agreement and California law.

**139.** TheAmplify owes Rezvani at least $100,000.00 in unpaid wages.

/ / /

**THIRTEENTH CAUSE OF ACTION**

**(Claim for Waiting Time Penalties Against Defendants theAmplify and Does 1 through 50, Inclusive)**

**140.** Rezvani repeats and incorporates by reference into this cause of action the allegations set forth above as though fully set forth in this cause of action.

**141.** Rezvani's employment with theAmplify ended on or about December 8, 2017, when theAmplify terminated him. At that time, theAmplify owed Rezvani at least $100,000.00.

**142.** But, theAmplify did not pay Rezvani all wages owed to him as of that date.

**143.** Notably, theAmplify's failure to pay Rezvani these wages was willful.

**FOURTEENTH CAUSE OF ACTION**

**(Rezvani Individually for Violations of 18 U.S.C. § 1962 Against Defendants Jones, the YoJo, and Does 1 to 50)**

**144.** Rezvani repeats and incorporates by reference into this cause of action the allegations set forth above as though fully set forth in this cause of action.

**145.** Rezvani is informed and believes Jones conspired with others to engage in a pattern of fraudulent conduct through various business enterprises, including theAmplify, in part using electronic communications across state lines.

**146.** Rezvani is informed and believes Jones' conspired with others to surreptitiously raid and take over several successful businesses, including theAmplify.

**147.** Rezvani Jones and YoJo culminated their malicious scheme to swipe a majority interest in theAmplify from Rezvani without payment, degrade the company for their self-interest, and push Rezvani out of theAmplify when they terminated his employment.

**148.** Jones has perpetrated this scheme with other businesses before, as Rezvani is aware of at least one similar instance with a company called MOFILM.

**149.** TheAmplify's termination of Rezvani's employment harmed Rezvani. And, theAmplify's conduct was a substantial factor in causing Rezvani's harm.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

**150.** For general, special, compensatory, and consequential damages and lost profits in at least the sum of at least $7,500,000.00, with the exact amount to be proven at the time of trial;

**151.** For pre-judgment interest at the maximum legal rate in an amount to be proven at the time of trial;

**152.** For punitive damages according to proof;

**153.** For attorney's fees and costs; and

**154.** For statutory penalties.

Dated: July 18, 2018

KUSHNER CARLSON, PC

By: */s/ Suren N. Weerasuriya*

MICHAEL B. KUSHNER
SUREN N. WEERASURIYA
PAUL H. DEESE
Attorneys for Plaintiffs

# EXHIBIT "A"

**EXECUTION COPY**

**REACH LABS, INC.**
**EMPLOYMENT AGREEMENT**

This EMPLOYMENT AGREEMENT (this "***Agreement***") is effective as of April 25, 2016 (the "***Effective Date***"), by and between **REACH LABS, INC.**, a California corporation (the "***Company***"), and **JUSTIN REZVANI** (the "***Executive***"). Unless otherwise stated herein, this Agreement shall replace and supersede any prior agreements relating to Executive's employment by the Company. The Company and the Executive are hereinafter collectively referred to as the "***Parties***", and individually referred to as a "***Party***."

**RECITALS**

**A.** The Company desires to retain the Executive's experience, skills, abilities, background and knowledge and is willing to engage the Executive's services on the terms and conditions set forth in this Agreement.

**B.** The Executive desires to be in the employ of the Company and is willing to accept such employment on the terms and conditions set forth in this Agreement.

**AGREEMENT**

In consideration of the foregoing Recitals and the mutual promises and covenants herein contained, and for other good and valuable consideration, the Parties, intending to be legally bound, agree as follows:

**1. EMPLOYMENT.**

**1.1. Term.** The Company hereby employs the Executive, and the Executive hereby accepts employment by the Company, upon the terms and conditions set forth in this Agreement. The Executive's employment under this Agreement shall continue until it is terminated pursuant to Section 4 (the "***Term***").

**1.2. Title**. The Executive shall have the title of Chief Executive Officer ("***CEO***") of the Company and shall serve in such other capacity or capacities commensurate with his position as the Board of Directors of the Company (the "***Board***") may from time to time prescribe. The Executive shall also be a member of the Board.

**1.3. Duties.**

**1.3.1** The Executive shall do and perform all services, acts or things necessary or advisable to manage and conduct the business of the Company and shall have the authority and responsibilities which are normally associated with the position of CEO. The Executive shall report to the Board.

**1.3.2** Notwithstanding anything to the contrary in this Agreement or in the Shareholder's Agreement, the Executive, either acting alone or acting together with other employees, shall not taking any of the following actions with respect to the business and operations of the Company, without the approval of the Board of Directors of the Company (acting by majority vote). Notwithstanding the foregoing, pursuant to the terms and conditions of the Shareholder Agreement, the following actions shall require the affirmative vote of the Sellers Director (as defined therein):

i. commitment of significant resources to a new line of business activity;

ii. any transaction affecting the capital or existence of the Company, such as the admittance of a new shareholder, a request for additional capital, a public offering, or the transfer of equity securities to a third party (other than transfers to an affiliated entity of Yojo);

iii. the adoption of any profit sharing plan, employee benefit plan, pension plan, commission plan, or bonus plan;

iv. the hiring of any employee with an annual salary of $80,000 or more;

v. the grant of any new rights or options with respect to the Shares, except as expressly provided for in this Agreement;

vi. any merger, consolidation, business combination, dissolution, liquidation or winding up (except as otherwise specified in Article 11) of the Company, or any sale, lease, exchange or other disposition of all or substantially all of the assets or business of the Company;

vii. any amendment to the Articles of Incorporation or the bylaws of the Company;

viii. any increase or decrease in the number of directors constituting the Board or the creation and/or delegation of any Board matters to a committee;

ix. the commencement or termination of any lawsuit, except in the ordinary course of business and except if the lawsuit if against Justin Rezvani or implying Justin Rezvani in any manner;

x. any declaration of dividends or similar payments or other distributions other than a one-hundred percent annual distribution;

xi. the approval of material changes to the annual budget and business plan of the Company that imply a variation of the business lines and or of the business model of the Company;

xii. the filing of a voluntary petition in bankruptcy or for reorganization or for the adoption of any plan or arrangement with creditors or an admission seeking the relief therein provided under any existing or future law of any jurisdiction relating to bankruptcy, insolvency, reorganization or relief of debtors by the Company or any of its subsidiaries;

xiii. any borrowing or lending of money or guarantee of indebtedness, except, the incurrence of up to $10,000 of trade payables in the ordinary course of business;

xiv. the execution of any contract, lease or other commitment, or the execution or amendment of any contracts, leases or other commitments in any one or a series of related transactions requiring or potentially requiring the expenditure, credit, abatement or forfeiture, potentially requiring the expenditure of more than $5,000 by and between Company, a Stockholder or any Seller (as such term is defined in the Stock Purchase Agreement of even

date herewith) or by and between the Company and any of Stockholder's or Seller's directors, officers, partners, agents, advisors, family members, affiliates, employees or an entities in which such Stockholder or Seller owns, or has a beneficial ownership interest in five (5%) percent or more of the voting power of such entity;

xv. authorization or approval of the Company's annual business plan, if this business plan materially and significantly varies the business lines and business model of the Company;

xvi. any material transaction or agreement outside the ordinary course of business, including without limitation, the sale, assignment, license, pledge or encumbrance of material assets including intellectual property, except such licenses granted in the ordinary course of business;

xvii. any change in the tax status of the Company; and

xviii. the entering into of any agreement to effectuate any of the matters set forth in clauses (i) through (xviii) above.

**1.4.** Notwithstanding anything to the contrary in this Agreement or in the Shareholder's Agreement, the Executive will have sole decision-making authority with respect to the termination of Rafi Mamalian's employment other than for "cause" (as defined in that certain Employment Agreement between the Company and Rafi Mamalian dated as of May 16, 2015). Any such termination of Mr. Mamalian's employment by the Board of Directors of the Company without the prior approval of the Executive will require the Company to indemnify the Executive from and against any and all monetary obligations associated with such termination as outlined in the above-referenced Employment Agreement dated as of May 16, 2015.

**1.5. Policies and Practices.** The employment relationship between the Parties shall be governed by this Agreement and the policies and practices established by the Company, by the You and Mr Jones group of companies, and the Board, regarding general business and financial reporting and distributions, including, without limitation, rules, policies, and practices relating to forecasts, financial reporting, and conflicts of interest (such requirements currently include an annual budget and four (4) forecast updates, monthly profit and loss statements, balance sheets, capital expenses and cash reports, and quarterly capital expenditure reports) and that he will use his best efforts to cause the Company to consistently observe those rules. The Executive further acknowledges he will, at all times, be part of an open exchange of information within the group of You and Mr Jones Companies regarding their business and affairs. In the event that the terms of this Agreement differ from or are in conflict with the Company's policies or practices or the Company's Employee Handbook, this Agreement shall control.

**2. LOYAL AND CONSCIENTIOUS PERFORMANCE; NONCOMPETITION.**

**2.1. Loyalty**. During the Executive's employment by the Company, the Executive shall devote the Executive's full business energies, interest, abilities and productive time to the proper and efficient performance of Executive's duties under this Agreement. Notwithstanding the foregoing, Executive shall not be deemed to be violating his loyalty or other obligations in this Agreement for Executive's involvement in an advisory role with a jewelry business called Divinity LA (www.divinityla.com) ("***Divinity***"), so long as (i) such role does not interfere with Executive's duties to the Company; (ii) Divinity does not directly or indirectly compete with the Business; (iii)

Executive does not use any confidential information, trade secrets, or violate the terms and conditions of the Confidential Information and Invention Assignment Agreement and (iv) Executive or Divinity does not make any public announcements pertaining to Executive's involvement in Divinity unless Executive receives the prior written consent of the Board, in the Board's sole discretion.

**2.2. Non-Competition and Non-Solicitation.**

**2.2.1. Non-Competition**. During the term of this Agreement, the Executive shall not, either directly or indirectly: (a) engage in the Business in the United States (the "***Restricted Territory***"); (b) render any services directly related to the Business to or for any person or entity engaged in the Business (other than the Company) in any part of the Restricted Territory (any such person or entity, a "***Competing Business***"); or (c) acquire a financial interest in, or otherwise become actively involved with, a Competing Business, directly or indirectly (and whether or not for compensation) as an individual, partner, stockholder, member, officer, director, employee, principal, agent, trustee or consultant, except with the prior written consent of the Board. Notwithstanding anything to the contrary in this Agreement, the Executive may, directly or indirectly, own, solely through passive ownership as a portfolio investment (with no director designation rights or other special governance rights), securities of any person engaged in the Business which are publicly traded on a national or regional securities exchange if the Executive (x) is not a controlling person of, or a member of a group which controls, such person, and (y) does not, directly or indirectly, through familial relationships or otherwise, own 3% or more of any class of securities of such person. The term ***"Business"*** means the Company's wide range of services related to the marketing strategy, data, social media marketing, software licensing, media planning and buying, influencer marketing, content marketing and digital communications.

**2.2.2. Non-Solicitation**. During the term of this Agreement, the Executive shall not, directly or indirectly, (i) solicit, entice, encourage or influence, or attempt to solicit, entice, encourage or influence, any customer of the Company or any of its affiliates (including any person or entity that is a customer of the Company or any of its affiliates at any time during the term of this Agreement) to alter, reduce or terminate its business relationship with the Company or any of its affiliates for the direct or indirect benefit of any Competing Business; or (ii) contact, solicit, or approach any person employed by the Company or any of its subsidiaries who was an employee of the Company or its subsidiary during the one-year period prior to such contact, for the purpose of inducing such person to terminate his or her employment relationship with the Company or its subsidiary, as applicable, or hire any person employed by the Company or any of its subsidiaries or who was an employee of the Company or any of its subsidiaries during the prior one-year period.

**2.3. Non-Disparagement.** Except as required by applicable law, rule or regulation or any recognized subpoena power, the Executive agrees that, during and after the Term, he shall not at any time make any statement or representation, written or oral, which the Executive knows or should know will, or which he knows or should know is reasonably likely to, disparage the reputation, goodwill, business, customer or supplier relationships, or public relations of the Company and/or its partners, directors, shareholders, investors, senior executives or officers.

**2.4. Injunctive Relief.** The provisions of this Section 2 are material inducements to the Company entering into and performing this Agreement. The Executive acknowledges and agrees that the Company will have no adequate remedy at law, and would be irreparably harmed, if the Executive breaches or threatens to breach any of the provisions of this Section 2. The Executive agrees that the Company shall be entitled to equitable and/or injunctive relief to prevent any breach or threatened breach of this Section 2, and to specific performance of each of the terms of such Section in addition to any other legal or equitable remedies that the Company may have. The

Executive further agrees that he shall not, in any equity proceeding relating to the enforcement of the terms of Section 2 of this Agreement, raise the defense that the Company has an adequate remedy at law.

**2.5. Acknowledgments.** The Executive acknowledges that in the course of his employment with the Company, the Executive has or will become familiar with the Company's and its affiliates' trade secrets and with other confidential information concerning the Company and/or its affiliates and that the Executive's services have been and will be of special, unique and extraordinary value to the Company and its affiliates. The Executive acknowledges that the provisions of this Section 2 are in consideration of employment with the Company and additional good and valuable consideration.

**2.6. Notification of Subsequent Employer.** The Executive hereby agrees that, prior to accepting employment with, or agreeing to provide services to, any other person or entity during any period during which the Executive remains subject to any of the covenants set forth in this Section 2, the Executive shall provide such prospective employer with written notice of such covenants, with a copy of such notice delivered simultaneously to the Company. In addition, the Executive hereby agrees that the Company may also provide such prospective employer with written notice of such provisions of this Agreement.

**3. COMPENSATION OF THE EXECUTIVE.**

**3.1. Base Salary.** The Company shall pay the Executive a base salary at the initial annualized rate of two hundred fifty thousand dollars ($250,000) per year (***"Base Salary"***), effective January 1, 2016. Such Base Salary shall be paid in accordance with the Company's standard payroll practice. Such base salary shall be prorated for any partial year of employment on the basis of a 365-day fiscal year. Executive's Base Salary will be reviewed annually.

**3.2. Discretionary Bonus**. Provided the Executive meets the conditions stated in this Section 3.2, the Executive shall be eligible for an annual discretionary bonus (hereinafter referred to as the ***"Discretionary Bonus"***) with a target amount of 60% of the Executive's Base Salary, subject to standard deductions and withholdings. For calendar year 2016, Executive and the Board shall collaborate on the metrics to be utilized to determine Executive's eligibility for and the amount of the Discretionary Bonus. The Discretionary Bonus shall also be subject to The Amplify's 2016 Bonus Program. For each year thereafter, the Executive's eligibility for and amount of the Discretionary Bonus shall be based on the Board's determination, in good faith, The Amplify's Bonus Program (if applicable), and based upon the Executive's individual achievement and Company performance objectives as set by the Board or the compensation committee thereof, of whether the Executive has met such performance milestones as are established for the Executive by the Board or the compensation committee thereof, in good faith, in consultation with the Executive (hereinafter referred to as the ***"Performance Milestones"***). The Performance Milestones will be based on certain factors including, but not limited to, the Executive's performance , the You and Mr Jones group performance and the Company's performance. The Executive's Discretionary Bonus target will be reviewed annually and may be adjusted by the Board or the compensation committee thereof in its discretion, provided however, that the Discretionary Bonus target may only be reduced upon Executive's written consent. The Executive must be employed on the date the Discretionary Bonus is awarded to be eligible for the Discretionary Bonus, subject to the termination provisions thereof. The Discretionary Bonus, if any, shall be paid after approval by the Board , on March 31st of the year following the calendar year for which such Discretionary Bonus was earned.

**3.3. Employment Taxes**. All of the Executive's compensation shall be subject to customary withholding taxes and any other employment taxes as are required to be collected or withheld by the Company.

**3.4. Expense Reimbursement**. The Company agrees to reimburse the Executive during the term of this Agreement for all reasonable, ordinary, and properly-vouchered business expenses incurred in the performance of his services hereunder in accordance with the Company's policies as in effect from time to time and with the You and Mr Jones group policies concerning travel and entertainment.

**3.5. Vacation**. The Executive shall be entitled to four (4) weeks of paid vacation annually.

**3.6. Benefits**. During the term of this Agreement, the Executive shall be entitled to participate in all employee benefit plans as are, or hereafter may be if approved by the Board, established by the Company for the benefit of the Company's senior executives and, without duplication, its employees, subject to the terms thereof as in effect from time to time.

**4. TERMINATION.**

**4.1. Termination**. The Executive's employment with the Company may be terminated under the following conditions:

**4.1.1. Termination for Death or Disability**. The Executive's employment with the Company shall terminate effective upon the date of the Executive's death or ***"Disability"*** (as defined in Section 4.4.1), provided, however, in the case of Disability, this Section 4.1.1 shall in no way limit the Company's obligations to provide such reasonable accommodations to the Executive as may be required by law.

**4.1.2. Termination by the Company For Cause**. The Company may terminate the Executive's employment under this Agreement for "Cause" (as defined in Section 4.4.3) by delivery of written notice to the Executive specifying the Cause or Causes relied upon for such termination. At the Company's option, any notice of termination given pursuant to this Section 4.1.2 shall effect termination as of (i) the date of the notice or (ii) such date as specified in the notice no later than six (6) months from the date of the notice (the "***Notice Period***").

**4.1.3. Termination by the Company Without Cause**. The Company may terminate the Executive's employment under this Agreement at any time and for any reason, or no reason, and such termination shall be effective on the six-month anniversary of the date the Executive is so informed in writing by the Company.

**4.1.4. Termination By The Executive For Good Reason**. The Executive may terminate his employment under this Agreement for "***Good Reason***" (as defined in Section 4.4.2) by delivery of written notice to the Company specifying the Good Reason or Good Reasons relied upon by the Executive for such termination, provided that such notice is delivered within 60 days following the occurrence of any event or events constituting Good Reason.

**4.1.5. Termination By The Executive Without Good Reason (Resignation)**. The Executive may terminate his employment under this Agreement without Good Reason, provided that the Executive give six-months notice to the Company by delivery of written notice to the Company. The Company, in its sole discretion, may elect to waive any or all of the notice period.

**4.2. Termination by Mutual Agreement of the Parties**. The Executive's employment pursuant to this Agreement may be terminated at any time upon a mutual agreement in writing of the Parties. Any such termination of employment shall have the consequences specified in such agreement.

**4.3. Compensation and Obligations Upon Termination**.

**4.3.1. Death or Disability**. If the Executive's employment shall be terminated by death or Disability as provided in Section 4.1.1, the Company shall promptly following the date of termination pay to the Executive, and/or Executive's heirs, in a lump sum all earned but unpaid Base Salary, all accrued but unpaid business expenses and all accrued but unused vacation time earned through the date of termination at the rate in effect at the time of termination (*"Accrued Amounts"*), less standard deductions and withholdings, and the Company shall thereafter have no further obligations to the Executive and/or Executive's heirs under this Agreement, except to the extent that the Executive and/or Executive's heirs is/are eligible for benefits pursuant to any insurance policies maintained by the Company in connection with his death or Disability, and except as otherwise provided by law.

**4.3.2. All Other Terminations**. If the Executive's employment is terminated pursuant to Sections 4.1.2 to 4.1.5 above, the Company shall promptly following the date of termination (unless the Company exercises its option pursuant to Section 4.3.3 below) pay in a lump sum to the Executive the Accrued Amounts, less standard deductions and withholdings, and the Company shall thereafter have no further obligations to the Executive under this Agreement, except as provided by law.

**4.3.3. Optional Required Notice Period**. In the event Executive is terminated pursuant to Sections 4.1.2 or 4.1.5 above, the Company, in its sole discretion, within thirty (30) days following such termination is in effect (i.e. end of the notice period if applicable), may elect to pay Executive such monthly pro-rata amount equivalent to the Base Salary in effect at the time of termination for a period of up to twelve (12) months (the *"Optional Notice Period"*), less standard deductions and withholdings, to be paid in the form of salary continuation on the Company's regular payroll dates (the *"Extended Employment Option"*). In the event Company elects to exercise the Extended Employment Option, Executive shall be required and agrees to furnish an effective Release (as defined in Section 4.6) as a condition to such payment during the Optional Notice Period (unless waived by the Company in its sole discretion). During the Optional Notice Period, the Company may reduce or alter the Executive's duties and responsibilities, or provide that the Executive is not required to, or shall not, provide services or appear at the Company's offices during the Notice Period. The Executive acknowledges and agrees that during any such Optional Notice Period, all obligations and duties of the Executive contained in Sections 2.1 and 2.2 of this Agreement will continue to have full force and effect.

**4.3.4. Conditions**. Notwithstanding any provisions in this Agreement to the contrary, the Company's obligations and the Executive's rights pursuant to Section 4.3.3 shall cease and be rendered a nullity immediately should the Executive violate any provision of Sections 2.1 and/or 2.2 herein or should the Executive violate the terms and conditions of the Employee Confidential Information and Invention Assignment Agreement, of even date herewith (the *"Confidential Information and Invention Assignment Agreement"*) by and between the Company and the Executive, which Confidential Information and Invention Assignment Agreement is expressly incorporated into and made a part of this Agreement as though fully set forth herein.

**4.4. Definitions**. For purposes of this Agreement, the following terms shall have the following meanings:

**4.4.1. Disability**. ***"Disability"*** shall mean the inability of the Executive to perform the Executive's duties under this Agreement, whether with or without reasonable accommodation, because the Executive has become permanently disabled within the meaning of any policy of disability income insurance covering employees of the Company then in force. In the event the Company has no policy of disability income insurance covering employees of the Company in force when the Executive becomes disabled, the term ***"Disability"*** shall mean the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or can be expected to last for a continuous period of not less than six (6) months. Determination of Disability shall be a final and binding determination made by the Board, based upon medical advice or an opinion provided by a licensed physician acceptable to the Board in a manner consistent with its definition as provided in Treasury Regulations Section 1.409A-3(i)(4)(i). The date such determination is made shall be the date of such Complete Disability for purposes of this Agreement.

**4.4.2. Good Reason**. ***"Good Reason"*** for the Executive to terminate the Executive's employment hereunder shall mean the occurrence of any of the following events without the Executive's consent:

(i) a material reduction as determined by the Company, in the Executive's duties, authority, or responsibilities relative to the duties, authority, or responsibilities in effect as of the Effective Date; or

(ii) a material reduction as determined by the Company, of the Executive's Base Salary as initially set forth herein or as the same may be increased from time to time, provided that if such reduction occurs in connection with a Company-wide decrease in salaries and the percent decrease in the Executive's base salary does not exceed the percent decrease in base salary of any other employees of the Company such reduction will not constitute Good Reason to terminate Executive's employment for purposes of this Agreement.

*Provided however* that, such termination by the Executive shall only be deemed for Good Reason pursuant to the foregoing definition if (i) the Company is given written notice from the Executive, within 60 days following the first occurrence of the condition that he considers to constitute Good Reason, describing the condition, and the Company fails to remedy such condition within 30 days following such written notice, and (ii) the Executive terminates employment within 30 days following the end of the period within which the Company was entitled to remedy the condition constituting Good Reason but failed to do so.

**4.4.3. Cause**. ***"Cause"*** for the Company to terminate the Executive's employment hereunder shall mean the occurrence of any of the following events:

(i) the Executive's failure to attend to his duties as assigned by the Board or officers of the Company to whom he reports that is not cured within 7 days of written notice to the Executive from the Company; *provided* that only one cure period shall be available hereunder;

(ii) the Executive's refusal or repeated failure to perform his duties and responsibilities as set forth in Section 1 hereof;

(iii) any willful or intentional misconduct by the Executive related to the Company or his duties, including without limitation, any act that could be reasonably be expected to have the effect of materially injuring the reputation, business or business relationships of the Company or any of the Yojo affiliated or related entities;

(iv) the Executive's conviction of, or plea of *nolo contendere* to, a felony or crime involving moral turpitude or dishonesty;

(v) the Executive's engaging or in any manner participating in any activity which violates any provisions of Section 2 hereof or the Confidential Information and Invention Assignment Agreement or the material policies of the Company;

(vi) the Executive's commission or attempted commission of any fraud, embezzlement, misappropriation of funds or dishonesty against the Company, its affiliates (including any Yojo affiliated or related entity), employees, agents or customers or use or intentional appropriation for his personal use or benefit of any funds or properties of the Company not authorized by the Board to be so used or appropriated;

(vii) use of illegal drugs or use of alcohol interfering with the performance of Executive's obligations under this Agreement or with the negative image of the Executive towards, clients, prospective clients and employees;

(viii) breach of any fiduciary duty to the Company or any of the Yojo affiliated and/or related entities, which the Executive has fiduciary duties, whether or not, involving personal profit to the Executive;

(ix) any significant violation of any substantive policy of the Company or Yojo affiliated and/or related entities, or other contractual, statutory or common law duties to the Company and/or Yojo affiliated and/or related entities, if such violation is not cured (if curable) within 7 calendar days after written notice to the Executive by the Company;

(x) any material breach by Executive not set forth in any of the foregoing items (i) through (ix) of this Agreement, if such breach is not cured (if curable) within 7 calendar days after written notice to the Executive by the Company; or

(xi) any other ground which the Company may be entitled to terminate this Agreement without notice under California law.

**4.5. Survival of Certain Sections**. Sections 2, 4.3.3, 4.3.4, 4.7, 4.8, 4.9, 4.10, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 16 and 17 of this Agreement will survive the termination of the Executive's employment.

**4.6. Release**. In order to be eligible to receive benefits under Section 4.3.3 of this Agreement, the Executive must execute and return to the Company a general waiver and release in substantially the form attached hereto as **Exhibit A** (the "***Release***") within the time frame set forth therein but in no event later than 45 days following the termination of the Executive's employment, and permit such Release to become fully effective in accordance with its terms, provided, however, no such Release shall require the Executive to forego any unpaid salary or any accrued but unpaid vacation pay. The Company has the authority, in its discretion, to modify the form of the release as necessary to comply with changes in applicable law and shall determine the form of the required

release, which may be incorporated into a termination agreement or other agreement with the Executive.

**4.7. Relinquishment of All Positions**. On the effective date of the termination of the Executive's employment for any reason, without further action by any person, the Executive's employment with the Company shall end and the Executive shall be deemed to have relinquished and resigned from any and all titles, positions and appointments with the Company and its subsidiaries, whether as an officer, director, employee, consultant, agent or otherwise. The Executive agrees to execute such documents as may be requested by the Company to evidence such termination of employment and resignation from all positions.

**4.8. Return of Property**. The Executive further agrees that, upon the termination of his employment with the Company, for whatever reason, the Executive shall surrender to the Company all of the property, notes, manuals, reports, documents and other things in his possession, including copies or computerized records thereof, which may relate directly or indirectly to confidential information or trade secrets.

**5. CONFIDENTIAL AND PROPRIETARY INFORMATION.**

**5.1.** Notwithstanding any provisions in this Agreement to the contrary, Executive shall be bound the terms and conditions of the Employee Confidential Information and Invention Assignment Agreement, of even date herewith (the ***"Confidential Information and Invention Assignment Agreement"***) by and between the Company and the Executive, which Confidential Information and Invention Assignment Agreement is expressly incorporated into and made a part of this Agreement as though fully set forth herein.

**5.2.** Any trade secrets of the Company will be entitled to all of the protections and benefits under applicable law. The Executive acknowledges that (i) he may have had, and may have in the future, access to information that constitutes trade secrets but that has not been, and will not be, marked to indicate its status as such and (ii) this Agreement constitutes reasonable efforts under the circumstances by the Company to notify the Executive of the existence of such trade secrets and to maintain the confidentiality of such trade secrets within the provisions of the Uniform Trade Secrets Act or other applicable law.

**6. TAXES.**

Any payments provided for hereunder shall be paid net of any applicable employment taxes or other withholdings required under federal, state or local law.

**7. ASSIGNMENT AND BINDING EFFECT.**

This Agreement shall be binding upon and inure to the benefit of the Executive and the Executive's heirs, executors, personal representatives, assigns, administrators and legal representatives. Because of the unique and personal nature of the Executive's duties under this Agreement, neither this Agreement nor any rights or obligations under this Agreement shall be assignable by the Executive. This Agreement shall be binding upon and inure to the benefit of the Company and any of its successors, assigns and legal representatives, provided that the Agreement may only be assigned to an acquirer of all or substantially all of the Company's assets. Any successor of the Company will be deemed substituted for the Company under the terms of this Agreement for all purposes. For this purpose, "successor" means any person, firm, corporation or

other business entity which at any time, whether by purchase, merger or otherwise, directly or indirectly acquires all or substantially all of the assets or business of the Company.

**8. NOTICES.**

All notices or demands of any kind required or permitted to be given by the Company or the Executive under this Agreement shall be given in writing and shall be personally delivered (and receipted for) or faxed during normal business hours or mailed by certified mail, return receipt requested, postage prepaid, addressed as follows:

If to the Company:

You and Mr Jones, Inc.
To the attention of Annette Stover
Annette@youandmrjones.com

If to the Executive:

Justin Rezvani
__________________
__________________
__________________

Any such written notice shall be deemed given on the earlier of the date on which such notice is personally delivered or three days after its deposit in the United States mail as specified above. Either Party may change its address for notices by giving notice to the other Party in the manner specified in this section.

**9. CHOICE OF LAW.**

This Agreement shall be construed and interpreted in accordance with the internal laws of the State of California.

**10. INTEGRATION.**

This Agreement, including Exhibit A, the Purchase Agreement, the Shareholder Agreement, and the Confidential Information and Invention Assignment Agreement, together, contain the complete, final and exclusive agreement of the Parties relating to the terms and conditions of the Executive's employment and the termination of Executive's employment, and supersedes all prior and contemporaneous oral and written employment agreements or arrangements between the Parties except as it otherwise expressly stated herein.

**11. AMENDMENT.**

This Agreement cannot be amended or modified except by a written agreement signed by the Executive and both Yojo Directors of the Board.

**12. WAIVER.**

No term, covenant or condition of this Agreement or any breach thereof shall be deemed waived, except with the written consent of the Party against whom the wavier is claimed, and any

waiver or any such term, covenant, condition or breach shall not be deemed to be a waiver of any preceding or succeeding breach of the same or any other term, covenant, condition or breach.

**13. SEVERABILITY.**

The finding by a court of competent jurisdiction of the unenforceability, invalidity or illegality of any provision of this Agreement shall not render any other provision of this Agreement unenforceable, invalid or illegal. Such court shall have the authority to modify or replace the invalid or unenforceable term or provision with a valid and enforceable term or provision, which most accurately represents the Parties' intention with respect to the invalid or unenforceable term, or provision.

**14. INTERPRETATION; CONSTRUCTION.**

The headings set forth in this Agreement are for convenience of reference only and shall not be used in interpreting this Agreement. This Agreement has been drafted by legal counsel representing the Company, but the Executive has been encouraged to consult with, and has consulted with, the Executive's own independent counsel and tax advisors with respect to the terms of this Agreement. The Parties acknowledge that each Party and its counsel has reviewed and revised, or had an opportunity to review and revise, this Agreement, and any rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement.

**15. REPRESENTATIONS AND WARRANTIES.**

The Executive represents and warrants that (i) the Executive is not restricted or prohibited, contractually or otherwise, from entering into and performing each of the terms and covenants contained in this Agreement, and has the full right, authority and capacity to enter into this Agreement and perform his obligations hereunder, (ii) the Executive's execution and performance of this Agreement shall not result in any breach or violation of, or a default under, any existing obligation, commitment or agreement to which the Executive is subject and (iii) the Executive is not bound by any agreement that conflicts with or prevents or restricts the full performance of his duties and obligations to the Company hereunder during or after the Term.

**16. COUNTERPARTS.**

This Agreement may be executed in two counterparts, each of which shall be deemed an original, all of which together shall contribute one and the same instrument.

**17. TRADE SECRETS OF OTHERS.**

It is the understanding of both the Company and the Executive that the Executive shall not divulge to the Company and/or its subsidiaries any confidential information or trade secrets belonging to others, including the Executive's former employers, nor shall the Company and/or its affiliates seek to elicit from the Executive any such information. Consistent with the foregoing, the Executive shall not provide to the Company and/or its affiliates, and the Company and/or its affiliates shall not request, any documents or copies of documents containing such information.

**18. ADVERTISING WAIVER.**

For so long as he remains employed, the Executive agrees to permit the Company, and persons or other organizations authorized by the Company to use, publish and distribute advertising or sales promotional literature concerning the products and/or services of the Company, or the machinery and equipment used in the provision thereof, in which the Executive's name and/or pictures of the Executive taken in the course of the Executive's provision of services to the Company appear. The Executive hereby waives and releases any claim or right the Executive may otherwise have arising out of such use, publication or distribution.

[Remainder of Page Intentionally Left Blank]

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the date first above written.

**REACH LABS, INC.**

By: ______________________________

Name: Justin Rezvani
Title: CEO & Founder

**EXECUTIVE:**

______________________________

**JUSTIN REZVANI**

**EXECUTION COPY**

## EXHIBIT A

## RELEASE AND WAIVER OF CLAIMS

In partial consideration of the payments and other benefits set forth in Section 4.3.3 of the Employment Agreement, dated as of [March __, 2016], by and between **REACH LABS, INC.** (the ***"Company"***) and me (the ***"Employment Agreement"***), I, **Justin Rezvani**, hereby furnish the Company with the following release and waiver (***"Release and Waiver"***), and I agree that I am not entitled to the payments and other benefits set forth in Section 4.3.3 of the Employment Agreement unless and until I execute this Release and it becomes effective in accordance with the terms hereof.

1. Release and Waiver of Claims

I, for and on behalf of myself and my heirs, successors and assigns, subject to the last sentence of this Section 1, hereby waive and release any common law, statutory or other complaints, claims, charges or causes of action of any kind whatsoever, both known and unknown, in law or in equity, which I ever had, now have or may have against the Company and its directors, officers, employees, shareholders, partners, investors, members, managers, agents, attorneys, representatives, trustees (each, in their official and individual capacities), predecessors, successors, parent and subsidiary entities, insurers, subsidiaries, affiliates, assigns, employee benefit plans and their administrators, fiduciaries, representatives or agent (each, in their official and individual capacities), and each affiliate, successor and assigns of the foregoing (collectively, the "***Releasees***") by reason of facts or omissions which have occurred on or prior to the date that I sign this Release, including, without limitation, any complaint, charge or cause of action arising out of or in any way related to: (1) my employment with the Company, any term or condition of that employment, or the termination of that employment; (2) all claims related to my compensation or benefits from the Company, including salary, bonuses, commissions, vacation pay, expense reimbursements, severance pay, fringe benefits, stock, stock options, or any other ownership interests in the Company; (3) all claims for breach of contract, wrongful termination, and breach of the implied covenant of good faith and fair dealing; (4) all tort claims, including claims for fraud, defamation, emotional distress, and discharge in violation of public policy; and (5) all federal, state, and local laws and regulations, including claims for discrimination, harassment, retaliation, attorneys' fees, or other claims arising under the Civil Rights Act of 1964 (as amended), the Americans with Disabilities Act of 1990, the Age Discrimination in Employment Act of 1967 (as amended) (***"ADEA,"*** a law which prohibits discrimination on the basis of age), the California Fair Employment and Housing Act (as amended), the Older Workers Benefit Protection Act, the National Labor Relations Act, the Civil Rights Act of 1991, the Employee Retirement Income Security Act of 1974, the Family and Medical Leave Act, the Sarbanes-Oxley Act of 2002, all as amended, and any other federal, state and local laws relating to discrimination on the basis of age, sex or other protected class, all claims under federal, state or local laws for express or implied breach of contract, wrongful discharge, defamation, intentional infliction of emotional distress, and any related claims for attorneys' fees and costs. I further agree that this Release and Waiver may be pleaded as a full defense to any action, suit, or other proceeding covered by the terms hereof which is or may be initiated, prosecuted or maintained by me, my descendants, dependents, heirs. executors, administrators or permitted assigns. By signing this Release and Waiver, I acknowledge that I intend to waive and release any rights known or unknown that I may have against the Releasees under these and any other laws; provided, that I do not waive or release claims with respect to (i) any rights I may have to any severance payments or benefits under the Employment Agreement, (ii) breach by the Company of this Release, or (iii) rights that cannot be released as a matter of law; and (iv) rights to indemnification, if any, whether under the California Labor Code Section 2802, any applicable agreement between the Company and me, statutory or common law, or under any applicable insurance policy that I may have been covered under while an employee of the Company.

2. Proceedings

I acknowledge that I have not filed any complaint, charge, claim or proceeding, except with respect to an Unreleased Claim, if any, against any of the Releasees before any local, state or federal agency, court or other body (each individually a "***Proceeding***"). I (i) acknowledge that I will not initiate or cause to be initiated on my behalf any Proceeding and will not participate in any Proceeding, in each case, except as required by law; and (ii) waive any right I may have to benefit in any manner from any relief (whether monetary or otherwise) arising out of any Proceeding, including any Proceeding conducted by the Equal Employment Opportunity Commission ("***EEOC***"). Further, I understand that, by executing this Release, I will be limiting the availability of certain remedies that I may have against the Company and limiting also my ability to pursue certain claims against the Releasees. Notwithstanding the above, nothing in Section 1 of this Release shall prevent me from (i) initiating or causing to be initiated on my behalf any complaint, charge, claim or proceeding against the Company before any local, state or federal agency, court or other body challenging the validity of the waiver of my claims under the ADEA contained in Section 1 of this Release (but no other portion of such waiver); or (ii) initiating or participating in an investigation or proceeding conducted by the EEOC, the National Labor Relations Board or any other federal or state administrative agency.

3. Time to Consider

I acknowledge that I have been advised that I have twenty-one (21) days from the date of receipt of this Release and Waiver to consider all the provisions of this Release and I hereby knowingly and voluntarily waive said given twenty-one (21) day period. I FURTHER ACKNOWLEDGE THAT I HAVE READ THIS RELEASE CAREFULLY, HAVE BEEN ADVISED BY THE COMPANY TO CONSULT AN ATTORNEY, AND FULLY UNDERSTAND THAT BY SIGNING BELOW I GIVE UP CERTAIN RIGHTS WHICH I MAY HAVE TO SUE OR ASSERT A CLAIM AGAINST ANY OF THE RELEASEES, AS DESCRIBED IN SECTION 1 OF THIS RELEASE AND THE OTHER PROVISIONS HEREOF. I ACKNOWLEDGE THAT I HAVE NOT BEEN FORCED OR PRESSURED IN ANY MANNER WHATSOEVER TO SIGN THIS RELEASE, AND I AGREE TO ALL OF ITS TERMS VOLUNTARILY.

In signing this Release, which is intended to have the effect of releasing forever claims, except for Unreleased Claims, that are presently unknown to me, I acknowledge that I have read and understand Section 1542 of the California Civil Code, which reads as follows:

> **"A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."**

I hereby expressly waive and relinquish all rights and benefits under that section and any law of any jurisdiction of similar effect with respect to my release of any unknown or unsuspected claims I may have against the Releasees.

4. Revocation

I hereby acknowledge and understand that I shall have seven (7) days from the date of execution of this Release to revoke this Release (including, without limitation, any and all claims arising under the ADEA) and that neither the Company nor any other person is obligated to provide any benefits to me pursuant to Section 4.3.3 of the Employment Agreement until eight (8) days have passed since my signing of this Release without my having revoked this Release, in which event the Company immediately shall arrange and/or pay for any such benefits otherwise attributable to said eight- (8) day period, consistent with the terms of the Employment Agreement. If I revoke this Release, I will be deemed not to have accepted the terms of this Release, and no action will be required of the Company under any section of this Release.

5. No Admission

This Release does not constitute an admission of liability or wrongdoing of any kind by the Company or me.

6. General Provisions

A failure of any of the Releasees to insist on strict compliance with any provision of this Release shall not be deemed a waiver of such provision or any other provision hereof. If any provision of this Release is determined to be so broad as to be unenforceable, such provision shall be interpreted to be only so broad as is enforceable, and in the event that any provision is determined to be entirely unenforceable, such provision shall be deemed severable, such that all other provisions of this Release shall remain valid and binding upon me and the Releasees.

7. Governing Law

The validity, interpretations, construction and performance of this Release shall be governed by the laws of the State of California without giving effect to conflict of laws principles.

* * *

I acknowledge my continuing obligations under my Confidential Information and Invention Assignment Agreement and Section 2 of the Employment Agreement. Pursuant to the Confidential Information and Invention Assignment Agreement and the Employment Agreement, I understand that among other things, I must not use or disclose any confidential or proprietary information of the Company and I must immediately return all Company property and documents (including all embodiments of proprietary information) and all copies thereof in my possession or control. I understand and agree that my right to the severance pay I am receiving in exchange for my agreement to the terms of this Release and Waiver is contingent upon my continued compliance with my Confidential Information and Invention Assignment Agreement and, to the extent permitted by law, Section 2 of the Employment Agreement.

This Release and Waiver constitutes the complete, final and exclusive embodiment of the entire agreement between the Company and me with regard to the subject matter hereof. I am not relying on any promise or representation by the Company that is not expressly stated herein. This Release and Waiver may only be modified by a writing signed by both me and a duly authorized officer of the Company.

Date: ______________________ ______________________________

Justin Rezvani

# EXHIBIT "B"

# STOCK PURCHASE AGREEMENT

**THIS STOCK PURCHASE AGREEMENT** (this "Agreement") is made and entered into as of April 25, 2016 (the "Closing Date") by and among **JUSTIN REZVANI**, an individual resident of the State of California ("Rezvani"); **MICHAEL TAYLOR**, trustee of the **RL STOCK HOLDING TRUST** dated January 1, 2014 ("Taylor"); **MICHAEL REZVANI**, an individual resident of the State of California ("Michael"); **MEDIA LINK, LLC**, a California limited liability company ("MediaLink" and collectively, with Rezvani, Taylor and Michael, the "Sellers"), being the holders of capital stock of **REACH LABS, INC.**, a California corporation (the "Company"); Justin Rezvani, an individual as the representative of the Sellers appointed pursuant to Section 6.9 (the "Sellers' Representative"); and **YOU & MR. JONES INC.**, a Delaware corporation ("Buyer").

**WHEREAS**, the Sellers own 5,089,583 of the issued and outstanding shares of the capital stock of the Company, comprised of common stock with a par value $0.0001 per share (the "Common Stock"); and

**WHEREAS**, upon and subject to the terms and conditions contained herein, the Sellers desire to sell to Buyer, and Buyer desires to purchase from Seller, the issued and outstanding shares of the Company;

**NOW, THEREFORE**, in consideration of the premises and the mutual representations, warranties, covenants and agreements contained herein, the receipt and sufficiency of which are hereby acknowledged, and upon and subject to the terms and the conditions hereinafter set forth, the parties, intending to be legally bound, do hereby agree as follows:

## ARTICLE I
## PURCHASE AND SALE OF SHARES

**Section 1.1** **Purchase and Sale of Stock of the Company**. Upon the terms and subject to the conditions of this Agreement, at the Closing (as defined below), the Sellers hereby sell, transfer, assign and deliver to Buyer, and Buyer hereby purchases from the Sellers, the issued and outstanding stock in the Company as set forth in Exhibit A hereto (the "Shares").

## ARTICLE II
## PURCHASE PRICE; CLOSING

**Section 2.1** **Purchase Price**.

(a) The purchase price for the Shares shall be Seven Million Two Hundred and Five Thousand 00/100 Dollars ($7,205,000.00) (the "Purchase Price"). The Purchase Price shall be further increased by the Earn-Out Payment(s) paid to Sellers pursuant to Section 2.2 hereof. The purchase and sale of the Shares shall take place remotely via the exchange of documents and signatures on April 22, 2016 (the "Closing"). The date on which the Closing shall occur is referred to herein as the "Closing Date." The Purchase Price paid by Buyer to Sellers for the Shares shall be in such amounts and via the wire instructions indicated in the Funds Flow Memorandum as set forth in Exhibit A-1. Sellers shall pay or cause to be paid the Purchase Price to the parties identified in the Funds Flow Memorandum on the later of the Closing or within three (3) business days of Buyer's receipt of the Funds Flow Memorandum. The parties agree that Buyer shall be entitled to rely on the Funds Flow Memorandum in making

payments under Sections 2.1 and 2.2 hereof and that Buyer shall not be responsible for verifying the calculations or the determinations regarding such calculations in the Flow of Funds Memorandum.

(b) Buyer shall be entitled to deduct and withhold from the Purchase Price such amounts as it is required to deduct and withhold with respect to the making of such payment under the Code, or any provision of applicable law relating to Taxes. To the extent that amounts are so withheld, paid over to, or deposited with the relevant Taxing Authority by Buyer, such amounts shall be treated for all purposes of this Agreement as having been paid to the applicable transferee in respect of which such deduction and withholding was made.

**Section 2.2 Calculation of Earn-Out Amounts.**

(a) As additional consideration for the Shares, the Sellers may be entitled to receive earn-out payments for the Fiscal Years (as defined below) ending on December 31, 2016, December 31, 2017 and December 31, 2018 (the "2016 Earn-Out Year", "2017 Earn-Out Year", and the "2018 Earn-Out Year", respectively, and collectively, referred to as the "Earn-Out Years"). The earn-out payment due for the 2016 Earn-Out Year, 2017 Earn-Out Year and 2018 Earn-Out Year shall be respectively referred to as the "2016 EO Payment", "2017 EO Payment" and the "2018 EO Payment" and shall collectively, be referred to as, the "Total EO Payment". Subject to the limitations set forth in Section 2.2(b), the Earn-Out Payment for each respective Earn-Out Year and Total Earn-Out Payment shall be calculated as follows:

**2016 Earn-Out Payment** =

*51% * [(2016 Unlevered Cash Flow * 10.7) - 15,000,000].*

**2017 Earn-Out Payment** =

*[51% * ((((2016 Unlevered Cash Flow + 2017 Unlevered Cash Flow)/2) * 10.7) - 15,000,000)] - 2016 EO Payment.*

**2018 Earn-Out Payment** =

*[51% * ((((2016 Unlevered Cash Flow + 2017 Unlevered Cash Flow +2018 Unlevered Cash Flow)/3) * 10.7) - 15,000,000)] - 2016 EO Payment - 2017 EO Payment.*

**Total Earn-Out Payment** =

*2016 EO Payment + 2017 EO Payment + 2018 EO Payment.*

(b) Notwithstanding the above,

(i) the 2016 EO Payment shall not exceed One Million Five Hundred Thirty Thousand ($1,530,000) Dollars;

(ii) the 2016 EO Payment plus the 2017 EO Payment shall not, in sum, exceed the total of Three Million Sixty Thousand ($3,060,000) Dollars; and

(iii) the aggregate Total Earn-Out Payment which may be received by the Sellers for all Earn-Out Years shall not exceed Seven Million Six Hundred and Fifty Thousand ($7,650,000) Dollars.

(iv) Earn-Out Payments shall not be carried forward or carried back from one Earn-Out Year to another and any such excess shall be forfeited. Any negative Earn-Out Payment, shall for purposes of this provision, be equal to zero. For the sake of clarity and by way of example, if the 2016 Earn-Out Payment calculation is $5,000,000 and the 2017 Earn-Out Payment calculation is 0, then

the 2016 Earn-Out Payment to the Sellers shall be $1,530,000, with the excess forfeited and the 2017 Earn-Out Payment shall be 0.

(c) Each Earn-Out Payment shall be allocated to each Seller as set forth in Exhibit A, with the total Earn-Out Payment not to exceed the limits set forth in Section 2.2(b) hereof:

(d) The following defined terms shall apply to Section 2.2:

(i) "Unlevered Free Cash Flow" shall be calculated for each Earn Out Year as follows: Net Income + Depreciation year n - Capital Expenditures year n + Working Capital as of December 31 n-1 – Working Capital as of December 31 n, which balances shall be determined in accordance with U.S. generally accepted accounting principals ("U.S. GAAP") applied consistently and restated for any extraordinary item (including, without limitation, any key-man insurance proceeds).

(ii) "Working Capital" shall be determined by using the following formula, for an Earn Out Year n: Current Assets including Cash and cash equivalents as of December 31 of the year n – Cash and cash equivalents as of December 31 of the year n - Current Liabilities (including overdrafts and financial short term liabilities as of December 31 of year n + overdrafts as of December 31 n + short term financial liabilities as of December 31 n).

(iii) "Capital Expenditures" shall mean the amount spent for purchase of Fixed Assets and Intangible Assets as such terms are defined by U.S. GAAP.

(iv) "Fiscal Year" shall mean the period beginning on January 1 and ending on December 31 of the respective calendar year.

(v) "Net Income" shall mean profit after taxes (PAT) in accordance with U.S. GAAP.

(e) As soon as practicable after the end of each Earn-Out Period (but no later than 60 days following receipt of audit clearance by the Company's auditor and of all information as reasonably requested by Buyer from the Company), the Buyer shall prepare an income statement (the "EO Period Income Statement") for the twelve month period of the applicable Earn-Out Year (each, an "Earn-Out Period"). Buyer will prepare the EO Period Income Statement in accordance with the U.S. GAAP. Upon request, Buyer will deliver to Sellers' Representative: (i) the EO Period Income Statement and (ii) Buyer's calculation of the Earn-Out Payment (the "Earn-Out Statement" and, together with the EO Period Income Statement, the "Earn-Out Financials"). If Buyer does not receive any objections in writing to the Earn-Out Statement within twenty (20) days of receipt (the "Earn-Out Notice"), the Sellers' Representative shall be deemed to have no objection to the Earn-Out Payment and the Earn-Out Payment shall become final and binding on the parties hereto for all purposes of this Agreement.

(f) The parties shall negotiate in good faith to resolve any disputes as promptly as practicable upon receipt of an Earn-Out Notice. If the parties are unable to resolve all disputes within twenty (20) calendar days of receipt of the Earn-Out Notice, then only the unresolved disputes shall be submitted to an independent third party accountant selected by Buyer ("Independent Accountant"). The parties shall be entitled to provide the Independent Accountant with supporting documentation in connection with resolution of such disputes. The Independent Accountant shall, within thirty (30) calendar days of its engagement, provide a final and conclusive resolution of all unresolved disputes and shall conform the Earn-Out Financials accordingly. All references in this Agreement to the Earn-Out Financials shall mean the Earn-Out Financials as modified pursuant to this resolution procedure, and the

resolution of the Independent Accountant shall be binding on the parties hereto. The fees and expenses of the Independent Accountant shall be borne solely by the party (Buyer or Sellers' Representative) whose valuation had the greatest difference from the Independent Accountant valuation.

**Section 2.3** **Closing; Closing Date**. Subject to the satisfaction or waiver of the conditions set forth in Article VII herein, the consummation of the purchase and sale of the Shares (the "Closing") shall take place remotely via the electronic exchange of documents and signatures on the Closing Date. All actions to be taken and all documents to be executed or delivered at the Closing pursuant to this Agreement will be deemed to have been taken, executed and delivered simultaneously, and no action will be deemed taken and no document will be deemed executed or delivered until all have been taken, delivered and executed, except in each case to the extent otherwise stated in this Agreement. Buyer shall commence to own and control the Company as of 12:01 a.m. Eastern Standard Time on the Closing Date.

**Section 2.4** **No Further Ownership Rights in Shares**. The Purchase Price, when delivered at Closing in accordance with Section 2.1 in exchange for the Shares shall be deemed to have been paid in full satisfaction of all Sellers' rights pertaining to the Shares, and Sellers shall have no further rights as a shareholder of the Company after the Closing; provided, however, that nothing set forth in this Section 2.4 shall relieve the Buyer of their obligations hereunder to make any payments required to be made to Sellers in accordance with Section 2.2 hereof.

**Section 2.5** **Exercise of Warrants**. Immediately prior to Closing, Sellers shall cause the Company to (a) take all appropriate actions to ensure that all unvested warrants of the Company become fully vested immediately prior to Closing and (b) MediaLink shall exercise all (but not less than all) of such warrants held by MediaLink.

**Section 2.6** **Appointment of Sellers' Representative**.

(a) Each Seller hereby appoints Rezvani (including any replacement for Rezvani as designated herein, the "Sellers' Representative") the attorney-in-fact of such Seller, with full power and authority, including power of substitution, acting in the name of and for and on behalf of such Seller with respect to this Agreement and any of the other agreements entered into in connection herewith, including to (i) deliver to Buyer at the Closing the Shares; (ii) execute and deliver to Buyer at the Closing all certificates and documents to be delivered to Buyer by the Company or the Sellers pursuant to this Agreement and the other agreements entered into in connection herewith; (iii) incur expenses on behalf of the Company or the Sellers in connection with this Agreement, the other agreements entered into in connection herewith and the transactions contemplated hereby and thereby as the Sellers' Representative may deem appropriate; and (iv) take such action on behalf of the Sellers as the Sellers' Representative may deem appropriate in respect of: (1) waiving any inaccuracies in the representations or warranties of Buyer contained in this Agreement or the other agreements entered into in connection herewith; (2) amending or waiving any provision of this Agreement or the other agreements entered into in connection herewith; (3) taking such other action as any Seller is authorized to take under this Agreement or the other agreements entered into in connection herewith; (4) receiving all documents or certificates and making all determinations, on behalf of any Seller, required under this Agreement or the other agreements entered into in connection herewith; (5) resolving any dispute with Buyer over any aspect of this Agreement or the other agreements entered into in connection herewith and claims by any Buyer Indemnified Party (as defined herein) under Article VIII (Indemnification) hereof; (6) all such other matters as the Sellers' Representative may deem necessary or appropriate to consummate the transactions contemplated by this Agreement or the other agreements entered into in connection herewith; (7) taking all such action as may be necessary after the Closing Date to carry out any of the transactions contemplated by this Agreement or the other agreements entered into in connection herewith; and (8) entering into any agreement to effectuate any of the foregoing which shall have the effect of binding any Seller as if such Seller had

personally entered into such agreement; except that any such action that disproportionally affects any Seller relative to the other Sellers shall require the prior written consent of such Seller. This appointment and power of attorney shall be deemed as coupled with an interest and all authority conferred hereby shall be irrevocable whether by the death or incapacity of any such Seller or the occurrence of any other event or events. Buyer shall be entitled to rely upon any communication or writings given by or to, or executed by, the Sellers' Representative and all actions, decisions and instructions of the Sellers' Representative shall be conclusive and binding upon all of the Sellers; except that any such action that disproportionally affects any Seller relative to the other Sellers shall require the prior written consent of such Seller. To the extent that the terms of this Agreement or any of the documents executed in connection herewith require (y) Buyer to obtain the consent of any Seller, such consent may be made or given by the Sellers' Representative or (z) notice to any Seller, such notice shall be deemed made upon delivery of such notice to the Sellers' Representative in accordance with <u>Section 9.8</u> hereof.

(b) Upon the death, disability, or resignation of the Sellers' Representative, the replacement Sellers' Representative shall be selected by written consent of the Sellers (including their successors, heirs and assigns) which held a majority of the Shares immediately prior to Closing.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Each of the Sellers, severally but not jointly, represents and warrants to Buyer as of the date hereof as follows regarding such Seller and only such Seller:

**Section 3.1** **<u>Power, Authority and Organization of the Sellers</u>**. Such Seller has the right, power and capacity to execute, deliver and perform this Agreement and to consummate the transactions contemplated hereby. This Agreement has been duly and validly executed and delivered by such Seller and constitutes such Seller's legal, valid and binding obligation, enforceable in accordance with its terms, except as limited by (a) applicable bankruptcy, insolvency, reorganization, moratorium or other laws of general application affecting the enforcement of creditors' rights generally, and (b) general principles of equity that restrict the availability of equitable remedies.

**Section 3.2** **<u>Shares Ownership</u>**. Such Seller owns, beneficially and of record, valid and marketable title to the Shares in the amounts set forth next to such Seller's name on **<u>Schedule 3.2</u>**. Such Shares are owned by such Seller and will be transferred to Buyer free and clear of all Liens, claims, equities, charges, options, rights of first refusal, or encumbrances, with no defects of title. Upon the conveyance and transfer of such Shares to Buyer hereunder, Buyer shall receive valid and marketable title thereto, free and clear of all Liens and with no defects of title.

**Section 3.3** **<u>No Conflict</u>**. The execution and delivery of this Agreement by such Seller, the consummation of the transactions contemplated herein by such Seller, and the performance of the covenants and agreements of such Seller will not, with or without the giving of notice or the lapse of time, or both, (a) violate, conflict with or result in a breach or default under or cause termination of any term or condition of any mortgage, indenture, contract, license, permit, instrument, trust document, will, stockholders' agreement, co-sale agreement or other agreement or document to which such Seller is a party or by which such Seller or any of his or its properties may be bound; (b) violate any provision of law, statute, rule, regulation, court order, judgment or decree, or ruling of any Governmental Authority, to which such Seller is a party or by which such Seller or his properties may be bound; or (c) result in the creation or imposition of any Liens of any kind whatsoever upon any asset of such Seller.

**Section 3.4** **<u>Litigation</u>**. There is no litigation, claim, suit, action, investigation, indictment or information, proceeding, arbitration, grievance or other procedure pending or threatened against or by

such Seller or any Affiliate of such Seller related to the Shares owned by such Seller or that challenges or seeks to prevent, enjoin or may otherwise delay the transactions contemplated by this Agreement.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF THE SELLERS REGARDING THE COMPANY AND THE SELLERS

Each of the Sellers (with the exception of MediaLink, who shall make no representations or warranties pursuant to this Section), severally but not jointly, represents and warrants to the Buyer as of the date hereof as follows:

**Section 4.1** **Organization; Authorization; Shares; Other Claims**

(a) The Company is a corporation duly organized, validly existing and in good standing under the laws of the California and has all requisite corporate power and authority to carry on and conduct its business as it is now being conducted. The Company is duly qualified and in good standing in the states set forth on **Schedule 4.1(a)**. The Company is duly qualified and in good standing in each state in which the conduct of its business or the ownership of its properties and assets requires it to be so qualified.

(b) The Company has no subsidiaries and does not own, directly or indirectly, of record or beneficially, any outstanding securities or other equity interests of any type in any entity.

(c) The current officers and directors of the Company are listed on **Schedule 4.1(c)**.

(d) The copies of the certificate of incorporation and the bylaws of the Company that have previously been delivered to Buyer are the true, correct and complete governing documents of the Company in effect as of the date hereof. The copies of the minutes of the meetings of the board of directors of the Company (the "Board") and the ownership records of the Company that have been delivered previously to Buyer are the true, correct and complete records of the meetings of the Board and of equity issuances through and including the date hereof and reflect all transactions and other matters required by applicable law to be reflected in such records. Except as set forth on **Schedule 4.1(d)**, neither the Company nor any Seller, is a party to or bound by, and there is not any, stockholders' agreement, control agreement, voting trust agreement or other contract, plan or understanding relating to the purchase, repurchase, acquisition, disposition, holding, voting, dividends, ownership or transfer rights or restrictions of any securities of the Company.

(e) The Company has the right, power and capacity to execute, deliver and perform this Agreement and to consummate the transactions contemplated hereby. The execution, delivery and performance of this Agreement by the Company, and the consummation of the transactions contemplated hereby, have been duly authorized by all necessary corporate action on the part of the Company. This Agreement has been duly and validly executed and delivered by the Company and constitutes the Company's legal, valid and binding obligation, enforceable in accordance with its terms, except as limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium or other laws of general application affecting the enforcement of creditors' rights generally, and (ii) general principles of equity that restrict the availability of equitable remedies ("Enforceability Exceptions").

(f) Upon the Closing, Buyer shall have obtained good and valid title to all of the outstanding equity of the Company free and clear of any Liens and with no defects of title whatsoever. The Shares collectively constitute fifty one percent (51.0%) of the issued and outstanding shares or other equity securities of the Company.

**Section 4.2** **Capital Stock**. The total authorized capital stock of the Company consists of (a) 10,000,000 shares of Common Stock, of which 9,979,575 shares are issued and outstanding as of the date hereof and (b) 1,000,000 shares of preferred stock, $0.0001 par value per share (the "Preferred Stock"), of which no shares are issued and outstanding. All of the issued and outstanding shares of Common Stock have been duly authorized and validly issued and are fully paid and non-assessable. All the Shares held by record of the Sellers, free and clear of all Liens. There are no outstanding subscriptions, options, warrants, commitments, preemptive rights, agreements, arrangements or commitments of any kind for or relating to the issuance, sale, registration or voting of, or outstanding securities convertible into, exchangeable for, any shares of capital stock of any class or other equity interests of the Company. None of the Shares were issued in violation of any preemptive rights or laws. All issuances, transfers or purchases of Common Stock have been in compliance with all applicable agreements and all applicable laws, including federal and state securities laws, and all Taxes thereon have been paid. **Schedule 4.2** sets forth the true and accurate pre-Closing and, assuming the consummation of the Closing in the manner set forth in this Agreement, post-Closing capitalization of the Company. **Schedule 4.2** contains the true and accurate stock ledger of the Company. All Company actions with respect to the authorization, issuance, repurchase, redemption or other similar corporate action have been duly executed and validly exercised by the Company and such respective stockholder of the Company's capital stock.

**Section 4.3** **Absence of Other Claims**. Except as set forth on **Schedule 4.3**, there are no outstanding obligations, options, rights, subscriptions, warrants or other commitments entitling any Person to purchase or otherwise subscribe for or acquire any equity interests of the Company or any security convertible into or exchangeable for equity interests of the Company, nor is there presently outstanding any security convertible into or exchangeable for equity interests of the Company, nor has the Company entered into any agreement with respect to any of the foregoing other than this Agreement. Except as set forth on **Schedule 4.3**, the Company does not have any obligation to repurchase, redeem or otherwise acquire any Shares of or other equity or voting interests in, the Company. There are no irrevocable proxies and no voting agreements to which the Company is a party with respect to any equity interests or other voting securities of the Company.

**Section 4.4** **No Conflict**. Neither the execution and delivery of this Agreement by the Company, the consummation of the transactions contemplated herein by the Company, nor the performance of the covenants and agreements of the Company will, with or without the giving of notice or the lapse of time, or both, (a) violate or conflict with any of the provisions of the Company's governing documents; (b) violate, conflict with or result in a breach or default under or cause termination of any term or condition of any mortgage, indenture, contract, license, permit, instrument, trust document, or other agreement or document to which the Company is a party or by which the Company or its properties may be bound; (c) violate any provision of law, statute, regulation, court order or ruling of any Governmental Authority, to which the Company is a party or by which it or its properties may be bound; or (d) result in the creation or imposition of any Lien of any kind whatsoever upon any asset of the Company.

**Section 4.5** **Consents and Approvals**. Except as set forth on **Schedule 4.5**, no consent or approval is required by virtue of the execution hereof by the Sellers or the Company or the consummation of any of the transactions contemplated herein by the Sellers or the Company to avoid a material violation or breach of, or a default under, or a creation of a Lien on assets of the Sellers, pursuant to the terms of any regulation, order, decree or award of any court or governmental agency or any lease, agreement, contract, mortgage, note, license, or any other instrument to which the Sellers or the Company is a party or to which the Sellers, the Company or any of their property or assets or any of the Shares is subject.

**Section 4.6** **<u>Compliance with Law; Permits</u>**.

(a) Except as set forth on **<u>Schedule 4.6(a)(i)</u>**, the Company is not, has not been nor will be (by virtue of any past or present action, omission to act, contract to which it is a party or any occurrence or state of facts whatsoever) in violation of any applicable local, state or federal law, ordinance, regulation, order, injunction or decree, or any other requirement of any Governmental Authority binding on it, or relating to its property or business (including any antitrust laws and regulations), the Company has not been notified of the existence of any of the foregoing, and the Company will not hereafter suffer or incur any loss, liability, penalty or expense (including attorneys' fees) by virtue of any such violation. The Company has all material licenses, permits or other authorizations of Governmental Authorities necessary for the conduct of its business. A correct and complete list of all such material licenses, permits and other authorizations is set forth on **<u>Schedule 4.6(a)(ii)</u>**. The Company has made available to Buyer true, correct and complete copies of all written licenses, permits and authorizations listed on **<u>Schedule 4.6(a)(ii)</u>**.

(b) No Seller nor any of such Sellers' Affiliates is a Person that is, or is owned or controlled by Persons that are: (i) listed in Executive Order No. 13224 (September 23, 2001) issued by the President of the United States (Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), any related enabling legislation or any other similar executive orders; (ii) named on the List of Specially Designated Nationals and Blocked Persons maintained by the U.S. Office of Foreign Assets Control, Department of Treasury, and/or on any other similar list maintained by the U.S. Office of Foreign Assets Control, Department of Treasury pursuant to any authorizing statute, executive order or regulation; (iii) located, organized or resident in a country or territory that is, or whose government is, the subject of U.S. sanctions, including Cuba, Iran, North Korea, Sudan and Syria or (iv) in violation of other requirements of any other Governmental Entity with respect to anti-money laundering, "know your customer" regulations and similar matters.

(c) Neither the Company nor, any director, officer or employee of the Company or agent acting at the direction of the Company has provided, offered, gifted or promised, directly or indirectly, anything of value to any officer, employee or representative of any Governmental Authority, any government-owned Person, any political party or official thereof, any candidate for political office, any government-owned or controlled company, or any public international organization (each, a "<u>Government Official</u>") or provided or promised anything of value to any other Person while knowing that all or a portion of that thing of value would or will be offered, given or promised, directly or indirectly, to any Government Official for the purpose of: (a) influencing any act or decision of such Government Official in his, her or its official capacity, including a decision to fail to perform his, her or its official functions; (b) inducing any Government Official or any other Person to act in violation of his, her or its lawful duty; (c) securing any improper advantage for the benefit of the Company; or (d) persuading any Government Official or other Person to use his or its influence with any Governmental Authority or any government-owned Person to effect or influence any act or decision of such Governmental Authority or government-owned Person, including to affect or influence any act or decision of such Governmental Entity or government-owned Person in order to assist the Company in obtaining or retaining business for or with, or directing business to, any Person. The Company maintains systems of internal accounting controls sufficient to provide reasonable assurances that violations of anti-bribery and similar Laws will be prevented, detected and deterred.

**Section 4.7** **<u>Financial Statements</u>**. **<u>Schedule 4.7</u>** contains (i) the unaudited balance sheets of the Company as of December 31, 2015, and the unaudited balance sheets of the Company as of December 31, 2014, and the related statements of income, retained earnings, and cash flows for the fiscal years then ended, and the notes thereto (collectively, the "<u>Year-End Financial Statements</u>") and (ii) and the unaudited balance sheets of the Company as of March 31, 2016 and the related unaudited statements of

income, retained earnings, and cash flows for the two months period then ended (the "Interim Financial Statements," and collectively with the Year-End Financial Statements, the "Financial Statements"). The Year-End Financial Statements are true, correct and complete in all material respects, and present fairly the financial position of the Company as of the dates thereof, and the related results of its operations for the years then ended. The Interim Financial Statements are true, correct and complete in all material respects and present fairly the financial position of the Company as of the date thereof, and the related results of its operations for the periods then ended, subject to the absence of footnotes and normal and recurring year-end adjustments. The Year-End Financial Statements have been prepared in accordance with GAAP applied on a consistent basis, and the Interim Financial Statements have been prepared in accordance with GAAP for interim statements on a basis consistent with prior periods. All adjustments, consisting of normal, recurring accruals necessary for a fair presentation, have been made in the Interim Financial Statements.

**Section 4.8** **Absence of Undisclosed Liabilities**.

(a) The Company does not have any material liability or obligation whatsoever, whether accrued, absolute, contingent or otherwise except (i) as and to the extent reflected and adequately reserved against in the Financial Statements as of December 31, 2015, (ii) as shown on **Schedule 4.8(a)**, or (iii) liabilities and obligations incurred by the Company since the Interim Balance Sheet Date in the Ordinary Course of Business that did not arise from any breach of contract, breach of warranty, tort, infringement claim, violation of law or any action, suit, litigation, claim, audit or cause of action before any Governmental Authority or arbitrator.

(b) Except as set forth in Schedule 4.8(b), each of the products produced or sold by the Company (collectively, the "Company Products") is, and at all times up to and including the sale thereof has been, (i) in compliance in all material respects with the terms and requirements of the applicable contract (including applicable express warranties and implied warranties not effectively disclaimed in compliance with applicable law ("Effective Implied Warranties")) between the Company and such Person, (ii) in conformance in all material respects with any promises or affirmations of fact made in connection with such contract for its sale and (iii) in compliance in all material respects with all applicable laws. All services provided by the Company to any third party (collectively, the "Company Services" and together with the Company Products, the "Company Offerings") have been performed in conformity in all material respects with the terms and requirements of the applicable contract (including applicable express warranties or Effective Implied Warranties) among the Company and such Person and in all material respects with all applicable laws. **Schedule 4.8(b)** sets forth all agreements that obligate the Company to provide Company Services after the date hereof. There are no material unresolved claims or, threatened claims by any customer or other Person against the Company (i) under or based upon any warranty provided by or on behalf of the Company, or (ii) relating to any Company Product or Company Service.

**Section 4.9** **Real Property**

(a) The Company does not own, and has never owned, any real property and is not obligated and does not have any option to acquire any real property. **Schedule 4.9(a)** sets forth a complete and accurate list and description of all leases, licenses, subleases, concessions, occupancy agreements and other agreements (written or oral), together with all amendments thereto, with respect to all real property in which the Company has a leasehold or subleasehold interest (whether as a lessor or lessee) or is grantee a license, concession or other right to use or occupy any land, buildings, improvements, fixtures or other interest in real property which is used in the operation of the Business (each, a "Lease" and collectively, the "Leases"; the property covered by Leases under which the Company is a lessee is referred to herein as the "Leased Real Property"). Except as set forth on

**Schedule 4.9(a)**, with respect to each Lease: (i) such Lease is legal, valid, binding, enforceable (subject to Enforceability Exceptions) and in full force and effect against the Company; (ii) except as set forth in **Schedule 4.5**, the consummation of the transactions contemplated by this Agreement will not result in a breach of or default under such Lease, or otherwise cause such Lease to cease to be legal, valid, binding, enforceable and in full force and effect on identical terms following the Closing; (iii) neither the Company nor any other party to the Lease is in breach or default under such Lease, and no event has occurred or circumstance exists which, with the delivery of notice, passage of time or both, would constitute a material breach or default or permit the termination, modification or acceleration of rent under such Lease; (iv) the Company has not received written or oral notice that a security deposit or portion thereof that has been deposited with respect to such Lease has been applied in respect of a breach or default under such Lease which has not been re-deposited in full; (v) there are no forbearance programs in effect with respect to such Lease; (vi) there are no disputes between the Company and any other Person with respect to such Lease; and (vii) the Company has not assigned, subleased, mortgaged, deeded in trust or otherwise transferred or encumbered such Lease or any interest therein. Except as set forth on **Schedule 4.5**, the transactions contemplated by this Agreement do not require the consent of any other party to any Lease.

(b) The Leased Real Property comprises all of the real property occupied, leased, operated or used by the Company, and there are no other leases, subleases, licenses, concessions, or other occupancy agreements in effect with respect to the Leased Real Property, other than such items that do not interfere with the Company's use of the Leased Real Property. Except as set forth on **Schedule 4.9(b)**, (i) to the Company's knowledge, there are no deferred real or personal property taxes or assessments with respect to the Leased Real Property payable by the Company which may or will become due and payable as a result of the consummation of the transactions contemplated by the Agreement, (ii) to the Company's knowledge, there are no condemnation or eminent domain proceedings pending or threatened with respect to all or any part of the Leased Real Property and (iii) the Company has not received any written notice that the improvements on each parcel of Leased Real Property and the Company's use thereof does not or may not comply in all material respects with any building, zoning, subdivision, traffic, parking, land use, occupancy, health or other applicable law relating to the Leased Real Property.

**Section 4.10 Personal Property**

(a) **Schedule 4.10(a)** sets forth a complete and accurate list and description of all of the personal property that the Company owns or leases, has agreed (or has an option) to purchase, sell or lease, or may be obligated to purchase, sell or lease, the net book value of which, as properly reflected in the books and records of the Company, on an individual, item-by-item basis, exceeds $2,500.

(b) The Company (i) has good and valid title to all material tangible and intangible properties and assets which it purports to own and use in the conduct of its business and all the personal properties and assets reflected on the Balance Sheets (except for inventory and assets sold in the Ordinary Course of Business and supplies consumed in the Ordinary Course of Business); and (ii) owns such personal property free and clear of all title defects or objections or Liens of any nature whatsoever, including any mortgages, leases, chattel mortgages, conditional sales contracts, collateral, security arrangements and other title or interest retention arrangements. **Schedule 4.10(b)** sets forth a general description and the location of any personal property or assets and leasehold improvements that are not located at the principal location of the Company's business. All material property and assets of the Company are in the possession of the Company.

(c) The equipment and the structures owned or leased by the Company are structurally sound with no material defects, are in good and safe operating condition and repair (normal wear and tear excepted).

(d) The rights, properties and other assets presently owned, leased or licensed by the Company and described on **Schedule 4.9**, **Schedule 4.10(a)**, and **Schedule 4.11** include, in the aggregate, all rights, properties and other assets necessary to permit the Company to conduct its business in substantially the same manner as its business has been conducted since the Interim Balance Sheet Date, without any need for extraordinary replacement, refurbishment or repair.

(e) **Schedule 4.10(e)** contains a complete and accurate list of all leases (including any capital leases) and lease-purchase arrangements pursuant to which the Company leases personal property from others and which (i) require the Company to pay, for rent and any obligatory improvements, more than $5,000 in any single year or $25,000 during the entire term of such lease or lease-purchase arrangement (including any renewal term that the Company may not avoid by refusing to renew in its sole discretion); or (ii) provide for a purchase option for a price of more than $25,000. **Schedule 4.10(e)** specifies which of such leases, if any, are capital leases. All leases that are required to be capitalized by GAAP have been so accounted for in the Financial Statements. The Company has made available to Buyer a true, correct and complete copy of each of the items listed or required to be listed on **Schedule 4.10(e)**.

**Section 4.11 Intellectual Property; Software.**

(a) The Company solely owns all right and title to, free and clear of any Lien, or has perpetual, non-terminable licenses to all Intellectual Property necessary for the conduct of its business. The Company is not subject to any proceeding or outstanding decree, order or judgment restricting in any manner the use, enforceability, transfer or licensing by the Company of any of the Company Intellectual Property.

(b) **Schedule 4.11(b)** contains a list of all Registered Intellectual Property owned by the Company. Each item of Registered Intellectual Property owned by the Company is valid and subsisting. All necessary registration, maintenance and renewal fees currently due in connection with said Registered Intellectual Property have been paid and all necessary documents, recordations and certifications in connection with such Registered Intellectual Property have been filed with the relevant patent, copyright, trademark or other authorities in the United States or foreign jurisdictions, as the case may be, for the purpose of maintaining such Registered Intellectual Property. Except as set forth on Schedule 4.11(b), there are no actions that must be taken by the Company within 120 days of the date of this Agreement, including the payment of any registration, maintenance or renewal fees or the filing of any responses to office actions of any applicable governmental agency in the United States or foreign jurisdictions, documents, applications or certificates for the purposes of obtaining, maintaining, perfecting or preserving or renewing any Registered Intellectual Property rights. With respect to all patents and patent applications within the Registered Intellectual Property, (i) such patents and patent applications have been prosecuted in material compliance with all applicable rules, policies, and procedures of the applicable governmental agencies, including the United States Patent and Trademark Office or applicable foreign patent agencies, (ii there is no material prior art relevant to any such patent or patent application that may render the claims therein unpatentable, invalid, or unenforceable, (iii) all information known to the individuals associated with filing and/or prosecution of any such patent application that is relevant to patentability of any claim in such patent application has been submitted to all applicable governmental agency having a disclosure requirement, including the United States Patent and Trademark Office. With respect to pending applications and applications for registration of the Registered Intellectual Property, the Company has no knowledge of any reason that would be materially likely to prevent any such

application or application for registration from being granted with coverage substantially equivalent to the latest amended version of the pending application or application for registration. Each patent and patent application included in the Registered Intellectual Property correctly and accurately identifies the inventors of the invention claimed in such patent or patent application.

(c) **Schedule 4.11(c)** sets forth a complete and accurate list of all Intellectual Property, including inventions, improvements, technology, patents, trademarks, service marks, logos, brand names, copyrights, applications and software that the Company owns or has the right to use pursuant to license, sublicense, agreement, or permission not listed as Registered Intellectual Property in Schedule 4.11(b) and indicates which such Intellectual Property is owned by the Company and which such Intellectual Property is licensed by the Company. Schedule 4.11(c) also separately identifies and sets forth (i) a true, correct and complete list of the Company Proprietary Software and (ii) a separate true, correct and complete list of the Company Licensed Software (other than commercially available cloud-based software, shrink wrap software or off the shelf software (by way of example only, Adobe Acrobat or Microsoft Word) having a per user license fee of less than $2,000 or a total acquisition cost of less than $10,000) ("Commercially Available Software"). Together the Intellectual Property listed in Schedule 4.11(c) and Registered Intellectual Property listed in Schedule 4.11(b) constitute all Intellectual Property necessary for the conduct of the Company's business.)

(d) **Schedule 4.11(d)** contains a list of all Intellectual Property Licenses. All Intellectual Property Licenses are valid, binding and in full force and effect. The Company has taken all necessary action to maintain each Intellectual Property License. No loss or expiration of any Intellectual Property License is pending or threatened (other than expiration upon the expiration of any term thereof). The execution, delivery and performance hereof and the consummation of the transactions contemplated hereby shall not adversely affect any Intellectual Property License. Except as detailed in the agreements listed in **Schedule 4.11(d)**, the Company has not granted any rights in any Intellectual Property that the Company purports to own, including the Company Proprietary Software, to any third party (other than end user licenses in the Ordinary Course of Business).

(e) Except as set forth on **Schedule 4.11(e)**, which contains a list of all claims from third parties that the Company Intellectual Property infringes the rights of third parties, the operation of the business of the Company, including the design, development, marketing and sale of the products or services (including products currently under development), has not and does not infringe, induce or contribute to the infringement of, or misappropriate in any manner the Intellectual Property of any third party or constitute unfair competition or trade practices under the laws of any jurisdiction and the Company Proprietary Software does not infringe any patent, copyright or trade secret or any other Intellectual Property right of any third party. Except as set forth on **Schedule 4.11(e)**, the Company has not received notice of any claim from any third party that either the Company Intellectual Property, including the Company Proprietary Software, or the operation of the business of the Company or any act, product or service thereof, infringes, induces or contributes to the infringement of, or misappropriates the Intellectual Property of any third party or constitutes unfair competition or trade practices under the laws of any jurisdiction.

(f) No Person has or is currently infringing or misappropriating any Company Intellectual Property, except as set forth on **Schedule 4.11(f)**. As of the date of this Agreement, except as set forth on **Schedule 4.11(f)**, the Company is not a party to any suit, action or proceeding which involves a claim of infringement, unauthorized use, or violation of any Intellectual Property used or owned by any Person against the Company, or challenging the ownership, use, validity or enforceability of any Intellectual Property owned or licensed to the Company (other than Commercially Available Software).

(g) The Company's licensing of any of the Company Intellectual Property it purports to own has been subject to commercially reasonable quality control by the Company and the Company has exercised such quality control in a consistent and commercially reasonable manner.

(h) All Registered Intellectual Property that the Company purports to own, which was developed by an employee of the Company (whether a previous or current employee), (i) was actually developed by such employee and has been assigned to the Company by said employee through a valid assignment document or (ii) was actually developed by said employee working within the scope of his or her employment at the time of such development so that such Registered Intellectual Property became the exclusive property of the Company pursuant to a valid, executed employment agreement. All Company Intellectual Property (excluding any Registered Intellectual Property) that the Company purports to own, including any Company Proprietary Software, which was developed by an employee (whether a previous or current employee) of the Company, was (A) developed by said employee working within the scope of his or her employment at the time of such development, so that such Intellectual Property became the exclusive property of the Company pursuant to a valid, executed employment agreement or (B) assigned to the Company by said employee through a valid assignment document. Except as set forth on **Schedule 4.11(h)**, all employees working for the Company as of the date of this Agreement, or employees who have previously worked for the Company, are or were under an obligation, pursuant to a valid executed employment agreement, to assign all rights and interest in any Intellectual Property, developed by said employee while working within the scope of his or her employment at the time of such development, to the Company, and such rights have been assigned by said employee. To the extent that any Company Intellectual Property has been developed or created by a third party (including any current or former employee of the Company) for the Company, the Company has a written agreement with such third party with respect thereto, and the Company thereby either (i) has obtained ownership of and is the exclusive owner of, or (ii) has obtained a valid and unrestricted right to exploit, sufficient for the conduct of its business as currently conducted or proposed to be conducted, such Intellectual Property. The Company has provided appropriate compensation to each such Third Party in consideration for any Intellectual Property Rights assigned by such third party to the Company.

(i) **Schedule 4.11(i)** lists all agreements pursuant to which Company Intellectual Property that the Company purports to own, including any Company Proprietary Software, has been developed or created by a third party (including the name of such third party, who is the actual inventor of such Company Intellectual Property), including any independent contractors, for the Company. The Company has not received notice from any third party claiming any right, title or interest in the Company Intellectual Property that the Company purports to own, including any Company Proprietary Software.

(j) The Company owns or holds a valid rights to use all Confidential Information used by the Company and has taken reasonable steps to protect the rights of the Company in the Confidential Information used by the Company, and, except under circumstances where the recipient is under confidentiality obligations or is the rightful owner of such Confidential Information, there has not been any disclosure by the Company of any Confidential Information. The Company has taken commercially reasonable measures to maintain the source code for the Company Proprietary Software in confidence and no unauthorized disclosure of such source code has occurred. All disclosure of Confidential Information owned by the Company by or to a third party has been pursuant to the terms of a written contract between the Company and such third party. All use, disclosure or appropriation of Confidential Information by the Company not owned by the Company has been pursuant to the terms of a written agreement between the Company and the owner of such Confidential Information, or is otherwise lawful. All current and former employees and consultants of the Company having access to Confidential Information or proprietary information of any of their respective customers or business partners have executed and delivered to the Company an agreement regarding the protection of such Confidential Information or proprietary information (in the case of proprietary information of the Company's

customers and business partners, to the extent required by such customers and business partners). There has been no breach or other violation of any such agreement relating to Confidential Information and there are no facts or circumstances, that with notice or the passage of time or otherwise, which would be reasonably likely to give rise to any such breach. The Company has become aware of such breach, it has taken any and all actions necessary to enforce their rights under such agreement relating to Confidential Information.

(k) The Company does not use open source software, copyleft, freeware, GNU or Linux systems, or any modification thereof that has resulted in any (i) restriction on the use, licensing or disclosure of any Company Proprietary Software, or that would restrict or prevent the operation of the business of the Company; or (ii) requirement that the Company deliver or otherwise disclose to any third party any source code for any Company Proprietary Software or permit any licensee to modify any such source code. Any open source software, freeware, GNU or Linux systems, used in connection with or embedded in the products of the Company, or any modification thereof is set forth on **Schedule 4.11(k)**.

(l) The material information technology systems used in the conduct of the Company's business are adequate, in all material respects, for the operation of the business, and the Company has implemented procedures and policies to adequate to protect such systems from viruses, worms, and other known contaminants. Except as set forth on **Schedule 4.11(l)**, there have been no unauthorized intrusions or breaches of the security of such systems.

(m) No funding or facilities of any governmental agency (or any university, college, other educational institution or research center) or funding from third parties was used in the development of any Intellectual Property owned by the Company or any Intellectual Property exclusively licensed by the Company. No current or former employee, consultant or independent contractor, who was involved in, or who contributed to, the creation or development of any Intellectual Property owned by the Company or any Intellectual Property exclusively licensed by the Company, has performed services for any governmental agency (or any university, college, or other educational institution or research center) during a period of time during which such employee, consultant or independent contractor was also involved in, or who contributing to, the creation or development of any Intellectual Property owned by the Company or any Intellectual Property exclusively licensed by the Company. The Company is not required to pay any royalty or make any other form of payment to any governmental agency to allow the use, licensing, assignment or transfer of any Company Intellectual Property.

(n) The Company has taken reasonable steps in accordance with normal industry practice to preserve and maintain reasonably complete notes and records relating to the Company Intellectual Property.

**Section 4.12** **Indebtedness**. **Schedule 4.12** sets forth a complete and accurate list and description of all instruments or other documents or arrangements, whether oral or in writing, relating to any direct or indirect Indebtedness of the Company, including Indebtedness by way of lease-purchase arrangements, guarantees, undertakings on which others rely in extending credit and all conditional sales contracts, chattel mortgages and other security arrangements with respect to personal property used or owned by the Company. The Company has made available to Buyer a true, correct and complete copy of each of the items listed on **Schedule 4.12**. Except as set forth on **Schedule 4.12**, the Company will not have any Indebtedness at Closing.

**Section 4.13** **Litigation**. **Schedule 4.13** sets forth (a) (i) all litigation, claims, suits, actions, investigations, indictments or informations, proceedings or arbitrations, grievances or other procedures (including grand jury investigations, actions or proceedings, and product liability and workers' compensation suits, actions or proceedings) pending or threatened as of the date hereof, and (ii) all

investigations which are, pending or threatened, in each case, before any court, commission, arbitration tribunal, or judicial, governmental or administrative department, body, agency, administrator or official, grand jury, or any other forum for the resolution of grievances, against the Company or involving any of its property or business, and (b) indicates the outcome and status of each such matter, which of such matters are being defended by an insurance carrier, and which of the matters being so defended are being defended under a reservation of rights. Except as set forth on **Schedule 4.13**, there are no judgments, orders, writs, injunctions, decrees, indictments or information, grand jury subpoenas or civil investigative demands, plea agreements, stipulations or awards (whether rendered by a court, commission, arbitration tribunal, or judicial, governmental or administrative department, body, agency, administrator or official, grand jury or any other forum for the resolution of grievances) against or relating to the Company or involving any of its property or business. The Company has made available to Buyer true, correct and complete copies of pleadings, briefs and other documents filed in each litigation, claim, suit, action, investigation, indictment or information, proceeding, arbitration, grievance or other procedure required to be listed on **Schedule 4.13**, and the judgments, orders, writs, injunctions, decrees, indictments and information, grand jury subpoenas and civil investigative demands, plea agreements, stipulations and awards required to be listed on said Schedule.

**Section 4.14 Employees; Independent Contractors.**

(a) **Schedule 4.14(a)(i)** sets forth the names, job title, and current compensation (including, without limitation, the current annual salary rate or hourly rate, as applicable, any bonus or other cash compensation) for each Person who is an employee of the Company as of the Closing Date. **Schedule 4.14(a)(ii)** sets forth the names and current rates of all independent contractors of the Company. No employee, independent contractor, officer or manager of the Company is a party to, or is otherwise bound by, any agreement or arrangement, including any confidentiality, noncompetition, or proprietary rights agreement, between such individual and any other Person that in any way adversely affects or will affect (i) the performance of his or her duties as an employee, independent contractor or officer of the Company, or (ii) the ability of the Company to conduct its business; and no such individual has communicated to the Sellers or the Company, or to any of its officers or managers, that such individual intends to cancel or otherwise terminate such individual's employment or service as a result of the consummation of the transactions contemplated hereby, or has any retention or similar agreement with the Company or any agreement which provides benefits upon a change of control other than the Transaction Documents. The Company is not a party to any employee leasing, professional employer organization (PEO), or management services agreement with any Person.

(b) The Company is in compliance in all material respects with all laws and orders applicable to the Company regarding the terms and conditions of employment or other labor related matters, including those relating to discrimination, fair labor standards and occupational health and safety or wrongful discharge, wages, hours, workers compensation, worker classification, collective bargaining, plant closing, the payment and withholding of Taxes with respect to employees, independent contractors, officers and directors and all relevant provisions of the Immigration and Nationality Act, 8 U.S.C. Section 1101 et seq. and any other laws, statutes, ordinances, orders, rules, regulations, policies, guidance documents, judgments, decrees, injunctions, or agreements issued by any Governmental Authority or related to the employment of foreign nationals (including but not limited to the obligation to retain a properly-executed Form I-9 for every active employee hired on or after November 6, 1986, and for every terminated employee for whom there remains a Form I-9 retention obligation under 8 U.S.C. Section 1324a). **Schedule 4.14(b)** lists the names, location of employment, position, immigration status (e.g., H-1B, L-1A) and employment authorization expiration date of any employee of the Company who is not either a legal permanent resident or a United States citizen. There are no proceedings pending or threatened against the Company brought by or on behalf of any applicant for employment, any current or former employee, or any current or former independent contractor, officer or director, or any class of the

foregoing, relating to any laws or orders referenced above: (i) alleging breach of any express or implied contract of employment, wrongful termination of employment or service; (ii) alleging any other discriminatory, wrongful or tortious conduct in connection with the employment or service relationship; or (iii) in respect of which any employee, independent contractor, officer, director or agent may be entitled to claim indemnification or other protection from the Company. As used herein, the term "foreign national" means a person who is not a citizen of the United States of America.

(c) The Company has not made any commitment or agreement to increase the compensation payable, or to modify the conditions or terms of employment or service of, any employee, independent contractor, officer or director, except increases occurring in the Ordinary Course of Business or in accordance with existing agreements and changes required by applicable law.

**Section 4.15** **Employee Benefit Plans**.

(a) **Schedule 4.15(a)** sets forth a description of all Employee Benefit Plans. The Sellers have provided Buyer a current, accurate and complete copy (or, to the extent no such copy exists, an accurate description) of each Employee Benefit Plan and, to the extent applicable: (i) any related trust agreement or other funding instrument; (ii) the most recent IRS determination or opinion letter; (iii) summary plan description and other written communications (or a description of any oral communications) concerning the extent of benefits provided; and (iv) for the three most recent years, the Form 5500 and schedules, audited financial statements, and actuarial valuations. The Company will have no material liability or potential liability from and after the Closing with respect to any employee benefit or compensation arrangement other than the Employee Benefit Plans.

(b) With respect to each Employee Benefit Plan (i) no event, act, omission or documentation defect has occurred which could reasonably be expected to cause such plan to become disqualified for purposes of Code Section 401(a) or to violate the applicable requirements of ERISA, the Code, or other Laws, or which could cause the Company, any plan fiduciary, or any plan participant to incur any monetary penalty or other liability; (ii) there are no pending claims, lawsuits or actions (other than ordinary course claims for benefits) and, none are threatened; (iii) it does not cover independent contractors or provide for post-termination coverage for any employee or former employee (except to the extent of coverage required under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, as set forth at Section 4980B of the Code and any regulations promulgated thereunder or Part 6 of Subtitle B of Title I of ERISA or similar state laws); (iv) all contributions or premiums which are due have been made or accrued in compliance with the deadlines prescribed by Law and the past custom and practice of the Company; (v) such plan may be amended or terminated without liability by the Company on or after the Closing; and (vi) the Company or plan administrator has timely satisfied all applicable reporting and disclosure requirements under ERISA and the Code.

(c) The Company and its ERISA Affiliates have never sponsored a "welfare benefit fund", voluntary employees' beneficiary association, supplemental unemployment benefit plan, defined benefit pension plan, multiemployer plan, multiple employer plan, or multiple employer welfare arrangement (all as defined in ERISA and the Code), or a plan that is subject to laws of a country other than the United States. The Company has not engaged in, and is not a successor or parent corporation to an entity that has engaged in, a transaction described in Section 4069 or 4212 of ERISA and has no liability (including contingent liability) under Title IV of ERISA.

(d) This transaction will not result in, accelerate the timing or vesting of, or increase the amount of, any payment due or becoming due from the Company or such Employee Benefit Plan to any current or former employee, independent contractor, officer or director (or dependents of such Persons).

(e) If the Company or any ERISA Affiliate is or has ever been a party to a nonqualified deferred compensation plan (within the meaning of Code Section 409A), each such plan is either in full compliance with, or meets an exemption from, Code Section 409A and no Person could reasonably be expected to incur additional Tax described in Code Section 409A as a result of any such plan.

**Section 4.16** **Labor Agreements**. (a) The Company is not currently, and, except as set forth on **Schedule 4.16**, has never been, a party to any collective bargaining agreement or any labor union contract, (b) there are and have been no labor unions representing or engaged in any organizing activity with respect to any employees of the Company, (c) there are, and have been, no strikes, slowdowns, work stoppages, lockouts or other labor disputes pending or threatened against or involving the Company, and (d) no grievance or arbitration demand or proceeding pursuant to a collective bargaining agreement is pending or has been threatened against the Company that involves an attempt by any labor organization to extend its jurisdiction or representation rights, or apply its collective bargaining agreement, to the Company. The Company has terminated any collective bargaining agreement to which it has been a party, and no further obligations under any such collective bargaining agreement exist. Except as set forth on **Schedule 4.16**, the Company has fulfilled all payments and obligations under such collective bargaining agreement while it was a party to such agreement, and the Company does not have any liability for any withdrawal obligations under any such agreement.

**Section 4.17** **Bank Accounts**. **Schedule 4.17** sets forth a complete and accurate list of each bank or financial institution in which the Company has an account or safe deposit box (giving the address and account numbers) and the names of the persons authorized to draw thereon or to have access thereto.

**Section 4.18** **Insurance Policies**. **Schedule 4.18** sets forth a true, correct and complete list and description of all insurance policies in force naming the Company or any employees, officers, directors, members or managers thereof in their capacity as such, as an insured or beneficiary or as a loss payable payee, or for which the Company has paid or is obligated to pay all or part of the premiums. The Company has maintained all insurance required to be maintained by it by law. The Company has not received written notice of any pending or threatened termination or premium increase (retroactive or otherwise) with respect thereto, and the Company is in compliance with all conditions contained therein. There have been no lapses (whether cured or not) in the coverage provided under the insurance policies referenced herein and as set forth on **Schedule 4.18** during the term of such policies, as extended or renewed. The Company has made available to Buyer true, correct and complete copies of each of the policies listed or required to be listed on **Schedule 4.18.**

**Section 4.19** **Major Suppliers and Customers**. **Schedule 4.19** sets forth a list of the twenty (20) largest suppliers of goods or services to the Company (each, a "Material Supplier") and a list of the twenty (20) largest customers of the Company (each, a "Material Customer") during the twenty-four (24) month period ended December 31, 2015, based on the amount paid to such suppliers or billed to such customers by the Company during such period, together, in each case, with the amount paid or billed during such period. The Company is not engaged in any dispute with any of such suppliers or customers. No Material Customer nor any Material Supplier has canceled or otherwise terminated, or threatened to cancel or otherwise terminate, its relationship with the Company or notified the Company that it may cancel or otherwise materially and adversely modify its relationship with the Company. The consummation of the transactions contemplated hereunder will not have any material adverse effect on the business relationship of the Company with any such customer or supplier.

**Section 4.20** **Contracts and Commitments**. Except as set forth on **Schedules 4.9(a)**, **4.10(e)**, **4.11(d)**, **4.11(i)**, **4.12**, **4.15(a)**, **4.20** and **4.25**:

(a) The Company is not a party to any agreement containing any liquidated damages (or similar) provision and the Company has not entered into any contract providing for warranties other than the Company's standard warranties contained "Terms of Use" attached hereto as **Exhibit 4.21**;

(b) No contracts or commitments of the Company continue for a period of more than twelve (12) months from the date hereof or require payments, in the aggregate, in excess of $10,000;

(c) The Company does not have any outstanding contract, written or oral, with any officer, employee, agent, consultant, advisor, salesman, manufacturer's representative, distributor, dealer, subcontractor, broker, or similar Person, or any agreement or arrangement providing for the payment of any bonus or commission based on sales or earnings other than the Transaction Documents;

(d) The Company is not under any liability or obligation under any agreement pursuant to which third parties have been provided with products that can be returned to the Company in the event they are not sold and which could involve a liability of the Company of $10,000 or more in the aggregate;

(e) The Company does not have (i) any outstanding loan or loan commitment (excluding credit extended in the Ordinary Course of Business to Buyers of inventory) to any Person, or (ii) any factoring, credit line or subordination agreement;

(f) Except for negotiable instruments in the process of collection, the Company does not have any power of attorney outstanding or any contract, commitment or liability (whether absolute, accrued, contingent or otherwise), as guarantor, surety, co-signer, endorser, co-maker, indemnitor in respect of the contract or commitment of any other Person;

(g) There are no contracts providing for or relating to a Related Party Transaction (as defined below);

(h) The Company is not subject to any contract or agreement containing covenants limiting the freedom of the Company to compete in any line of business in any geographic area or requiring the Company to share any profits;

(i) There is no contract, agreement or other arrangement entitling any Person to any profits, revenues or cash flows of the Company or requiring any payments or other distributions based on such profits, revenues or cash flows;

(j) The Company is not a party to any licensing agreement relating to any of its products; and

(k) The Company does not have any other agreement, contract, or commitment, whether written or oral, material to the Business.

The Company has made available to Buyer true, correct and complete copies of (i) all contracts, agreements, plans, leases, policies and licenses referred to, or required to be referred to or listed on, any Schedule delivered by the Sellers of the Company hereunder; and (ii) all standard forms used in connection with the sale of products or services, including customer service contracts, purchase orders, sales orders, quotation forms and standard terms and conditions. For avoidance of doubt, including such documents in a virtual data room accessible by representatives of Buyer shall constitute making such documents available to Buyer. Except as set forth on **Schedule 4.21**, all contracts, agreements, plans, leases, policies and licenses referred to, or required to be referred to, on any Schedule delivered pursuant

to Article IV hereto are valid and binding, and are in full force and effect and are enforceable in accordance with their terms as to the Company and the other party thereto subject to Enforceability Exceptions. There is no pending or threatened bankruptcy, insolvency or similar proceeding with respect to any party to such agreements, and no event has occurred which (whether with or without notice, lapse of time or the happening or occurrence of any other event) would constitute a default thereunder by the Company or any other party thereto.

**Section 4.21** **Absence of Certain Changes**. Since January 1, 2016, except as: (A) set forth on **Schedule 4.21**, or (B) as expressly contemplated by this Agreement, the Company has operated in the Ordinary Course of Business and has not:

(a) suffered any Material Adverse Effect;

(b) not declared, set aside or paid any dividend or made any distribution with respect to its capital stock (whether in cash or in kind) or redeemed, repurchased or otherwise acquired any of its capital;

(c) suffered any material adverse change in the Company's working capital, assets, liabilities, financial condition, business prospects, or relationships with any Material Supplier or Material Customer;

(d) except for customary increases based on term of service or regular promotion of non-officer employees of the Company, increased (or announced any increase in) the compensation payable or to become payable to any employee of the Company, or increased (or announced any increase in) any bonus, insurance, pension or other Employee Benefit Plan, payment or arrangement for any employee, independent contractor, officer or director of the Company or accelerated the vesting or payment thereof;

(e) cancelled or forgiven any indebtedness or otherwise waived any material claims or rights;

(f) sold, transferred or otherwise disposed of any of its assets, including by license, other than in the Ordinary Course of Business and set forth on **Schedule 4.11(d)**;

(g) made any change in any method, practice or principle of financial or tax accounting;

(h) managed working capital components, including cash, receivables, other current assets, trade payables and other current liabilities in a fashion inconsistent with past practice;

(i) suffered any casualty, loss, damage or destructions (whether covered by insurance) of any of the Company's assets;

(j) not issued, sold or otherwise disposed of any of its capital stock, or granted any options, warrants or other rights to purchase or obtain (including upon conversion, exchange or exercise) any of its capital stock;

(k) changed its authorized capital stock, effected any recapitalization or issues or sold or otherwise disposed of any of its stock or other securities, options, warranties, calls or other rights to purchase equity interests or any securities convertible into or exchangeable for its securities;

(l) disclosed any secret or confidential Intellectual Property or disposed of, licensed or allowed the lapse or abandonment of any Intellectual Property, or any registration or grant thereof or any application relating thereto, to which the Company has any right, title, interest or license;

(m) been subject to any warranty or other claim, or have any claim brought against it or, threatened to be brought against it, or entered into a settlement with respect to any such claims brought against it;

(n) made any loan, advance or capital contribution to or investment in any Person other than expenses or advances to employees of the Company made in the ordinary course of business; or

(o) agreed in writing, or otherwise, to take any action described in this Section.

**Section 4.22** **Accounts Receivable.** All accounts receivable of the Company as of the date hereof (i) are valid, existing and represent monies due for goods sold or services rendered and arising from bona fide transactions undertaken by the Company in the Ordinary Course of Business; (ii) are not subject to any defenses, rights of set-off, assignment, restrictions, security interests or other encumbrances; and (iii) have not been assigned to any third party. Except as shown on **Schedule 4.22**, as of the date of such Schedule, all accounts receivable of the Company are current, and there is no dispute regarding the collectability of any such accounts receivable. All reserves shown on the Financial Statements were adequate as of such dates calculated consistent with past practice.

**Section 4.23** **Tax Matters.**

(a) (i) All Tax Returns required to be filed by or on behalf of the Company have been duly and timely filed with the appropriate Taxing Authority in all jurisdictions in which such Tax Returns are required to be filed (after giving effect to any valid extensions of time in which to make such filings), and all such Tax Returns are true, complete and correct in all material respects; and (ii) all Taxes payable by or on behalf of the Company have been fully and timely paid. With respect to any period for which Tax Returns of or relating to the Company have not been filed or for which Taxes are not yet due or owing, the Company has made due and sufficient accruals for such Taxes in the most recent Financial Statements and on its books and records;

(b) The Company has not (i) granted an extension of or waived the statute of limitations for the assessment or collection of Taxes; (ii) requested any extension of time within which to file any Tax Return, which Tax Return has not been filed; (iii) granted to any Person any power of attorney that is currently in force with respect to any Tax matter; (iv) executed or entered into a "closing agreement" pursuant to Section 7121 of the Code or any similar provision of law with respect to the Company;

(c) All deficiencies asserted or assessments made as a result of any examinations by any Taxing Authority of the Tax Returns of, or including, the Company have been fully paid, and there are no other audits or investigations by any Taxing Authority in progress, nor has the Company received any notice from any Taxing Authority that it intends to conduct such an audit or investigation. No issue has been raised by a Taxing Authority in any prior examination of the Company which, by application of the same or similar principles, could reasonably be expected to result in a proposed deficiency for any subsequent taxable period;

(d) The Company has complied in all material respects with all applicable laws relating to the withholding of Taxes and the payment thereof to appropriate authorities required to be

withheld and paid pursuant the Code or similar provisions under state, local or non-U.S. law. The Company is in compliance with, and its records contain all information and documents necessary to comply with, all applicable information reporting requirements under federal, state, and local Tax laws;

(e) The Company has never been a party to or bound by any Tax sharing allocation, indemnity, or similar agreement or arrangement (whether oral or written); the Company is not subject to any private letter ruling of the IRS or comparable rulings of any Taxing Authority;

(f) The Company has never been a member of any affiliated, consolidated, combined or unitary group for purposes of filing Tax Returns with respect to Taxes;

(g) The Company has not participated in a "reportable transaction" within the meaning of Treasury Regulations Section 1.6011-4. The Company has disclosed on their federal income Tax Returns all positions taken therein that could reasonably be expected to give rise to substantial understatement of federal income tax within the meaning of Section 6662 of the Code;

(h) The Company has never had a permanent establishment in any country other than the United States, or has engaged in a trade or business in any country other than the United States;

(i) There are no material Liens for Taxes against any asset of the Company (other than Liens for Taxes not yet due and payable);

(j) The Company has no liability for any Tax under Section 1374 of the Code;

(k) The Company is not required to include an item of income, or exclude an item of deduction, for any period (or portion thereof) ending after the Closing Date as a result of (i) an installment sale transaction occurring on or before the Closing governed by Section 453 of the Code (or any similar provision of state, local or non-U.S. laws); (ii) a transaction occurring on or before the Closing reported as an open transaction for U.S. federal income tax purposes (or any similar doctrine under state, local or non-U.S. Laws); (iii) any prepaid amounts received on or prior to the Closing Date; (iv) a change in method of accounting requested or occurring on or prior to the Closing Date or an adjustment pursuant to Section 481 of the Code (or any similar provision of under state, local or non-U.S. Laws); (v) an agreement entered into with any Taxing Authority (including a "closing agreement" under Section 7121 of the Code) on or prior to the Closing Date; or (vi) an election (including a protective election) pursuant to Section 108(i) of the Code.

(l) During the two-year period ending on the date hereof, the Company was not a "distributing corporation" or "controlled corporation" in a transaction intended to be governed by Section 355 of the Code.

(m) The Company is not a party to any joint venture, partnership, or other arrangement or contract which could be treated as a partnership for U.S. federal income tax purposes. Neither the Company nor any other Person on its behalf has agreed to or is required to make any adjustment pursuant to Section 481(a) of the Code or any similar provision of applicable law.

(n) The Company has withheld and paid all Taxes required to have been withheld and paid by it in connection with any amounts paid or owing to any employee, independent contractor, creditor or other third party, including, without limitation any cash or equity consideration.

(o) No claim has ever been made by a jurisdiction in which the Company has not filed Tax Returns that the Company is or may be subject to taxation by that jurisdiction.

**Section 4.24** **Brokers, Finders and Investment Bankers**. Except as set forth in **Schedule 4.24**, the Company nor any Sellers has employed any broker, finder, investment banker, or other intermediary or incurred any liability for any investment banking fees, financial advisory fees, brokerage fees, finders' fees, or other similar fees (collectively, the "Transaction Related Fees") in connection with the transactions contemplated by this Agreement.

**Section 4.25** **Related Party Arrangements and Relationships**. Except as set forth on **Schedule 4.25**, no Seller and no employee, officer or director of the Company, and no Affiliate or family member of any such Person: (a) owns, directly or indirectly, in whole or in part, or maintains any direct or indirect interest in, any tangible or intangible property which the Company is using in its business; (b) has any cause of action or other claim whatsoever against, or owes any amount to, the Company, except for routine claims for benefits under any Employee Benefit Plan; (c) is a party to any contract with the Company; or (d) has received any loan, advance or investment from the Company, that has not been repaid in full prior to the date hereof (each of (a), (b), (c) and (d) referred to herein as a "Related Party Transaction").

**Section 4.26** **Privacy Laws**. The Company has complied in all material respects with (i) all applicable laws relating the ownership, use, storage, maintenance, control, processing, disclosure and/or transfer of employee personal data and other personally-identifiable information ("Personal Data") in any relevant jurisdiction ("Data Privacy Laws"), and all Personal Data owned, licensed, received, stored, maintained, controlled, processed, disclosed or transferred by or on behalf of the Company or any Affiliate has been obtained, used, stored, maintained, controlled, processed, disclosed or transferred in compliance with relevant Data Privacy Laws applicable to such Personal Data and (ii) all rules, policies and procedures established by the Company with respect to the foregoing. No claims have been asserted or threatened in writing against the Company by any Person alleging a violation of such Person's privacy, personal or confidentiality rights under any such Data Privacy Laws, rules, policies or procedures. The Company has taken commercially reasonable steps consistent with normal industry practice to protect the types of information referred to in this Section 4.26 against loss and unauthorized access, use, modification, disclosure or other misuse, and, there has been no unauthorized access to or other misuse of such information.

**Section 4.27** **Full Disclosure**. The representations, warranties, assurances or statements of Sellers and the Company contained in this Agreement and the Transaction Documents do not contain any untrue statement of a material fact or omit a material fact required to be stated therein or necessary to make the statements made, in light of the circumstances under which such statements were made, not materially false or misleading. None of the Sellers or the Company has knowledge of any facts or of the occurrence of any event or transaction that has not been disclosed to Buyer in writing and that could reasonably be expected to have a Material Adverse Effect.

**Section 4.28** **No Other Representations and Warranties.** Except for the representations and warranties contained in Article III and this Article IV (including the related portions of the Disclosure Schedules) and the Transaction Documents, none of the Sellers, the Company or any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Sellers or the Company, including any representation or warranty as to the accuracy or completeness of any information regarding the Company furnished or made available to Buyer or as to the future revenue, profitability or success of the Company, or any representation or warranty arising from statute or otherwise in law. Without limiting the generality of the foregoing, none of Sellers nor the Company nor any other person is making any representation or warranty to Buyer with respect to any financial projection or forecast.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Sellers as of the date hereof as follows:

**Section 5.1** **Organization**. Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to effect the transactions contemplated hereunder.

**Section 5.2** **Authorization**. Buyer has the right, power and capacity to execute, deliver and perform this Agreement and to consummate the transactions contemplated hereby. The execution, delivery and performance of this Agreement by Buyer, and the consummation of the transactions contemplated hereby, have been duly and validly authorized by all necessary corporate action on the part of Buyer. This Agreement has been duly and validly executed and delivered by Buyer and constitutes Buyer's legal, valid and binding obligation, enforceable in accordance with its terms, except as limited by (a) applicable bankruptcy, insolvency, reorganization, moratorium or other laws of general application affecting the enforcement of creditors' rights generally, and (b) general principles of equity that restrict the availability of equitable remedies.

**Section 5.3** **No Conflict**. The execution and delivery of this Agreement by Buyer, the consummation of the transactions contemplated herein by Buyer, and the performance of the covenants and agreements of Buyer will not, with or without the giving of notice or the lapse of time, or both, (a) violate or conflict with any of the provisions of the certificate of incorporation or bylaws of Buyer; (b) violate or conflict with or result in breach or default under or cause termination, of any term or condition of any mortgage, indenture, contract, license, permit, instrument, trust document, or other agreement, document or instrument to which Buyer is a party or by which Buyer or any of its properties may be bound; or (c) violate any provision of law, statute, rule, regulation, court order, judgment or decree, or ruling of any Governmental Authority, to which Buyer is a party or by which Buyer or its properties may be bound.

## ARTICLE VI
## COVENANTS

**Section 6.1** **Transfer Taxes**. All sales or transfer taxes, including stock transfer taxes, document recording fees, stamp taxes and excise taxes and expenses of preparing and filing any Tax Return or other document with respect to such sales or transfer Taxes or fees, arising out of or in connection with the consummation of the transactions contemplated hereby ("Transfer Taxes") shall be timely paid by the Sellers. Sellers' Representative shall timely file any Tax Return or other document with respect to such Taxes or fees (and Buyer shall cooperate with respect thereto, as reasonably necessary).

**Section 6.2** **Preparation of Supporting Documents**. In addition to such actions as the parties may otherwise be required to take under this Agreement or applicable law to consummate this Agreement and the transactions contemplated hereby, each of the parties hereto shall take such action, shall furnish such information, and shall prepare, or cooperate in preparing, and execute and deliver, such certificates, agreements and other instruments as the other parties hereto may reasonably request from time to time, before, at or after the Closing.

**Section 6.3** **Tax Reporting and Allocation**. The following provisions govern the allocation between Buyer on the one hand and the Company and Sellers' Representative, on the other hand, of responsibility for certain Tax matters following the Closing Date:

(a) Amendment of Tax Returns by Buyer. Without the prior written consent of Sellers' Representative, which consent shall not be unreasonably withheld, conditioned, or delayed, Buyer shall not, with respect to the Company: (i) file or amend any Tax Return with respect to a Pre-Closing Tax Period; or (ii) extend or waive any statute of limitations or other period for the assessment of any Tax that relates to a Pre-Closing Tax Period.

(b) Cooperation and Records Retention. Sellers' Representative and Buyer shall: (i) each provide the other with such assistance as may reasonably be requested by any of them in connection with the preparation of any Tax Return, audit, or other examination by any Taxing Authority or judicial or administrative proceedings relating to liability for Taxes, including the execution of powers of attorney; (ii) each retain and provide the other with any records or other information that may be relevant to such Tax Return, audit or examination, proceeding, or determination; and (iii) each provide the other with any final determination of any such audit or examination, proceeding, or determination that affects any amount required to be shown on any Tax Return of the other for any period. Without limiting the generality of the foregoing, Buyer shall cause the Company to retain, until the applicable statutes of limitations (including any extensions or tolling thereof) have expired, copies of all Tax Returns, supporting work schedules, and other records or information that may be relevant to such returns for all Tax periods or portions thereof ending before or including the Closing Date and shall not destroy or otherwise dispose of any such records without first providing Sellers' Representative with a reasonable opportunity to review and copy the same. Each party shall bear its own expenses in complying with the foregoing provisions.

(c) Tax Contests. If a party receives notice from any Taxing Authority of any proposed audit, claim, assessment, or other dispute concerning an amount of Taxes with respect to which another party may incur liability hereunder (a "Tax Claim"), such party shall promptly notify such other party of such matter. Such notice shall contain factual information (to the extent known) describing such asserted Tax liability in reasonable detail and shall be accompanied by copies of any notice or other documents received from any Taxing Authority with respect to such matter. If a party receives written notice of an asserted Tax liability with respect to a matter for which it has a right to indemnification under this Article VI (and the other party does not have knowledge of the asserted Tax liability) and fails to provide the other party with prompt notice thereof in the manner described in the preceding sentence and as a result such other party is materially prejudiced by such failure, then such other (indemnifying) party shall be relieved of its indemnification obligation with respect to such asserted Tax liability, but only to the extent of such material prejudice. Sellers' Representative shall control the contest or resolution of any Tax Claim with respect to any pre-Closing period. Buyer shall control the contest or resolution of any Tax Claim with respect to any post-Closing period. In the event that any Tax Claim involves a period commencing prior to the Closing and ending after the Closing, then the Sellers' Representative shall control the contest or resolution if it involves more days before the Closing and the Buyer shall control the contest or resolution if it involves more days after the Closing.

(d) Tax Indemnity. Sellers' shall severally, but not jointly, indemnify, reimburse, defend and hold harmless (collectively, "indemnify" or "indemnification" or any variation thereof) each and all of each and all of Buyer, the Company, its or their respective Affiliates, successors or assigns, and its or their respective directors, officers, stockholders, members, managers, employees, consultants, representatives and agents (collectively, "Tax Indemnitees") from and against (i) any loss attributable to any breach of or inaccuracy in any representation or warranty made in Section 4.23 hereof; (ii) any loss attributable to any breach or violation of, or failure to fully perform, any covenant, agreement, undertaking or obligation in Section 6.1, 6.2 or 6.3 hereof; (iii) any and all Taxes of the Company (net of Taxes paid prior to Closing) or Sellers relating to the business of the Company or any of Sellers on or prior to December 31, 2015; (iv) any and all Taxes of any member of an affiliated, consolidated, combined or unitary group of which the Company (or any predecessor of the Company) is or was a

member on or prior to the Closing Date by reason of a liability under Treasury Regulation Section 1.1502-6 or any comparable provisions of non-U.S., state or local law; (v) any and all Taxes of any person imposed on the Company or Sellers or Buyer arising under the principles of transferee or successor liability or by contract, relating to an event or transaction attributable to the business of the Company or any of the Sellers occurring before the Closing Date; (vi) any and all Tax liabilities of the Company or any Seller arising from the consummation of the Closing; (vii) any and all Tax liabilities of the Company arising from Section 1374 of the Code; and (viii) any and all Transfer Taxes (collectively, "Tax Indemnity"). In each of the above cases, the Tax Indemnity shall include all such Taxes together with all fees, costs and expenses (including attorneys' and accountants' fees, court costs and litigation expenses) incurred by or for any of the Tax Indemnitees in connection therewith. The survival period for any claims for Tax Indemnity shall expire thirty (30) days following the expiration of the applicable statute of limitations under Tax law with respect to each such claim, excluding for purposes of such limitation (i) claims based on fraud or intentional misrepresentation and (ii) claims asserted in writing in good faith by any Tax Indemnitee prior to such expiration date.

(e) Overlap. To the extent that any obligation or liability pursuant to Article VIII may overlap with an obligation or liability pursuant to Section 6.1, 6.2 or 6.3, the provisions of Section 6.1, 6.2 or 6.3, as applicable, shall govern.

**Section 6.4 Employee Benefit Matters.**

(a) **No Credit of Service for Continuing Employees.** Buyer shall use commercially reasonable efforts to cause any employee benefit plan provided by Buyer or its Affiliates to employees who continue employment with the Company following the Closing ("Continuing Employees"), (i) in the case of a welfare benefit plan, to waive all limitations as to pre-existing conditions and waiting periods with respect to participation and coverage requirements applicable to the Continuing Employees to the extent that such conditions or waiting periods would not apply under the comparable Employee Benefit Plans as of Closing and (ii) for the plan year in which the Closing Date occurs, to credit each Continuing Employee with any co-payments and deductibles paid prior to the Closing Date (or effective date of such coverage, if later) toward satisfaction of any applicable deductible or out-of-pocket maximums or other requirements under such plan.

(b) **No Implied Amendment**. Notwithstanding anything in this Section 6.4 to the contrary, nothing contained herein, whether express or implied, shall be treated as an amendment, termination or other modification of any employee benefit plan maintained by Buyer or any of its Affiliates (including the Company after Closing), or shall limit the right of Buyer to amend, terminate or otherwise modify any employee benefit plan maintained by Buyer or any of its Affiliates following the Closing or to terminate or change the terms of the employment of any employee of Buyer or any of its Affiliates at any time. If (i) a party other than the parties hereto makes a claim or takes other action to enforce any provision in this Agreement as an amendment to any employee benefit plan maintained by Buyer or any of its Affiliates, and (ii) such provision is deemed to be an amendment to such employee benefit plan maintained by Buyer or any of its Affiliates even though not explicitly designated as such in this Agreement, then, solely with respect to the employee benefit plan maintained by Buyer or any of its Affiliates at issue, such provision shall lapse retroactively and shall have no amendatory effect with respect thereto.

**Section 6.5 Release by Sellers.**

(a) Release. In consideration for the Purchase Price, as of and following the Closing, each Seller knowingly, voluntarily and unconditionally releases, forever discharges, and covenants not to sue, Buyer, the Company, their respective predecessors, successors, parents, subsidiaries and other

Affiliates, and all of their respective current, former and future officers, directors, members, managers, employees, agents and representatives from and for any and all claims, causes of action, demands, suits, debts, obligations, liabilities, damages, losses, costs and expenses (including attorneys' fees and cost and litigation expenses) of every kind or nature whatsoever, including those based on any agreement or relationship of employment, whether known or unknown, actual or potential, suspected or unsuspected, fixed or contingent, such Seller has or may have, now or in the future, arising out of, relating to, or resulting from any act or omission, error, negligence, strict liability, breach of contract, tort, violation of law, matter or cause whatsoever from the beginning of time up to the Closing, or any time after the Closing to the extent such claims, causes of action, demands, suits, debts, obligations, liabilities, damages, losses, costs and expenses (including attorneys' fees and costs and litigation expenses) arise out of, relate to, or result from any from any continuing act or omission, error, negligence, strict liability, breach of contract, tort, violation of law, matter or cause whatsoever that existed as of the Closing, including any claim or cause of action based on any theory of successor liability; provided, however, that nothing contained herein shall operate to release any obligations of Buyer, the Company or their respective Affiliates under this Agreement or any other Transaction Document executed and delivered in connection herewith.

(b) Section 1542 Waiver. Out of an abundance of caution, each Seller hereby expressly waives and relinquishes any and all claims, rights or benefits that Seller may have under California Civil Code Section 1542, which provides as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HER OR HER SETTLEMENT WITH THE DEBTOR;

and under any statutes or common law principles of similar effect of any other jurisdiction.

**Section 6.6** **Confidentiality.** In addition to the Confidentiality Agreements and Assignment of Intellectual Property Agreements being delivered by Sellers pursuant to Section 7.3, and without limiting the same:

(a) Each Seller agrees that from and after the Closing Date, Seller shall not use or disclose, in whole or in part, directly or indirectly, the Confidential Information.

(b) Notwithstanding the foregoing, a Seller shall not be subject to the nondisclosure restrictions set forth in Section 6.6(a) with respect to otherwise Confidential Information that:

(i) becomes generally available to the public, other than as a result of disclosure or breach by a Seller or any agent or representative thereof of the obligations under this Agreement; or

(ii) becomes available to a Seller on a non-confidential basis from a source which lawfully obtained such information and is not bound by a confidentiality agreement with the Company or any of its Affiliates or successors or assigns.

(c) In the event that any Seller is requested or required by law, regulatory authority or other applicable judicial or governmental order to disclose any Confidential Information, Seller will provide the Company with prompt notice of any such request or requirement so that the Company may seek a protective order or other appropriate remedy and/or waive compliance with the terms of this Agreement and Seller agrees to cooperate with the Company, at the Company's expense, in any

reasonable efforts to obtain such remedies. In the event that such protective order or other remedy is not obtained, or that the Company waives compliance with the terms hereof, Seller may disclose only that portion of the Confidential Information which is legally required to be disclosed.

(d) Nothing in this Agreement is intended to alter, supersede or eliminate the applicable law, rights and remedies that the Company may have pursuant to any applicable law pertaining to trade secrets or other Intellectual Property, which law, rights and remedies shall be in addition to the respective obligations and rights of the Parties hereunder.

**Section 6.7** **Public Announcements**. Except as required by any applicable law or regulatory requirement (including the United States securities laws), no public announcement shall be made by the Company or any Sellers with regard to the transactions contemplated by this Agreement without the prior consent of Buyer. Buyer shall be entitled within thirty (30) days of the Closing Date, or other mutually agreed upon date, to publicly announce the transactions contemplated by this Agreement, subject to the reasonable consent of Sellers' Representative.

**Section 6.8** **Tax Sharing Agreement**. Company agrees and acknowledges that in the event Buyer acquires a certain percentage of the outstanding capital stock of the Company (such percentage equivalent to the percentage that shall allow for a tax sharing agreement to be legally in effect in the United States), whereby the Company shall be a consolidated entity in Buyer's parent and/or group companies, Company will enter into a tax sharing agreement as provided by the Buyer.

**Section 6.9** **Further Assurances**. Each of the parties hereto will use its reasonable good faith efforts to take all actions and to do all things necessary, proper or advisable following the Closing to consummate and effectuate the transactions contemplated by this Agreement and the other Transaction Documents.

## ARTICLE VII
## CONDITIONS TO CLOSING

The obligation of Buyer to consummate the transactions contemplated by this Agreement is subject to the satisfaction (subject, however, to Buyer's right to waive in writing any of the Sellers' deliveries, and the Sellers' right to waive in writing any of Buyer's deliveries) of the following conditions in Sections 7.1 through 7.18 as of the Closing Date:

**Section 7.1** **Required Company Consents**. The Sellers shall executed and deliver all consents, authorizations, waivers and approvals required to be listed on **Schedule 4.5**. With respect to each such consent, authorization, waiver or approval, the Sellers shall deliver to Buyer written evidence, satisfactory to Buyer, that such consent or approval has been duly and lawfully filed, given, obtained or taken and is effective, valid and subsisting.

**Section 7.2** **Confidentiality Agreement and Assignment of Intellectual Property Rights**. All Company employees and independent contractors shall have executed agreements with respect to confidentiality and ownership and assignment of any Intellectual Property in substantially the form attached hereto as **Exhibit 7.2.**

**Section 7.3** **Release of Claims**. The Company shall have obtained releases from those individuals listed on **Schedule 7.3** prior to the Closing Date.

**Section 7.4** *Intentionally Omitted.*

**Section 7.5** **<u>Resignations of Directors and Officers</u>**. All directors and officers of the Company shall deliver to Buyer their written resignations as directors and officers, effective as of the Closing Date, in a form reasonably satisfactory to Buyer.

**Section 7.6** **<u>Stock Certificates</u>**. The Sellers shall deliver to Buyer the original stock certificates, evidencing the Sellers' ownership of the Shares, duly endorsed in blank or accompanied by duly executed stock transfer powers, and the Shares shall be free and clear of all Liens other than restrictions on transfer arising under applicable securities Laws or, if such stock certificates cannot be found, a duly executed lost stock certificate affidavit.

**Section 7.7** **<u>State of California Filings</u>**. Company has filed all necessary documentation with the State of California with respect to issuances and sales of its capital stock prior to Closing, including, without limitation evidence of such filing and payment of any outstanding fees related to Section 25102(f) of the California Corporations Code attached hereto as **<u>Exhibit 7.7</u>**.

**Section 7.8** **<u>Certificates</u>.** Certificates of the Secretary of the Company (i) attaching and certifying copies of the resolutions of the Company's board of directors, authorizing the execution, delivery and performance of this Agreement and the other documents, instruments and certifications required or contemplated hereby; (ii) attaching and certifying certificates of good standing or existence, as applicable, dated within one Business Day of the Closing Date, from the Secretaries of State of the State of California and every other state of the United States in which the conduct of the Company's business or the ownership of the Company's properties and assets requires it to be so qualified; and (iii) attaching copies of the articles of incorporation or charter of the Company certified by the Secretary of State of the State of California and a certified copy of the Company's bylaws.

**Section 7.9** **<u>Minute Books, Records</u>**. The Company shall deliver to Buyer the complete minute books and corporate records of the Company.

**Section 7.10** **<u>Termination of Company Agreements</u>**. The agreements set forth on **<u>Exhibit 7.10</u>** shall have been terminated by the Company, and the Company shall have delivered evidence of such terminations and that any amounts due and owing with respect to such terminations have been paid, in form reasonably satisfactory to Buyer.

**Section 7.11** **<u>Shareholder Agreement</u>**. Sellers shall have entered into and delivered an executed original of a Shareholder Agreements in the form of **<u>Exhibit B</u>** hereto.

**Section 7.12** **<u>Opinion of Legal Counsel</u>**. Sellers' counsel shall have delivered an opinion with respect to the capitalization of the Company as of Closing Date in form and substance acceptable to Buyer.

**Section 7.13** **<u>Spousal Consent</u>**. The respective Spouse of each Seller shall have entered into and delivered an executed original of a Spousal Consent in the form of **<u>Exhibit 7.13</u>** hereto.

**Section 7.14** **<u>Management Agreement; Services Agreement</u>**. The Company shall delivery a duly executed Management Agreement and Services Agreement attached hereto as **<u>Exhibit C</u>** and **<u>C-1</u>**.

**Section 7.15** **<u>MediaLink Release</u>**. The Company shall obtain a release from MediaLink in form of **<u>Exhibit 7.15</u>** hereto.

**Section 7.16** **Fully-Paid Up Shares**. The Company shall provide evidence that all capital stock holders, including without limitation, warrant and option holders, have exercised and fully-paid the Company for the capital stock.

**Section 7.17** **Key-Man Insurance**. The Company shall provide evidence of certain key-man insurance for Justin Rezvani, with the Company as the beneficiary, in such form as required by the Buyer and for an amount of five (5) million dollars.

**Section 7.18** **Rezvani Employment Agreement and Restricted Stock Agreement.** The Company and Rezvani have entered into that certain Employment Agreement and Restricted Stock Agreement in a form satisfactory to the Buyer attached hereto as **Exhibit C-1** and **Exhibit C-2**, respectively.

**Section 7.19** **Buyer Deliveries**. Sellers' obligations to close the transactions contemplated by this Agreement shall be conditioned upon the Buyer delivering: (i) to Seller the portion of the Purchase Price to be paid at Closing to the Seller pursuant to Section 2.2, in accordance with such section, and (ii) all other documents required to be entered into or delivered by the Buyer at or prior to the Closing, including the Shareholder Agreement.

For the avoidance of doubt, Sellers' deliveries are contained in Sections 7.1 to 7.18.

## ARTICLE VIII
## INDEMNIFICATION

**Section 8.1** **Seller Agreement to Indemnify.**

(a) Except as otherwise expressly limited by Sections 8.3 and 8.5, Sellers (excepting MediaLink, whose obligations with respect to this Section shall be limited solely to Sections 8.1(a)(i), (vi) and (viii) below, it being understood, however, that Medialink's obligation to indemnify under Sections 8.1(a)(vi) and (viii) shall be extinguished on the second anniversary of the Closing Date (the "Medialink Indemnity Period"), which upon the conclusion of the Medialink Indemnity Period, Rezvani shall be additionally responsible for any indemnification obligations of Medialink in accordance with Section 8.8) shall, severally, but not jointly, indemnify, reimburse and hold harmless and defend (collectively "indemnification" or "indemnify" or any variation thereof) each and all of the Buyer, the Company, its or their respective Affiliates, successors or assigns, and its or their respective directors, officers, stockholders, members, managers, employees, consultants, representatives and agents (the "Buyer Indemnified Parties"), from and against any and all claims, demands, legal or regulatory actions, causes of action, settlements, judgments, losses, liabilities, damages, costs (including court costs) and expenses (including interest and reasonable attorneys' and accountants' fees and litigation expenses) asserted against, imposed upon, suffered by, or incurred by any of the Buyer Indemnified Parties but excluding any incidental, consequential, special, indirect, or punitive damages, lost profits (in each case, except to the extent payable in connection with a Third Party Claim and except as a result of fraud or intentional misrepresentation) (collectively, and together (without duplication) with any Tax Indemnity, "Buyer Damages") as a result of, or with respect to, or arising from or in connection with any one or more of the following, whether or not arising from a third party claim:

(i) any breach or inaccuracy of any representation or warranty of such Seller set forth in Article III of this Agreement or in any other Transaction Document without giving effect to any qualifications as to Knowledge, materiality, disclosure, Material Adverse Effect or similar qualifications contained in such representations and warranties;

(ii) any breach or inaccuracy of any representation or warranty of the Sellers or the Company of any Fundamental Representations or in any other Transaction Document without giving effect to any qualifications as to Knowledge, materiality, disclosure, Material Adverse Effect or similar qualifications contained in such representations and warranties;

(iii) any breach or inaccuracy of any representation or warranty of the Sellers or the Company of any Other Representations without giving effect to any qualifications as to Knowledge, materiality, disclosure, Material Adverse Effect or similar qualifications contained in such representations and warranties;

(iv) any breach of or noncompliance by Seller with any covenant or agreement of such Seller contained in this Agreement or in any other Transaction Document;

(v) any breach of or noncompliance by the Company with any covenant or agreement of the Company contained in this Agreement or any Transaction Document;

(vi) the amount of any repayments owed in relation to losses of any kind corresponding to any decrease or deficiency of assets or increase of liabilities or insufficiency of reserves of the Yojo Group Companies (which for purposes of this Section 8.1(a)(vi) shall mean any parent, subsidiary, affiliated company or group of such companies on a consolidated basis of Yojo) resulting from events having their origin or their cause prior to the Closing Date, as compared to such amounts set forth in the Financial Statements as of December 31, 2015;

(vii) any claims arising or against the Company (until the Company procures such insurance post-Closing) as customarily covered with respect to (w) automobile insurance, (x) errors and omissions (professional liability insurance), (y) network security and privacy liability, also known as cyber insurance, and (z) commercial crime, including dishonesty coverage; and

(viii) any breach or inaccuracy of any representation or warranty of the Sellers or the Company of Section 4.23.

(b) Rezvani shall indemnify, reimburse and hold harmless and defend (collectively "indemnification" or "indemnify" or any variation thereof) each and all of the Buyer Indemnified Parties, from and against any and all Buyer Damages asserted against, imposed upon, suffered by, or incurred by any of the Buyer Indemnified Parties as a result of, or with respect to, or arising from or in connection with respect to, or arising from or in connection with any one or more of the following, whether or not arising from a third party claim, as follows:

(i) that certain Offer Letter and Commission Plan between the Company and Rafi Mamalian dated as of May 6, 2015, including any extensions or renewals (collectively, the "Mamalian Employment Terms"), any amounts paid by the Company arising out of or related to obligations of the Company in connection with any severance, change of control provisions and/or variable compensation and commissions (unless originating from a plan and for an amount duly approved by the You and Mr Jones directors), as further defined in Sections 5(b), 6, 7, 8 and the document entitled "Commission Plan" of the Mamalian Employment Terms. Any such indemnification obligations shall include, without limitation (y) any compensation paid to Rafi Mamalian, or any local, state or federal government or agency, and (ii) any Buyer Damages incurred with respect to the foregoing.

(ii) any indemnification obligations pursuant to Sections 8.1(a)(ii)-(vii) that would be attributable to Medialink on a several basis, if Medialink had made such representation, warranty, covenant or the like under this Agreement.

**Section 8.2** **Buyer's Agreement to Indemnify**. Subject to the terms and conditions set forth herein, from and after the Closing, Buyer shall indemnify and hold harmless the Sellers from and against any and all claims, demands, legal or regulatory actions, causes of action, settlements, judgments, losses, liabilities, damages, costs (including court costs) and expenses (including interest and reasonable attorneys' and accountants' fees and litigation expenses) incurred by the Sellers (collectively "Seller Damages") as a result of or arising out of (a) Buyer's breach of any representation or warranty contained in Article V of this Agreement or in any other Transaction Document, or (b) any breach of or noncompliance by Buyer with any covenant or agreement contained in this Agreement or in any other Transaction Document. "Buyer Damages" and "Seller Damages" may be referred to collectively herein as "Damages".

**Section 8.3** **Limitations on Indemnification**. Notwithstanding any contrary provision of this Agreement:

(a) With respect to only any indemnification obligation of the Sellers arising solely under Section 8.1(iii), no Seller shall be liable for any indemnification to any Buyer Indemnified Party unless the aggregate amount of corresponding indemnification exceeds $5,000 (the "De Minimis") (for purposes of this Section 8.3(a), a series of Buyer Damages having the same cause or origin will be deemed to constitute one single Buyer Damages for purposes of determining whether or not the De Minimis amount has been exceeded). Furthermore, no Seller shall be liable for any indemnification obligation arising solely under Section 8.1(iii) unless the aggregate amount of claims giving right to indemnification exceeds $100,000 (the "Deductible Amount"). If the aggregate amount of Buyer Damages exceeds the Deductible Amount, the full aggregate amount of Buyer Damages shall be payable. Notwithstanding the foregoing, the De Minimis and Deductible Amount shall not apply to any representation and/or warranty Sellers fail to disclose in the Disclosure Schedule.

(b) Notwithstanding any contrary provision of this Agreement, the Buyer's aggregate obligation to indemnify Sellers for indemnification pursuant to Section 8.2 shall not exceed $50,000; provided, however, that the foregoing payment limitation shall not apply to Seller Damages arising out of defense obligations, claims based on willful misconduct or fraud.

(c) Sellers and each Buyer Indemnified Party shall take, and cause its Affiliates to take, all reasonable steps to mitigate any Damages upon becoming aware of any event or circumstance for which such Buyer Indemnified Party makes a claim under this Article VIII including reasonably pursuing any and all other available indemnity rights and claims under applicable insurance policies, provided, however, that neither Sellers nor Buyer Indemnified Party shall be obligated to incur any legal or financial obligations for which it is not indemnified hereunder in taking such mitigating action.

(d) Notwithstanding anything to the contrary, the obligation to either party to indemnify the other party's Indemnified Parties hereunder from any Seller or Buyer Damages, as applicable, shall be unlimited and not subject to any deductibles or caps of any kind to the extent such Damages arise from or relate to or are in connection with any one or more of the following acts or omissions under or with respect to this Agreement or any Transaction Document: (i) fraud, intentional misrepresentation or willful misconduct by the breaching party, (ii) any items disclosed in the Disclosure Schedule and/or disclosed to Buyer on or before the Closing Date, including without limitation, during the due diligence process and (iii) any Fundamental Representations (collectively "Non-Capped Claims").

(e) Except as expressly set forth in this Agreement (such as the indemnification obligations of Sellers set forth in this Article VIII, which have been expressly made) or any Transaction Document, no Seller shall have any liability or obligation with respect to any Company liabilities or obligations under this Agreement, which arise on or after the Closing Date (including, with respect to

business practices of the Company that existed prior to the Closing Date and continued on or after the Closing Date), are first required to be performed after the Closing Date or arise out of any act or omission by the Company taken on or after the Closing Date, provided that, such liability or obligation does not otherwise relate to, or arise from, any willful or fraudulent act or omission of Sellers or the Company prior to the Closing Date.

(f) The amount of any Damages subject to indemnification under this Agreement shall be calculated net of (i) any insurance proceeds actually received by the Indemnified Party on account of such Damage, net of costs and expenses associated with pursuing such insurance recoveries; and (ii) any proceeds actually received from third parties in respect of such Damage, including without limitation, through indemnification, counterclaim, reimbursement arrangement, contract or otherwise in compensation for the subject matter of an indemnification claim, net of costs and expenses associated with pursuing such proceeds ("Alternative Arrangements"). The Indemnified Party shall seek full recovery under all insurance policies or Alternative Arrangements covering any Damage to the same extent as they would if such Damage were not subject to indemnification hereunder.

(g) If any Indemnified Party receives any payment under an applicable insurance policy in respect of such Damages, or from any other Person alleged to be responsible for such Damages, subsequent to receipt of an indemnification payment in respect of such Damages, then such Indemnified Party shall promptly reimburse the Indemnifying Party, as applicable, for any payment made or expense incurred by such Indemnifying Party in connection with providing such indemnification payment up to the lesser of (i) the amount received by the Indemnified Party from such insurance policy or other Person in respect of such Damages, net of any expenses incurred by the Indemnified Party in collecting such amount, and (ii) the excess, if any, of the total amount received in respect of such Damages from such insurance policy or other Person and from the indemnification payment from the Indemnifying Party over the sum of the total amount of such Damages suffered by the Indemnified Party and the expenses incurred by the Indemnified Party in collecting such amounts.

(h) In the event that a tax benefit is actually realized (determined on a with and without basis) with respect to a Damage for which an Indemnified Party has been indemnified hereunder, then an amount equal to such tax benefit shall be promptly paid to the Indemnifying Party.

(i) In connection with breaches of Seller's or Company's representations and warranties in the event that the primary aggrieved party is the Company or if the Damages were directly incurred by the Company, then the Company shall be the Indemnified Party (as defined below) and indemnification payments shall be made to the Company.

(j) Medialink's aggregate obligation to indemnify Buyer for indemnification shall not exceed the net amount of proceeds paid to Medialink by Buyer (for avoidance of doubt, net of Medialink's exercise price); provided, however, that the foregoing payment limitation shall not apply to (i) Buyer Damages arising out of defense obligations, claims based on willful misconduct or fraud by Medialink; or (ii) claims made pursuant to Section 8.1(a)(i). Notwithstanding the foregoing, in the event Medialink's indemnification obligations exceed the net amounts of proceeds paid to Medialink by Buyer, Buyer shall be entitled to offset any excess indemnification obligations against payments to Medialink under Section 2.2.

**Section 8.4** **Notice of Claim**. Any party (the "Indemnified Party") which believes it is entitled to indemnification pursuant to this Article VIII shall notify the party required to indemnify the Indemnified Party pursuant to this Article VIII (the "Indemnifying Party"), in writing, of any claim for indemnification, specifying in reasonable detail the nature of the Damages, and, if known, the amount, or an estimate of the amount, of the liability arising therefrom ("Claim Notice The Indemnified Party shall

provide to the Indemnifying Party as promptly as practicable thereafter such information and documentation as may be reasonably requested by the Indemnifying Party to support and verify the claim asserted, so long as such disclosure would not violate the attorney-client privilege of the Indemnified Party. No delay in or failure to give a Claims Notice by an Indemnified Party shall adversely affect any of the other rights or remedies that the Indemnified Party has under this Agreement or change or relieve any parties to this Agreement of their obligations to indemnify the Indemnified Persons, except and to the extent that such delay or failure has materially prejudiced such parties.

**Section 8.5** Defense. If the Damages are the subject of or arise out of the claim of any third party, or if there is any claim against a third party available by virtue of the circumstances of the Damages (each, a "Third Party Claim"), then the following shall apply:

(a) The Indemnifying Party shall have the right, upon written notice delivered to the Indemnified Party no later than thirty (30) days after the Indemnifying Party's receipt of notice and reasonably requested information from the Indemnified Party in accordance with Section 8.4, to assume the defense of such Third Party Claim at its own expense and in its own name or in the name of the Indemnified Parties, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and disbursements of such counsel; provided that the Indemnifying Party has, during such fifteen (15) day period, (A) confirmed in writing to the Indemnified Party that the Indemnifying Party is required to indemnify and hold harmless and defend the Indemnified Party for all Damages in connection with such Third Party Claim and (B) demonstrated, to the reasonable satisfaction of the Indemnified Party, that the Indemnifying Party has sufficient financial resources to indemnify and hold harmless and defend the Indemnified Party for the full amount of any potential Damages in connection with such Third Party Claim. The Indemnified Party further shall have the right to employ separate counsel in any such Third Party Claim and to participate in the defense thereof, but the fees and expenses of such counsel shall not be included as part of any Damages incurred by the Indemnified Party and shall not be payable by the Indemnifying Party except as provided in the preceding subsection (a) or Section 8.5(b).

(b) Notwithstanding the foregoing subsection (a), in the event that (i) the Indemnifying Party declines or fails to assume the defense of such Third Party Claim within such thirty (30) day period, (ii) the Indemnified Party reasonably determines that the Indemnifying Party does not have sufficient financial resources to indemnify and hold harmless and defend the Indemnified Party for the full amount of any potential Damages in connection with such Third Party Claim, (iii) the Indemnifying Party does not use commercially reasonable efforts to diligently defend the Third Party Claim after written notice thereof from the Indemnified Party and a reasonable opportunity to cure without prejudice to the Indemnified Party, (iv) the Third Party Claim arises out of in connection with the representations and warranties made in Section 4.11 (v) such Third Party Claim seeks an order, injunction, or other equitable relief against the Indemnified Party other than the Company, (vi) such Third Party Claim names both the Indemnified Party and the Indemnifying Party as parties and the Indemnified Party has determined with the advice of counsel that a conflict of interest between such parties may exist, or (vii) the Indemnified Party is otherwise entitled to have control over the defense of such Third Party Claim in accordance with this Agreement, then the Indemnified Party by written notice may undertake and exercise sole control of the defense of such Third Party Claim and, if such Third Party Claim is a matter with respect to which the Indemnified Party is entitled to receive payment from the Indemnifying Party for the Damages in question, the Indemnifying Party will pay the reasonable fees and disbursements of such counsel as incurred; provided, however, that the Indemnifying Party will not be required to pay the fees and disbursements of more than one counsel for all Indemnified Parties in any jurisdiction in any single Third Party Claim.

(c) In no event shall either the Indemnifying Party or Indemnified Party settle or compromise or enter into a confession of judgment or admission of liability or fault in connection with any Third Party Claim without the written consent of the other Party, which consent shall not be unreasonably withheld.

(d) In any Third Party Claim with respect to which indemnification is being sought hereunder, the Indemnified Party or the Indemnifying Party, whichever is not assuming the defense of such action, shall have the right to participate in such matter and to retain its own counsel at such party's own expense (except for the Indemnified Party's right to participate at the Indemnifying Party's cost and expense as set forth in Section 8.5(a)). The Indemnifying Party or the Indemnified Party, as the case may be, shall at all times use reasonable efforts to keep the Indemnifying Party or the Indemnified Party, as the case may be, reasonably apprised of the status of any matter the defense of which they are maintaining and to cooperate in good faith with each other with respect to the defense of any such matter.

**Section 8.6** **Right to Indemnification; Knowledge**. The right to indemnification, payment of Damages or other remedy based on the representations, warranties, covenants, and obligations in this Agreement and the other Transaction Documents and other documents, agreements, and certificates delivered pursuant to or in connection with this Agreement shall not be affected by any investigation conducted with respect to, or any knowledge capable of being acquired at any time, whether before or after the Closing Date, with respect to the accuracy or inaccuracy of or compliance with, any such representation, warranty, covenant or obligation, including without limitation, where (i) Buyer had actual, conscious and documented knowledge of such breach prior to the Closing, without any duty of investigation or inquiry, or (ii) Sellers or the Company disclosed or otherwise communicated such knowledge of such breach to Buyers or to their legal counsel or other representative prior to the Closing, whether such disclosure or communication was made orally or in writing (including, without limitation, such representations made on the Disclosure Schedule).

**Section 8.7** **Set-off**. Except for the Non-Capped Claims, the indemnification provisions set forth herein shall constitute the sole remedy for any breach of this Agreement or for any Damages arising out of or relating this Agreement or the other Transaction Documents and the transactions contemplated hereby or thereby; provided, however, that nothing herein shall preclude either party from bringing an action for specific performance of the terms hereof. Buyer shall, upon five (5) days prior written notice, immediately be entitled to set-off any amount or right it is entitled to hereunder, but only after (i) such claim for indemnification has been made by a Buyer Indemnified Party and Sellers' Representative has not contested in good faith such claim within five (5) days of receipt of a Claim Notice in Section 8.4; (ii) such claim has been settled or otherwise finally adjudicated by a court or other judicial or quasi-judicial body with jurisdiction (such as an arbitration panel) and is not subject to further appeal; in any case against any amount, right or obligation owed to the Sellers under this Agreement, including any amounts owed by Buyer to the Sellers (on a joint and several basis) pursuant to Sections 2.1 or 2.2 herein, or pursuant to any other payment obligation of the Buyer (or any of its Affiliates) to any Seller.

**Section 8.8** **Survival of Representations, Warranties, Covenants and Agreements**. The representations, warranties, covenants and agreements made by the Sellers and Buyers and contained herein, or in any certificate, schedule or exhibit delivered pursuant hereto and required by their terms to be performed or complied with following the Closing, shall not be extinguished by the Closing but will survive the Closing and continue in full force and effect until six months after issuance of the auditors' report for the fiscal year ended December 31, 2018 but under no circumstances later than December 31, 2019.

**Section 8.9** **Tax Treatment of Indemnification Payments**. All indemnification payments made under this Agreement shall be treated by the parties as an adjustment to the Purchase Price for Tax purposes, unless otherwise required by law.

## ARTICLE IX
## MISCELLANEOUS

**Section 9.1** **Entire Agreement**. This Agreement (including the Schedules and Exhibits, which are incorporated herein) constitutes the sole and entire agreement and understanding of the parties with respect to the subject matter hereof and shall supersede any prior or other contemporaneous representations, warranties, agreements or discussions relating to the subject matter hereof; provided, however, that this provision is not intended to and shall not supersede any of the other Transaction Documents or any other written agreements between the parties executed with or after this Agreement, each of which shall subsist and remain in full force and effect in accordance with its respective terms and conditions.

**Section 9.2** **Amendment**. No amendment, modification or alteration of the terms or provisions of this Agreement shall be binding unless the same shall be in writing and duly executed by the Buyer, the Company and the Sellers' Representative.

**Section 9.3** **Bound by Agreement; Successors and Assigns**. The terms, conditions and obligations of this Agreement shall inure to the benefit of and be binding upon the parties hereto and the respective successors and permitted assigns thereof. Neither the Sellers nor the Company may assign or transfer or delegate or pledge or hypothecate (collectively "Transfer") this Agreement or any other Transaction Document or any rights or obligations hereunder or thereunder without the prior written consent of Buyer, which may be withheld in its sole discretion. Any purported Transfer except with such prior written consent of Buyer shall be null and void and a material breach of this Agreement.

**Section 9.4** **Counterparts and Facsimile**. This Agreement may be executed in any number of counterparts, and delivered in facsimile by electronic transmission. Each such counterpart so executed and delivered shall for all purposes be deemed to be an original and all such counterparts, when taken together, shall constitute one and the same instrument.

**Section 9.5** **Headings**. The headings of the Sections and paragraphs of this Agreement are inserted for convenience only and shall not be deemed to constitute part of this Agreement or to affect the construction thereof.

**Section 9.6** **Modification and Waiver**. Any of the terms or conditions of this Agreement may be waived in writing at any time by the party which is entitled to the benefits thereof. No waiver of any of the provisions of this Agreement shall be deemed to or shall constitute a waiver of any other provision hereof (whether or not similar).

**Section 9.7** **Expenses**. Sellers shall be liable for, and shall be responsible for payment of, all costs and expenses incurred by them or the Company or on behalf of the Company in connection with this Agreement and the transactions contemplated hereby, including fees and expenses of their own financial consultants, accountants and counsel, unless otherwise stated herein. Buyer shall be liable for, and shall be responsible for payment of all costs and expenses incurred by Buyer or on behalf of Buyer in connection with this Agreement and the transactions contemplated hereby, including fees and expenses of its own financial consultants, accountants and counsel, unless otherwise stated herein.

**Section 9.8** **Notices**. Any notice, request, instruction or other document to be given hereunder by any party hereto to any other party hereto shall be in writing and sent by email, delivered personally or sent by registered or certified mail (including by overnight courier such as UPS or express mail service), postage or fees prepaid,

| | |
|---|---|
| if to Sellers, to: | Justin Rezvani<br>19556 Shadow Glen Cir.<br>Northridge, California 91326<br>Email: justin@theamplify.com |
| with a copy to: | Michelman & Robinson LLP<br>10880 Wilshire Boulevard, 19th Floor<br>Los Angeles, California 90024<br>Attention: Ronald Camhi<br>Email: rcamhi@mrllp.com |
| if to Buyer or the Company, to: | Annette Stover<br>Email: annette@youandmrjones.com |
| with a copy to: | Dentons US LLP<br>241 Centre St, 6th Floor<br>New York, NY 10013<br>Attention: Michael Chung<br>Email: michael.chung@dentons.com |

or at such other address for a party as shall be specified by like notice. Any notice sent by email shall be deemed to have been duly given to the party to whom it is sent upon written confirmation of receipt, provided that a copy of such email is delivered personally or mailed to the recipient within one Business Day of the date of the email, in the manner herein provided. Any notice which is delivered personally in the manner provided herein shall be deemed to have been duly given to the party to whom it is directed upon actual receipt by such party or the office of such party. Any notice which is addressed and mailed in the manner herein provided shall be conclusively presumed to have been duly given to the party to which it is addressed at the close of business, local time of the recipient, on the fourth Business Day after the day it is so placed in the mail or, if earlier, the time of actual receipt.

**Section 9.9** **Governing Law; Jurisdiction and Venue**. This Agreement and the Transaction Documents, and any and all matters arising from or made in connection with the transactions contemplated hereby shall be governed by and construed in accordance with the laws of the State of California, without giving effect to any conflict of law provision or rule that would cause the application of the laws of any other jurisdiction. Each of the parties hereto irrevocably agrees that any legal action or proceeding with respect to this Agreement or the transactions contemplated hereby, or for recognition and enforcement of any judgment in respect hereof, brought by the other party hereto or its successors or assigns may be brought and determined in state or federal courts sitting in the State of California, and each party hereby irrevocably submits with regard to any such action or proceeding for itself and in respect of its property, generally and unconditionally, to the nonexclusive jurisdiction of the aforesaid courts. Each party hereto hereby irrevocably waives, and agrees not to assert, by way of a motion, as a defense, counterclaim or otherwise, in any action or proceeding with respect to this Agreement, (a) any claim that it is not personally subject to the jurisdiction of the above-named courts for any reason other than the failure to lawfully serve process; (b) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or

otherwise); and (c) to the fullest extent permitted by applicable law, that (i) the suit, action or proceeding in any such court is brought in an inconvenient forum; (ii) the venue of such suit, action or proceeding is improper; and (iii) this Agreement, or the subject matter hereof, may not be enforced in or by such courts.

**Section 9.10** **No Third-Party Beneficiaries**. With the exception of the parties to this Agreement, the Buyer Indemnified Parties and the Tax Indemnitees, there shall exist no right of any Person to claim a beneficial interest in this Agreement or any rights occurring by virtue of this Agreement.

**Section 9.11** **References**. Whenever reference is made in this Agreement to any Article, Section, Schedule or Exhibit, such reference shall be deemed to apply to the specified Article or Section of this Agreement or the specified Schedule or Exhibit to this Agreement.

**Section 9.12** **Severability**. In case any one or more of the provisions contained in this Agreement should be found by a court of competent jurisdiction to be invalid, illegal or unenforceable in any respect against any party hereto, such invalidity, illegality or unenforceability shall only apply to such party in the specific jurisdiction where such judgment shall be made, and the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby, except that this Agreement shall not be reformed in any way that will deny to any party the essential benefits of this Agreement, unless such party waives in writing its rights to such benefits.

**Section 9.13** **Currency**. All payments hereunder or contemplated by this Agreement shall be paid in U.S. currency.

**Section 9.14** **Enforcement**. The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specified terms. It is accordingly agreed that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

## ARTICLE X
## DEFINITIONS

**Section 10.1** **Certain Matters of Construction**

(a) The words "hereof," "hereby," "herein," " hereunder" and words of similar import shall refer to this Agreement.

(b) The words "party" and "parties" shall refer to Buyer, the Sellers and the Company.

(c) Definitions shall be equally applicable to both the singular and plural forms of the terms defined, and references to the masculine, feminine or neuter gender shall include each other gender.

(d) Accounting terms used herein and not otherwise defined herein are used herein as defined by GAAP in effect as of the date hereof, consistently applied.

(e) All references in this Agreement to any Exhibit or Schedule shall, unless the context otherwise requires, be deemed to be a reference to an Exhibit or Schedule, as the case may be, to this Agreement, all of which are made a part of this Agreement.

(f) The word "including" shall mean "including, without limitation."

(g) This Agreement has been prepared by the joint efforts of the respective attorneys for the parties. No provision of this Agreement shall be construed on the basis that any party was the author of this Agreement or any provision hereof.

**Section 10.2 Certain Definitions**

(a) "Affiliate" of any specified Person means any other Person directly or indirectly controlling or controlled by, or under common control with, such specified Person.

(b) "Balance Sheets" means the Year-End Balance Sheet and the Interim Balance Sheet.

(c) "Business Day" means any day except Saturday, Sunday, or any day on which banks are generally not open for business in New York City, New York.

(d) "Code" means the Internal Revenue Code of 1986, as amended.

(e) "Company Intellectual Property" means any Intellectual Property that is owned by or licensed to the Company, including the Company Software.

(f) "Company Licensed Software" means all Software licensed to the Company.

(g) "Company Proprietary Software" means all Software owned by the Company, including, all current and prior versions of any Software owned by the Company used to operate the internal computers and systems of the Company or used in products and services marketed, licensed, sold or distributed to customers of the Company.

(h) "Company Software" means the Company Licensed Software and the Company Proprietary Software.

(i) "Confidential Information" means any non-public data or information concerning and developed by or on behalf of, the Company (including trade secrets), without regard to form, regarding (for example and including, but not limited to) (a) business process models; (b) proprietary software; (c) research, development, products, services, marketing, selling, business plans, budgets, unpublished financial statements, licenses, prices, costs, contracts, suppliers, customers, and customer lists; (d) the identity, skills and compensation of employees, contractors, and consultants; (e) specialized training; and (f) discoveries, developments, trade secrets, processes, formulas, data, lists, and all other works of authorship, mask works, ideas, concepts, know how, designs, and techniques, whether or not any of the foregoing is or are patentable, copyrightable, or registrable under any intellectual property laws or industrial property laws in the United States or elsewhere. Confidential Information also includes any information or data described above which the Company obtains from another party and which the Company treats as proprietary or reasonably designates as confidential information whether or not owned or developed by the Company.

(j) "Employee Benefit Plan" means each (i) employee benefit plan (as defined in Section 3(3) of ERISA), (ii) nonqualified deferred compensation plan (as defined in Section 409A of the Code), or (iii) employment, severance, change-in-control, bonus, incentive, equity compensation, fringe benefit, retirement, and any other compensatory or employee benefit plan, contract or arrangement of any kind (whether or not subject to ERISA, written or oral, qualified or nonqualified, funded or unfunded,

foreign or domestic, currently effective or terminated), and any trust, escrow, insurance contract, or other funding mechanism related thereto now in effect or required in the future as a result of the transaction, under which any present or former employee, independent contractor, officer or director of the Company or any ERISA Affiliate has any present or future right to benefits, which is sponsored or maintained by the Company or any ERISA Affiliate, or with respect to which the Company or any ERISA Affiliate has had or could reasonably be expected to have any liability.

(k) "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

(l) "ERISA Affiliate" means any trade or business (whether or not incorporated) under common control within the meaning of Section 4001(b)(1) of ERISA with the Company or that together with the Company is treated as a single employer under Section 414 of the Code.

(m) "Fundamental Representations" means those respective representations and warranties of the Sellers or Company, as applicable, found in Sections 4.1, 4.2, 4.3, 4.4, 4.5, 4.8, 4.21(b) and (j), and 4.23, 4.25, and 4.26.

(n) "Funds Flow Memorandum" means a fund flow memorandum, executed by Sellers and provided to Buyer prior to the Closing, indicating the exact amount payable to, and full and complete wire instructions for, each Seller to whom any portion of the Purchase Price is to be paid pursuant to Section 2.1.

(o) "Governmental Authority" means any agency or other instrumentality of the United States, or any domestic or foreign state, county, city, municipality or other political or governmental or quasi-governmental subdivision.

(p) "Indebtedness" means, with respect to any Person, the aggregate amount (including the current portions thereof) of all (a) indebtedness for borrowed money, (b) obligations evidenced by notes, bonds, debentures or similar instruments, (c) indebtedness for the deferred purchase price of property or services, (d) all obligations under any hedging, interest rate hedging, derivative or swap contracts, (e) all leases which are required to be recorded as capital leases in accordance with GAAP, (f) all obligations guaranteeing any obligation of any other Person, (g) all obligations under any letter of credit, comfort letter, surety or other bond, (h) all obligations secured by a Lien on any assets or properties, and (i) any liability in respect of interest, fees or other charges in respect of any indebtedness referred to in subsections (a) through (h) above.

(q) "Intellectual Property" means any and all of the following, throughout the universe, and all rights arising out of or associated therewith: (a) all patents and applications therefor and all reissues, divisions, renewals, reexaminations, extensions, provisionals, continuations and continuations in part thereof; (b) all inventions (whether patentable or not), invention disclosures, improvements, proprietary information, trade secrets, processes, methods, systems, know how, technology, technical data and customer lists, and all documentation relating to any of the foregoing; (c) all works of authorship, copyrights, copyright registrations and applications therefor, and all derivative works thereof; (d) all rights in and good-will associated with internet uniform resource locators, domain names, trade names, logos, slogans, designs, common law trademarks and service marks, trademark and service mark registrations and applications therefor; (e) all Software; (f) all rights in databases and data collections; (g) all other proprietary rights derived under applicable state, federal or foreign laws; and (h) all moral and economic rights of authors and inventors, however denominated.

(r) "Intellectual Property Licenses" shall mean licenses, commitment of non-assertion or freedom from suit, or submission to a standard setting body or pool (i) with respect to Company Intellectual Property licensed to any third party (other than end user licenses in the Ordinary Course of Business) or (ii) pursuant to which a third party has licensed any Company Intellectual Property to the Company (other than licenses of commercially available shrink wrap software or off the shelf software (by way of example only, Adobe Acrobat or Microsoft Word) having a per user license fee of less than $2,000 or a total acquisition cost of less than $10,000).

(s) "Interim Balance Sheet" means the unaudited balance sheets of the Company as of the Interim Balance Sheet Date.

(t) "Interim Balance Sheet Date" means [October 31, 2015].

(u) "Knowledge of the Company" means the actual knowledge after reasonable investigation of Justin Rezvani of the Company.

(v) "Liens" means any and all mortgages, liens, pledges, security interests, charges, claims, restrictions, encumbrances, options, deeds of trust, encroachments, orders, decrees, judgments, conditions, restrictions (including easements, rights of way, covenants, leases, licenses, zoning and setback requirements), or other restrictions on title or transfer.

(w) "Material Adverse Effect" means any state of facts, change, event, effect or occurrence (when taken together with all other states of fact, changes, events, effects or occurrences) that (a) is, or would be reasonably expected to be, in the aggregate, materially adverse to the financial condition, properties, business, assets, operations, liabilities, prospects or results of operations of the Company; excluding any states of fact, changes, events, effects or occurrences arising out of or attributable to (i) a downturn in general economic, business or regulatory conditions, (ii) the industries and markets in which the Company operates, (iii) the United States or global economy or securities or financial markets, (iv) earthquakes, hostilities, acts of war or terrorism, or (v) the failure of the Company to meet any of its projections (provided that this clause (v) shall not prevent or otherwise affect a determination that any state of facts, change, event, effect or occurrence underlying such failure has resulted in, or contributed to, a Material Adverse Effect), provided, that, in the case of clauses (i), (ii) and (iii), any such state of facts, change, event, effect or occurrence that has a disproportionate impact on the Company relative to other Persons operating in the industries in which the Company operates shall not be excluded from the determination of whether there has been a Material Adverse Effect; or (b) would prevent or materially delay the performance by Sellers of their respective obligations under this Agreement or the consummation by Sellers of the transactions.

(x) "Ordinary Course of Business" means, with respect to actions and operations conducted by an entity, actions and operations that are (a) consistent with the past practices of such entity, (b) taken in the ordinary course of the normal, day-to-day operations of such entity, and (c) not required to be authorized by the board of directors or other governing body of such entity.

(y) "Other Representations" means those respective representations and warranties of the Sellers or Company, as applicable, found in Sections 4.6, 4.7, 4.9, 4.10, 4.11 through 4.21 (excluding 4.21(b) and (j)), 4.22, 4.24, 4.26, 4.27, and 4.28.

(z) "Person" means any individual, partnership, corporation, limited liability company, association, trust, joint venture, unincorporated organization or other entity.

(aa) "Registered Intellectual Property" means, throughout the world, any and all: (a) patents and patent applications (including provisional applications); (b) registered trademarks and service marks, applications to register trademarks and service marks, and intent to use applications to register trademarks and service marks; (c) registered copyrights and applications for copyright registration; (d) domain name registrations; and (e) any other Intellectual Property that is the subject of an application, registration or corresponding right issued by, filed with, or recorded with any governmental body.

(bb) "Software" means any computer software program, together with any error corrections, updates, modifications, or enhancements thereto, in both machine readable form and human readable form, including all comments and any procedural code.

(cc) "Tax" (and, with correlative meaning, "Taxes" and "Taxable") with respect to any Person, all (i) United States federal, state or local or non-United States taxes, duties, levies or other similar governmental charges, including all income taxes (including any tax on or based upon net income, gross income, or income as specially defined, or earnings, profits, or selected items of income, earnings or profits), profits, capital gains, gross receipts, capital stock, occupation, property, excise, severance, value added, alternative minimum, environmental, customs, social security (or similar), sales, use, ad valorem, transfer, franchise, license, withholding, payroll, employment or windfall profits taxes, alternative or add-in minimum taxes, social security (or similar), unemployment, disability, escheat and other taxes, duties, fees, levies or other similar governmental charges of any kind whatsoever, whether disputed or not, together with all estimated taxes, deficiency assessments, additions to tax, penalties and interest and (ii) any liability for the payment of any amount of a type described in clause (i) arising as a result of being or having been a member of any consolidated, combined, unitary or other group or being or having been included or required to be included in any Tax Return related thereto or as a result of any tax sharing, tax indemnity or tax allocation agreement or any other express or implied agreement to assume Taxes of any other Person or indemnify any Person.

(dd) "Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(ee) "Taxing Authority" means the IRS and any other Governmental Entity exercising any authority to impose, assess or collect any Tax or any other authority exercising Tax regulatory authority.

(ff) "Transaction Documents" means the Shareholder Agreement, Funds Flow Memorandum, and those documents to be delivered pursuant to Sections 7.3, 7.14, 7.15 7.18 hereunder.

(gg) "Transaction Fees" means any and all fees and expenses incurred by the Sellers in connection with this Agreement, including, without limitation, all such due diligence, fees and expenses, paid by the Company to its legal advisors.

(hh) "Year-End Balance Sheet" means the unaudited balance sheet included in the Company's most recent Year-End Financial Statements.

*(Signatures begin on next page)*

**IN WITNESS WHEREOF**, each of the parties has caused this Agreement to be duly executed on its behalf as of the date first above written.

**"BUYER":**

**YOU & MR. JONES INC.**

By:______________________________
Name: David Jones
Title: Founder & CEO

**"COMPANY":**

**REACH LABS, INC.**

By:______________________________
Name:
Title:

**"SELLERS":**

______________________________
Justin Rezvani

______________________________
Mike Rezvani

______________________________
RL Stock Holding Trust, dated January 1, 2014

______________________________
Media Link, LLC

# EXHIBIT A

| Shareholder | Number of Shares to be Sold | Purchase Price Paid for Shares | Earn-Out Allocation Percentage |
|---|---|---|---|
| | | | |
| Justin Rezvani | 3,939,583 | $5,577,017.98 | 77.405% |
| Media Link, LLC | 500,000 | $707,818.27* | 9.824% |
| Mike Rezvani | 500,000 | $707,818.27 | 9.824% |
| RL Stock Holding Trust | 150,000 | $212,345.48 | 2.947% |
| | | | |
| ***Total*** | **5,089,583** | **$7,205,000.00** | **100.00%** |

*Media Link, LLC to exercise warrants for a total of $284,500. Net proceeds payable to Media Link, LLC shall be $423,318.27.

**EXHIBIT A-1**

**FUNDS FLOW MEMORANDUM**

# EXHIBIT "C"

**SHAREHOLDER AGREEMENT**

among

**REACH LABS, INC.**

and

**THE STOCKHOLDERS NAMED HEREIN**

dated as of

April 25, 2016

# REACH LABS, INC.
# SHAREHOLDER AGREEMENT

**THIS SHAREHOLDER AGREEMENT** (this "**Agreement**"), dated the 25th day of April, 2016 (the "**Effective Date**"), is made by and among REACH LABS, INC., a California corporation (the "**Company**"), You & Mr. Jones, Inc., a Delaware corporation ("**Yojo**") and Justin Rezvani, an individual residing in the State of California ("**Rezvani**") and each individual who may become a party to this Agreement by execution of a joinder agreement hereto, substantially in the form set forth in Exhibit "B" hereto(each a "**Company Stockholder**"). Yojo , Rezvani, and each Company Stockholder are also hereinafter sometimes referred to individually as a "**Stockholder**" and collectively as the "**Stockholders.**"

**WHEREAS**, the Stockholders hold shares of the Company's common stock, par value $0.0001 per share, of the Company ("**Shares**") as set forth in Exhibit A; and

**WHEREAS**, the Stockholders executing this Agreement desire to enter into this Agreement in order to provide for, among other things, certain provisions regarding the governance of the Company.

**NOW, THEREFORE**, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto, hereby agree as follows.

## ARTICLE I

## BOARD OF DIRECTORS

**Section 1.1**. **Election of Directors**. At each annual meeting of the Stockholders of the Company, or at each special meeting of the Stockholders of the Company called for the purpose of the election of directors, and at any other time at which Stockholders of the Company will have the right to, or will vote for, or consent in writing to the election of directors (including the filling of any vacancies), then and in each such event, the Stockholders hereby agree to vote all shares of capital stock of the Company now owned or hereafter acquired by each of them (and any other shares over which they exercise voting control) so as to cause the Company's Board of Directors ("**Board**") to consist of three (3) directors, which directors shall be designated as follows: (i) two (2) director designated by Yojo (each, a "**Yojo Director**"), and (ii) so long as Rezvani owns at least 850,000 Shares, one (1) director shall be designated by Rezvani (the "**Sellers Director**"). Rezvani shall be entitled to elect himself or another individual to serve as the Sellers Director. In the event Rezvani's ownership of the Shares falls below 850,000 Shares, then the Sellers Director shall automatically resign and Yojo shall appoint all three directors. The initial members of the Board shall be David Jones, Jean Marc Antoni and Justin Rezvani.

**Section 1.2**. **Meetings**. A regular meeting of the Board shall be held each year, without other notice, at the place of, and immediately following, the annual meeting of stockholders; and other regular meetings of the Board may be held at such places if any, and at such times as the Board may provide, by resolution, without other notice than such resolution. A special meeting of the Board may be called by a director or Chief Executive Office of the Company. Notice of special meetings of the Board shall be given to each director at least one hundred and twenty (120) hours prior to the time of such meeting and shall be given in writing and by electronic transmission. Each such notice shall state the time and place (within or without the state of California), if any, of the meeting but need not state the purposes thereof, except that notice shall be given of any proposed amendment to the bylaws if it is to be adopted at any special meeting or with respect to any other matter where notice is required by statute or by the Company's bylaws. Each director, for all meetings of the Board, shall be afforded the opportunity

to participate in a meeting of the Board by means of telephone conference, video conference, or other similar means which allow all persons participating in the meeting to hear and speak to each other. Persons participating in a meeting in this manner shall be deemed to be present at the meeting.

**Section 1.3**. **Quorum**. Provided that Rezvani owns at least 850,000 Shares of the Company, a majority of the Board directors shall constitute a quorum, provided that such majority is comprised of one (1) Yojo Director and the Sellers Director. Once a quorum is reached at any meeting of the Board, then unless set forth herein, the act of a majority of the directors present at any meeting at which there is a quorum shall be the act of the Board. If a quorum shall not be reached at any meeting of the Board, the directors present thereat may adjourn the meeting from time to time by once again providing at least a one hundred and twenty (120) hours notice of such meeting and the meeting shall be so adjourned until a quorum shall be present. If a quorum is not reached, then the next duly called meeting may not be called for at least seven business days from the last duly called meeting. In the event the Board fails to reach a quorum at two consecutive duly called Board meeting, the presence of a director appointed by Yojo at the third duly called meeting shall constitute a quorum.

**Section 1.4**. **Actions Requiring Seller Director Consent**. Notwithstanding Section 1.3 hereof, so long as Rezvani owns 850,000 Shares of the Company, then the following matters shall require the affirmative vote of the Sellers Director.

i. the opening of a new office, relocation of an existing office or the commitment of significant resources to a new line of business activity;

ii. any transaction affecting the capital or existence of the Company, such as the admittance of a new shareholder, a request for additional capital, a public offering, or the transfer of equity securities to a third party (other than transfers to an affiliated entity of Yojo);

iii. the adoption of any profit sharing plan, employee benefit plan, pension plan, commission plan, or bonus plan or arrangements;

iv. the hiring of any employee with an annual salary of $80,000 or more;

v. the grant of any new rights or options with respect to the Shares, except as expressly provided for in this Agreement;

vi. a change in the dividend policy from the policy of a 100% annual distribution;

vii. any merger, consolidation, business combination, dissolution, liquidation or winding up (except as otherwise specified in Article 11) of the Company, or any sale, lease, exchange or other disposition of all or substantially all of the assets or business of the Company;

viii. any amendment to or waiver of, the Articles of Incorporation, the bylaws of the Company or this Agreement or the approval of any winding up or dissolution of the Company;

ix. any increase or decrease in the number of directors constituting the Board or the creation and/or delegation of any Board matters to a committee;

x. the commencement or termination of any lawsuit, except in the ordinary course of business and except if the lawsuit is against Justin Rezvani or implying Justin Rezvani in any manner;

xi. any declaration of dividends or similar payments or other distributions other than a one-hundred percent annual distribution;

xii. the approval of material changes to the annual budget and business plan of the Company that imply a variation of the business lines and or of the business model of the Company;

xiii. the filing of a voluntary petition in bankruptcy or for reorganization or for the adoption of any plan or arrangement with creditors or an admission seeking the relief therein provided under any existing or future law of any jurisdiction relating to bankruptcy, insolvency, reorganization or relief of debtors by the Company or any of its subsidiaries;

xiv. any borrowing or lending of money or guarantee of indebtedness, except, the incurrence of up to an aggregate of $10,000 of trade payables in the ordinary course of business;

xv. approval of any transaction or the execution, modification or waiver of any contract, lease or other commitment, or the execution or amendment of any contracts, leases or other commitments in any one or a series of related transactions requiring or potentially requiring the expenditure, credit, abatement or forfeiture, potentially requiring or requiring the expenditure of more than $5,000 by and between Company, a Stockholder or any Seller (as such term is defined in the Stock Purchase Agreement of even date herewith) or by and between the Company and any of Stockholder's or Seller's directors, officers, partners, agents, advisors, family members, affiliates, employees or an entities in which such Stockholder or Seller owns, or has a beneficial ownership interest in five (5%) percent or more of the voting power of such entity;

xvi. any decision to vary the business of the Company in a material manner;

xvii. authorization or approval of the Company's annual business plan, if this business plan materially and significantly varies the business lines and business model of the Company;

xviii. any material transaction or agreement outside the ordinary course of business, including without limitation, the sale, assignment, license, pledge or encumbrance of material assets including intellectual property, except such licenses granted in the ordinary course of business;

xix. the termination of Rafi Mamalian's employment other than for "Cause" (as defined in that certain Employment Agreement between the Company and Rafi Mamalian dated as of May 16, 2015;

xx. any change in the tax status of the Company; and

xxi. the entering into of any agreement to effectuate any of the matters set forth in clauses (i) through (xviii) above.

**Section 1.5**. **Action Without Meeting**. Any action required or permitted to be taken at any meeting of the Board, may be taken without a meeting, if all the members of the Board or of such committee consent thereto in writing or by electronic transmission, and the writing or writings or electronic transmission or transmissions are filed with the minutes of proceedings of the Board. Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

**Section 1.6**. **Powers**. The business and affairs of the Company shall be managed by or under the direction of the Board, which may exercise all such powers of the Company and do all such lawful acts and things as are not by statute or by the Articles of Incorporation directed or required to be exercised or done by the Stockholders. Each director elected shall hold office until his or her successor has been elected and qualified or, if earlier, his or her death, resignation, retirement, disqualification or removal. Directors need not be residents of the state of California, citizens of the United States. of America or Stockholders of the Company.

## ARTICLE II

## CAPITAL CONTRIBUTION REQUIREMENTS

**Section 2.1**. Yojo and Rezvani acknowledge and agree that, from time to time, Company may require addition capital to fund ongoing Company operations (each, a "**Cash Deficit**"). If the Company's sixty day cash flow forecast reflects a Cash Deficit then Rezvani shall immediately inform Yojo and the Board. The Board shall thereafter determine the amount of the Cash Deficit ("**Cash Deficit Amount**"). Rezvani and Yojo both agree to loan to Company an amount in proportion to the Cash Deficit Amount as follows:

i. Yojo shall loan Company fifty-one (51%) percent of the Cash Deficit amount; and
ii. Rezvani shall loan to Company forty-nine (49%) percent of the Cash Deficit amount.

**Section 2.2**. Rezvani and Yojo agree to loan their proportional Cash Deficit Amount within twenty (20) days after the Board fixes the Cash Deficit Amount (each, a "**Cash Deficit Loan**"). The Company, Rezvani and Yojo shall work in good faith to determine the terms of the Cash Deficit Loans, but under no circumstances shall the terms be any less favorable to Company than market terms for similar loans. If Rezvani fails to loan his proportionate share of the Cash Deficit Loan amount then the Seller Director's power to approve any action in Section 1.4 hereof shall be null and void. For purposes of clarification, if Rezvani fails to loan his proportionate share of the Cash Deficit Loan, then the approval of a majority of the Board directors, which majority may only consist of the Yojo Directors, may take and approve any action outlined in Section 1.4. Furthermore, if Yojo is forced to loan any amount to Company in excess of its proportional Cash Deficit Loan amount due to Rezvani's failure or inability to loan Rezvani's proportional Cash Deficit Loan amount, then any amount loaned by Yojo over its proportional Cash Deficit Loan amount shall be deemed a loan made by Yojo to Rezvani. The amount loaned by Yojo to Rezvani shall be set-off against any of Rezvani's Earn-Out Payment as defined in Section 2.2 of the Stock Purchase Agreement of even date herewith and against any money owed by Yojo to Rezvani in the event of an exercise of any of the options outlined in Article III hereof. The set-off amount shall be against the cumulative Earn-Out Payments and shall not be limited to the Earn-Out Payment corresponding to the year in which the loan is made. By way of example, if Rezvani's

proportionate Cash Deficit Loan amount is $1,000,000 in 2016, and Yojo makes such loan to Company on behalf of Rezvani, then this amount shall be deemed a simultaneous loan by Yojo to Rezvani. The amount loaned on behalf of Rezvani shall be offset by all Earn-Out Payments until such time that the entire $1,000,000 is paid back to Yojo. Therefore, if the 2016 Earn-Out Payment is $300,000, the 2017 Earn-Out Payment is 400,000 and the 2018 Earn-Out Payment is 300,000, then Rezvani shall not receive any Earn-Out Payments, as the entire $1,000,000 loan amount will be paid back to Yojo, which payment shall be set-off against the 2016, 2017 and 2018 Earn-Out Payments. Furthermore, if any Put, Call or Swap option is exercised in accordance with Article III hereof, then any amount due by Yojo to Rezvani as a result of such exercise shall be decreased by the amount loaned by Yojo to Company on behalf of Rezvani. Rezvani shall be personally liable to Yojo for any unpaid or unreimbursed portion of any such loan. All tax obligations on account of the Earn-Out Payments or the exercise of any options as set forth in Article III hereof that are used to offset the loan made by Yojo on behalf of Rezvani and would customarily be the obligations of Rezvani, shall be paid by Rezvani.

## ARTICLE III

## PUT/CALL/SWAP OPTIONS

**Section 3.1**. **Put Option of Seller's Interest**. Except as set forth in Section 3.1(e) hereof, each Stockholder shall have the right to put such Stockholder's Shares to Yojo in accordance with the following put options (each, a "**Put Option**" and collectively, the "**Put Options**"):

a. 29% Put Option: Following the earlier of (i) the fifth (5th) anniversary of the Effective Date, (ii) an initial public offering of Yojo and its related and affiliated entities (the "**IPO**"), or (iii) the sale of Yojo, and its related and affiliated entities (the "**Global Sale**"), each Stockholder shall have the option, but not the obligation, to put up to 59.18% of the Stockholder's fully-vested Shares as set forth on Exhibit A ("**29% Put Option**"), which Shares are then owned and held by such Stockholder, by delivering an election notice ("**Election Notice**") to Yojo of the Stockholder's election to exercise the 29% Put Option.

b. 20% Put Option: Following the second (2nd) anniversary of the closing date of either a Global Sale or IPO, each Stockholder shall have the option, but not the obligation to put up to 40.82% of the Stockholder's fully vested Shares to Yojo as set forth in Exhibit A ("**20% Put Option**"), which Shares are then owned and held by the Stockholder, by delivering an Election Notice to Company of Stockholder's election to exercise the 20% Put Option.

c. Put Option Upon Termination: In the event a Stockholder's employment with the Company is terminated by (i) reason of the Stockholder's death, or Disability, (ii) without Cause by the Company, or (iii) terminated by Stockholder for Good Reason, then all of such Stockholder's fully-vested Shares may be put to Yojo by providing Yojo with an Election Notice. This provision shall not apply in the event a Stockholder terminates such Stockholder's employment without Good Reason or termination by the Company for Cause. For purposes of this Agreement, whether a Stockholder has Good Reason for termination shall be determined by: (y) mutual agreement of Yojo and such Stockholder, or (z) adjudication as Good Reason by a relevant court of law.

d. As a condition to the valid exercise of any Put Option, such respective Stockholder agrees to enter into a non-compete agreement in a form satisfactory to Yojo for a period of thirty-six months following the exercise of the Election Notice.

e. Notwithstanding any term contain in this Section 3.1 or any other term contained in this Agreement, Rezvani shall have no right to put his shares to Yojo or to exercise any Put Option contained herein, until all Company Stockholders whose names are listed in Exhibit A hereto, and their respective heirs, successors or assigns, as the case may be, execute a joinder agreement substantially in the form set forth in Exhibit B hereto, and agree to be bound by all of the terms of this Agreement.

**Section 3.2**. **Maximum Put Option Annual Threshold**. Notwithstanding the foregoing, it is hereby expressly agreed that Yojo shall not be obligated to purchase more than 29% of the aggregate number of Company's issued and outstanding Shares per any calendar year (the "**Put Option Cap**"). Accordingly, in the event the Stockholders exercise their respective Put Option(s) such that the total exercise of such Put Option(s) requires Yojo to purchase more than 29% of the aggregate number of Company's Shares pursuant to the Put Option(s) granted herein, then the right of the exercising Stockholder to put his or her Shares to Yojo shall be reduced such that the total number of Shares which Yojo shall be obligated to purchase during any given calendar year, shall not exceed the Put Option Cap. In the event the Put Option Cap is triggered, then the Shares in excess of the Put Option Cap shall be automatically exercised on the first business day of the following calendar year but at the per Share Fair Market Value as of the date the Election Notice is duly served.

**Section 3.3.** **Call Option**. Yojo shall have the right to call each Stockholder's Shares as set forth in Exhibit A in accordance with the following call options (each, a "**Call Option**" and collectively, the "**Call Options**"):

a. Full Call Option: Yojo shall have the right and option, but not the obligation, to purchase all Shares held by a Stockholder if the employment of such Stockholder terminates by reason of such Stockholder's death, Disability, resignation, retirement, or if such Stockholder is terminated for Cause (the "**Full Call Option**"). The Full Call Option shall be exercised by Yojo by sending the respective Stockholder an Election Notice.

b. 29% Call Option: Yojo shall have the right and option, but not the obligation, to purchase 59.18% of a Stockholder's Shares as set forth in Exhibit A at any time after the fifth (5th) anniversary of the Effective Date and the balance of a Stockholder's Shares at any time after the IPO or Global Sale of Yojo (the "**29% Call Option**"). The 29% Call Option shall be exercised by Yojo by sending the respective Stockholder an Election Notice.

c. 20% Call Option: Following the second (2nd) anniversary of the closing date of either a Global Sale or IPO, Yojo shall have the right and option but not the obligation to purchase up to 40.82% of the Stockholder's fully vested Shares as set forth in Exhibit A ("**20% Put Option**"), which Shares are then owned and held by the Stockholder, by delivering an Election Notice to Stockholder's of Company's election to exercise the 20% Call Option.

d. Such respective Stockholder agrees that YoJo may, at its sole discretion, require, as a condition to the closing of any Call Option set forth herein, such respective Stockholder to enter into a non-compete agreement in a form satisfactory to Yojo for a period of thirty-six months following the exercise of the Election Notice.

**Section 3.3.** **Fair Market Value Determination**. In the event any Put Option or Call Option is exercised, the Fair Market Value of the Shares shall be determined as of the date the Election Notice is duly given. The term "**Fair Market Value**" means: the amount at which all the outstanding Shares of the Company would change hands between a willing buyer and a willing seller, when the buyer is not under

any compulsion or duress to buy the Shares and the seller is not under any compulsion or duress to sell the Shares, with both parties being of sound mind and having all reasonable information required to enter into such a transaction. Fair Market Value shall not include any discount for the minority status of the Shares, and shall include customary discounts for private companies (as compared with publicly traded companies). The parties agree, and instruct the future evaluators accordingly, that a key measure of future value will be the Company's ability to generate free cash flow, and that the payment made as of the date hereof (such payment amount equal to $7,205,000, based upon the agreed purchase price of $7,650,000 minus a cash adjustment of $445,000), shall not be taken as a reference for future valuations. In the event the parties, after negotiation in good faith, cannot agree on a Fair Market Value within thirty (30) days after service of the Election Notice, then both sides shall mutually agree, within ten (10) days after said thirty day period to select one of the following valuation expert ("**Valuation Expert**") from the following list of firms, whose Fair Market Value determination shall be final and binding on both parties. The Valuation Expert shall only be one of the following firms: (i) Pricewaterhouse Coopers, (ii) KPMG, (iii) Grant Thornton, and (iv) WeiserMazars LLP. If the selling Stockholder fails to elect a Valuation Expert within the time designated herein, then the Company shall elect the Valuation Expert and such election and subsequent determination of the Fair Market Value by such Valuation Expert shall be binding upon the Company and such selling Stockholder. The Valuation Expert shall be required to determine the Fair Market Value in accordance with this Section 3.3.

**Section 3.4**. **Closing**: Upon the exercise of a Put Option or a Call Option, the Stockholders involved in the transaction, which shall at all times be Yojo as the buyer and Stockholder as a seller, shall meet and exchange documents and pay any amounts due, and otherwise do all things necessary to conclude the transaction set forth herein (the "**Closing**"). The Closing shall occur at the offices of the counsel for the Company at such time during normal business hours on a business day designated in writing by the Company, or at any other mutually agreed upon locations. The Closing shall occur no later than one hundred twenty (120) days after the Election Notice has been duly given, except if a Valuation Expert is appointed pursuant to Section 3.3, in which case the closing shall occur forty-five (45) days after the Fair Market Value is determined by such Valuation Expert. At the Closing, the selling Stockholder shall deliver to Yojo (i) a duly executed assignment/stock power for all of the selling Stockholder's Shares, (ii) a duly executed non-compete agreement in accordance with the terms of this Agreement and if required by Yojo, and (iii) upon the request of Yojo, concurrently therewith (or at any time and from time to time thereafter) execute and deliver such other documents and records as Yojo determines are necessary or desirable to conclude the Closing and to transfer all of Selling Stockholder's ownership, title and control of all of his Shares of the Company and to otherwise enable Yojo to own the Shares being purchased by Yojo that are owned by the selling Stockholder. Yojo shall, at the Closing, deliver to the selling Stockholder the full amount of the Purchase Price by cashier's check or wire transfer of immediately available funds, or such other manner of payment as is mutually agreeable to the Parties. The selling Stockholder shall transfer its Shares free of all liens or encumbrances.

**Section 3.5**. **Swap Option.** In the event of the IPO or Global Sale, each Shareholder shall have the option to swap up to 59.18% of such Shareholder's Shares as set forth in Exhibit A in Company to Yojo, which swap shall be deemed effective immediately prior to the initial public offering or the sale of all of Yojo Shares (the "**Swap Option**"). The swap price of the Shareholder's Shares shall be based on the fair market value (for clarity not the Fair Market Value defined in this Agreement) as agreed between the parties to the IPO or a Global Sale. If the parties cannot agree on a fair market value within fifteen (15) days of being informed of an IPO or Global Sale then the Swap Option shall be deemed null and void.

## ARTICLE IV

## RESTRICTIONS ON TRANSFER

**Section 4.1** **Prohibited Transfers**. A Stockholder shall not sell, assign, transfer, pledge, hypothecate, mortgage, encumber or dispose of ("**Transfer**") any shares of capital stock of the Company, except in accordance with the terms of this Agreement and each Stockholder's individual equity award agreements; and provided, further, that (i) any such sale, assignment or transfer is permitted pursuant to applicable Federal and state securities laws, (ii) the transferee shall agree as a condition to such Transfer, by execution of a joinder to this Agreement, to be bound by all of the provisions of this Agreement to the same extent as if such transferee were the Stockholder transferring the shares, (iii) no Transfer of any shares may be made to a competitor (or any Affiliate thereof) of the Company, and (iv) except for Permitted Transfers, such Transfer shall be approved by both Yojo Directors. "Permitted Transfers" shall mean, in the case of a Stockholder that is a natural person upon his or her death.

## ARTICLE V

## ADDITIONAL AGREEMENTS

**Section 5.1** **Yojo Operating Policies**. The Stockholders and Board shall cause the Company to comply with the policies and procedures applicable to all Yojo subsidiaries as provided by Yojo, including, without limitation, all rules and deadlines relating to forecasts, financial reporting and conflicts of interests. The Company's fiscal year shall close on December 31 of each year. Furthermore, the Board agrees to provide Yojo the following information rights: (i) Company's annual budget; (ii) four (4) quarterly forecast updates; (iii) monthly profit and loss statements; (iv) monthly balance sheet; (v) monthly capital expenditure reports; and (vi) monthly cash projections, including 3 month forward projections.

**Section 5.2** **Dividend Policy**. The Stockholders and Board agree that all distributable profits of the Company shall be distributed every year, unless otherwise determined by the Board, provided the Company has sufficient working capital for operations following any distribution. Prior to any resolution providing a dividend to the Stockholders, the Board shall meet and issue an opinion with respect to the amounts of sufficient working capital deemed necessary for the Company based upon the Company prepared budget and operating plans and taking into account such financial requirements of the Company identified therein.

**Section 5.3** **Tax Sharing Agreement**. The Stockholders and Board agree that in the event Yojo acquires a certain percentage of the outstanding capital stock of the Company, whereby the Company shall be a consolidated entity in Yojo's parent and/or group companies, Company will enter into a tax sharing agreement as provided by the Yojo.

**Section 5.4** **Key Man Insurance**. Yojo shall obtain, at its expense, from financially sound and reputable insurers term "key-person" insurance on Justin Rezvani, in the amount of no less than five million dollars, and will cause such insurance policy to be maintained until such time as Yojo determines that such insurance should be discontinued. The key-person policy shall name Yojo as loss payee. Justin Rezvani hereby covenants and agrees that, he will execute and deliver to Yojo, as reasonably requested, a written notice and consent form with respect to such policy.

**Section 5.5** **Yojo Service Fee**. Each Shareholder hereby expressly agrees to, at all times, vote their shares to retain the services of Yojo for the performance of certain services as more specifically set forth in that certain Service Agreement dated as of January 1, 2016, as may be extended, amended, or

modified form time to time ("**Service Agreement**"). Each Shareholder further agrees that in consideration for the services to be provided or made available by Yojo to the Company as described in the Service Agreement, the Company shall pay to Yojo in quarterly installments a fee ("**Annual Service Fee**") which reflects the lesser of one percent (1%) of the gross income of the Company or the Company's share of the total costs incurred by the Service Company for the provision of the services, including an appropriate mark-up determined on an arm's length basis in accordance with all applicable tax regulations and transfer pricing requirements. The Annual Service Fee shall be determined in accordance with this provision and the Service Agreement.

**Section 5.6** **Rezvani Indemnification**. By entering into this Agreement, Rezvani expressly agrees to indemnify and hold Company, it's officers, employees, directors, shareholders, subsidiaries and affiliates, harmless from and against any and all costs and expenses (including reasonable attorneys' fees and disbursements), judgments, fines, settlements, claims and other liabilities incurred by or imposed upon Company in connection with, or resulting from, investigating, preparing or defending any claim, action, suit or proceeding, whether civil, criminal, administrative, investigative, legislative or otherwise (or any appeal therein), to which any Stockholder listed hereto at Exhibit A (each, a "**Minority Stockholder**"), or any of the Minority Stockholder's successors, representatives, heirs, or assigns, in each case by reason of, or in connection with, a Minority Stockholder's claim against the Company for any claim made by a Minority Stockholder associated with such Minority Stockholder's minority ownership interest in the Company, including, but not limited to, minority rights, appraisal rights, and other similar claims a Minority Shareholder may have against the Company, or any of the Company's it's officers, employees, directors, shareholders, subsidiaries and affiliates.

## ARTICLE VI

## GENERAL PROVISIONS

**Section 6.1**. **Term**. Except as otherwise provided herein, this Agreement and the rights and obligations of the parties under this Agreement shall terminate upon (i) the consent of Yojo and a vote of Stockholders (other than Yojo) holding a majority of the Shares held by the Stockholders at the time of termination or (ii) immediately prior to the closing of a Global Sale or IPO.

**Section 6.2**. **Certain Defined Terms**: As used in this Agreement, the following defined terms shall have the meaning ascribed to them below:

a. "**Cause**" shall be defined as:

i) the employee's failure to attend to his duties as assigned by the Board or officers of the Company to whom he reports that is not cured within fourteen (14) days of written notice to the employee from the Company; *provided* that only one cure period shall be available hereunder;

ii) the employee's refusal or repeated failure to perform his duties to the Company;

iii) any willful or intentional misconduct by the employee related to the Company or his duties, including without limitation, any act that could be reasonably be expected to have the effect of materially injuring the reputation, business or business relationships of the Company or any of the Yojo affiliated or related entities;

iv) the employee's conviction of, or plea of *nolo contendere* to, a felony or crime involving moral turpitude or dishonesty;

v) the employee's engaging or in any manner participating in any activity which violates any provisions of Section 2 of such employee's Employment Agreement or the Confidential Information and Invention Assignment Agreement or the material policies of the Company;

vi) the employee's commission or attempted commission of any fraud, embezzlement, misappropriation of funds or dishonesty against the Company or its affiliates (including any Yojo affiliated or related entity), employees, agents or customers or use or intentional appropriation for his personal use or benefit of any material funds or properties of the Company not authorized by the Board to be so used or appropriated;

vii) use of illegal drugs or use of alcohol interfering with the performance of employee's obligations under this Agreement, or with the negative image of the Executive towards clients, prospective clients and/or employees;

viii) breach of any fiduciary duty to the Company or any of the Yojo affiliated and/or related entities, which the employee has fiduciary duties, whether or not, involving personal profit to the employee;

ix) any significant violation of any substantive policy of the Company or Yojo affiliated and/or related entities, or other contractual, statutory or common law duties to the Company and/or Yojo affiliated and/or related entities, if such violation is not cured (if curable) within fourteen (14) calendar days after written notice to the employee by the Company;x) any material breach by employee not set forth in any of the foregoing items (i) through (ix) of this Agreement, if such breach is not cured (if curable) within seven (7) calendar days after written notice to the employee by the Company; or

xi) any other ground which the Company may be entitled to terminate this Agreement without notice under California law.

b. "**Disability**" shall mean the inability of the employee to perform the employee's duties under the employee's employment agreement, whether with or without reasonable accommodation, because the employee has become permanently disabled within the meaning of any policy of disability income insurance covering employees of the Company then in force. In the event the Company has no policy of disability income insurance covering employees of the Company in force when the employee becomes disabled, the term Disability shall mean the inability of employee to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or can be expected to last for a continuous period of not less than six (6) months. Determination of Disability shall be a final and binding determination made by the Board, based upon medical advice or an opinion provided by a licensed physician acceptable to the Board in a manner consistent with its definition as provided in Treasury Regulations Section 1.409A-3(i)(4)(i). The date such determination is made shall be the date of such Disability for purposes of this Agreement.

c. "**Good Reason**" shall be defined as:

i) a material reduction, as determined by the Company, in the employee's duties, authority, or responsibilities relative to the duties, authority, or responsibilities in effect as of the Effective Date;

ii) a relocation of the Company's headquarters outside of a one hundred mile (100) radius from its current location; or

iii) a material reduction as determined by the Company of the employees base salary as initially set forth herein or as the same may be increased from time to time, provided that if such reduction occurs in connection with a Company-wide decrease in salaries and the percent decrease in the employee's base salary does not exceed the percent decrease in base salary of any other employees of the Company such reduction will not constitute Good Reason to terminate employee's employment for purposes of this Agreement.

*Provided however* that, such termination by the employee shall only be deemed for Good Reason pursuant to the foregoing definition if (i) the Company is given written notice from the employee, within sixty (60) days following the first occurrence of the condition that he considers to constitute Good Reason, describing the condition, and the Company fails to remedy such condition within thirty (30) days following such written notice, and (ii) the employee terminates employment within thirty (30) days following the end of the period within which the Company was entitled to remedy the condition constituting Good Reason but failed to do so.

d. **"Affiliate"** An affiliate of a Stockholder is a person or entity directly or indirectly (through one or more intermediaries) controlling, controlled by or under common control with the Stockholder, or, as applied to an individual, any member of such individual's family or any trust for the benefit of such family member or individual.

**Section 6.3. Specific Performance**. Because shares of capital stock of the Company cannot be readily purchased or sold in the open market, the parties hereby acknowledge and agree that they may be irreparably damaged in the event that this Agreement is not specifically enforced. Upon a breach or threatened breach of the terms, covenants and/or conditions of this Agreement by any party, the other parties shall, in addition to all other remedies, be entitled to a temporary or permanent injunction, without showing any actual damage and without the necessity of posting a bond or similar undertaking, and/or a decree for specific performance, in accordance with the provisions hereof.

**Section 6.4. Equitable Relief**. If a Stockholder would refuse to transfer the Shares in accordance with the terms of this Agreement, or whereby a Stockholder would attempt to transfer the Shares in violation of the terms of this Agreement or whereby the Company, Yojo or any Shareholder fail to purchase Shares as provided herein, then the Company, Yojo and the Shareholder hereby agree that, in addition to any other remedies which the parties hereto may have, each party shall be entitled to specific performance of all affirmative duties with respect to the transfer of the Shares hereunder, and to an injunction, restraining order or other form of equitable relief prohibiting a violation of any of the restrictive covenants with respect to the transfer of the Shares, without the necessity of posting a bond or similar undertaking, and, to the extent permitted by law, to recover reasonable attorneys' fees and expenses incurred in enforcing their rights under this Agreement.

**Section 6.5. Legend**. All certificates evidencing shares of capital stock of the Company now owned or hereafter acquired by any Stockholder shall bear a legend substantially as follows during the term of this Agreement:

> "THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO RESTRICTIONS ON TRANSFER AND MAY NOT BE SOLD, EXCHANGED, TRANSFERRED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED OF EXCEPT IN ACCORDANCE WITH AND SUBJECT TO ALL THE TERMS AND CONDITIONS OF A CERTAIN STOCKHOLDERS' AGREEMENT, A COPY OF WHICH THE COMPANY WILL FURNISH TO THE HOLDER OF THIS CERTIFICATE UPON REQUEST AND WITHOUT CHARGE."

**Section 6.6.** **Governing Law; Successors and Assigns**. This Agreement shall be construed in accordance with, and governed by, the laws of the State of California, without giving effect to principles of conflicts of laws, and shall be binding upon the heirs, personal successors, executors, administrators, successors and permitted assigns of the parties.

**Section 6.7**. **Notices**. All notices, requests, consents and other communications hereunder shall be in writing and shall be delivered in person, mailed by certified or registered mail, return receipt requested, or overnight courier, addressed as follows: (i) if to the Company, at its principal place of business, or (ii) if to any Stockholder, at such address as may have been furnished to the Company in writing by such Stockholder. All notices and other communications required or permitted to be given to a party pursuant to this Agreement shall be in writing, and shall be deemed duly given (i) on the date delivered if personally delivered, (ii) on the second business day if sent by certified mail return receipt requested, or (iii) on the business day after being sent by Federal Express or another nationally recognized overnight courier service which utilizes a written form of receipt for next day or next business day delivery in each case addressed to the applicable Party at the address set forth on the first page of this Agreement; provided that a Party hereto may change its address for receiving notice by the proper giving of notice hereunder

**Section 6.8**. **Entire Agreement and Amendments**. This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof and supersedes any and all prior agreements with respect to such subject matter. This Agreement may not be modified, amended or terminated except with the written consent of the Board in accordance with the provisions of this Agreement. Adding parties to this Agreement as "Stockholders" as required by the terms hereof shall not constitute an amendment or modification hereof.

**Section 6.9**. **Waivers**. No waiver of any breach or default hereunder shall be considered valid unless in writing, and no such waiver shall be deemed a waiver of any subsequent breach or default of the same or similar nature.

**Section 6.10**. **Severability**. If any provision of this Agreement shall be held to be illegal, invalid or unenforceable, such illegality, invalidity or unenforceability shall attach only to such provision and shall not in any manner affect or render illegal, invalid or unenforceable any other severable provision of this Agreement, and this Agreement shall be carried out as if any such illegal, invalid or unenforceable provision were not contained herein.

**Section 6.11**. **Counterparts**. This Agreement may be executed in counterparts, each of which when so executed shall be deemed an original, but all of which when taken together shall constitute one and the same instrument.

**Section 6.12**. **Aggregation**. All shares of capital stock of the Company held or acquired by a Stockholder and its Affiliates and the partners, members and shareholders of the Stockholder or its Affiliates shall be aggregated together for the purpose of determining the availability of any rights under this Agreement.

**Section 6.13**. **Costs of Enforcement**. If any party to this Agreement seeks to enforce its rights under this Agreement by legal proceedings, the non-prevailing party shall pay all costs and expenses incurred by the prevailing party, including, without limitation, all reasonable attorneys' fees.

*[Signature Pages Follow]*

**IN WITNESS WHEREOF,** the undersigned parties have executed this Agreement as of the date first above written.

**REACH LABS, INC.**

By:________________________

Name: Justin Rezvani
Title: CEO & Founder

**STOCKHOLDERS:**

________________________

You & Mr. Jones Inc.
By: David Jones
Title: Founder & CEO

________________________

Justin Rezvani

**IN WITNESS WHEREOF,** the undersigned parties have executed this Agreement as of the date first above written.

**REACH LABS, INC.**

By:____________________________
Name:
Title:

**STOCKHOLDERS:**

____________________________
You & Mr. Jones Inc.
By: David Jones
Title: Founder & CEO

____________________________
Justin Rezvani

**Exhibit A**
**List of Shareholders**

1. Rafi Mamalian
2. Noelia Callejas
3. Jennifer Smith
4. Jeff Weintraub
5. Harrison Petit
6. Lindsay Fultz
7. Casey Denneh
8. Matt Abdo
9. Nicole Jamal
10. Peter Scobel
11. Richelle Vertucci
12. Seth Weinkranz

**Exhibit B**
**Joinder Agreement**

By execution of this JOINDER AGREEMENT, the undersigned (the "Shareholder") hereby joins in, agrees to become a party to, be bound by, and subject to, all of the covenants, terms and conditions of that certain Shareholder Agreement, dated April 25, 2016 (as the same may be amended, supplemented or otherwise modified from time to time, the "Shareholder Agreement"), by and among, REACH LABS, INC., a California corporation (the "**Company**"), You & Mr. Jones, Inc., a Delaware corporation ("**Yojo**") and Justin Rezvani, an individual residing in the State of California ("**Rezvani**"), and certain of its shareholders in the same manner as if the Shareholder were an original signatory to such Shareholder Agreement.

The Shareholder shall have all the rights, and shall observe all the obligations, applicable to the Shareholder under the Shareholder Agreement.

The Shareholder represents and warrants that he/she/it has received a copy of, and has reviewed the terms of, the Shareholder Agreement and agrees that ______ shares of common stock (the "Acquired Shares") are subject to the Shareholder Agreement.

Assignment. Neither this Joinder Agreement nor any right, interest or obligation hereunder may be assigned by any party hereto, in whole or part (whether by operation of law or otherwise), without the prior written consent of the other parties hereto and any attempt to do so will be null and void.

Amendments. This Joinder Agreement may not be amended except by written agreement signed by all of the parties to this Joinder Agreement.

Counterparts. This Joinder Agreement may be executed in one or more counterparts, each of which shall be deemed to constitute an original and shall become effective when one or more counterparts has been executed by each party hereto and delivered to the other party.

Governing Law. This Joinder Agreement shall be governed by and construed in accordance with the laws of the State of California (without reference to such State's conflicts of laws provisions).

**IN WITNESS WHEREOF,** the Shareholder has executed this JOINDER AGREEMENT as of this __ day of ___________, 201_.

the "Shareholder"

By:________________________
Name: